**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

FILED

July 12 2017

U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| MAIL TRANSPORTATION, INC., et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

Case No. ___17-934 C_____

Judge_____

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**APPLICATION FOR TEMPORARY RESTRAINING ORDER**
**AND MOTION FOR PRELIMINARY INJUNCTION**

Multiple Plaintiffs, as identified in the Complaint in Paragraph 11 ("Plaintiffs"), submit

this memorandum in support of their application for temporary restraining order and motion for

preliminary injunction.

i

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     QUESTION PRESENTED .......................................................................................5

III.    STATEMENT OF THE CASE ................................................................................5

        A.      Contracted HCR and In-House PVS Methods of Mail Transportation. ..............5

        B.      The APWU Grievance and the August 18, 2016 Arbitration Award. .................7

        C.      Actions Taken Following the Arbitration Award. ...............................................9

        D.      The 2016 District Court Proceeding. ................................................................10

        E.      The Postal Service's Decision Regarding Which Routes to Terminate. ...........11

        F.      Plaintiffs' Converted Routes. ..........................................................................12

IV.     STATEMENT OF THE ARGUMENT ...................................................................13

        A.      Jurisdiction and Standing Are Present. .............................................................14

                1.      This Court Has Subject-Matter Jurisdiction Over Plaintiffs'
                        Claims and Plaintiffs Have Standing Under 28 U.S.C. § 1491(b)..........14

                2.      The Court Also Has Subject-Matter Jurisdiction Over Plaintiffs'
                        Claims and Plaintiffs Have Standing Under 28 U.S.C. § 1491(a). .........16

        B.      Plaintiffs Are Entitled to Preliminary Injunctive Relief. ...................................19

                1.      Plaintiffs Are Likely to Succeed on the Merits.....................................20

                        i.      *The Planned Conversion from HCR to In-House PVS Drivers
                                Violates 39 U.S.C. § 5005(c).* ....................................................20

                        ii.     *The Postal Service's Termination of the Contracts in
                                Violation of Law Breaches the Implied Duty of Good
                                Faith and Fair Dealing.*.............................................................23

                2.      Plaintiffs Will Suffer Irreparable Harm Without an Injunction.............24

                3.      The Balance of Harms Tips in Favor of Plaintiffs Because the Postal
                        Service Will Not Be Harmed by the Entry of Injunctive Relief. ...........31

       4.       Injunctive Relief Will Serve the Public Interest. ....................................33

**V.**    **CONCLUSION** ............................................................................................................33

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Alliant Techsystems, Inc. v. United States*,
178 F.3d 1260 (Fed. Cir. 1999)..................................................................18

*American Federal of Government Employees, AFL-CIO v. United States*,
104 F. Supp. 2d 58 (D.D.C. 2000)...............................................................30

*ASI Constructors, Inc. v. United States*,
129 Fed. Cl. 707 (2016)..............................................................................17

*Centex Corp. v. United States*,
395 F.3d 1283 (Fed. Cir. 2005)...................................................................22

*Clarke v. Office of Federal Housing Enterprise Oversight*,
355 F. Supp. 2d 56 (D.D.C. 2004)...............................................................30

*Dellew Corp. v. United States*,
108 Fed. Cl. 357 (2012)..............................................................14, 15, 19, 30

*Distributed Solutions, Inc. v. United States*,
539 F.3d 1340 (Fed. Cir. 2008)...................................................................15

*Elmendorf Support Services Joint Venture v. United States*,
105 Fed. Cl. 203 (2012)..............................................................................15

*Hoffman-Laroche, Inc. v. Califano*,
453 F. Supp. 900 (D.D.C. 1978)..................................................................30

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
52 Fed. Cl. 826 (2002)................................................................................30

*LABAT-Anderson, Inc. v. United States*,
65 Fed. Cl. 570 (2005)................................................................................15

*Lee v. Christian Coalition of America, Inc.*,
160 F. Supp. 2d 14 (D.D.C. 2001)...............................................................31

*Metcalf Construction Co. v. United States*,
742 F.3d 984 (Fed. Cir. 2014)....................................................................22

*Nalco Co. v. Environmental Protection Agency*,
786 F. Supp. 2d 177 (D.D.C. 2011).............................................................30

*National Star Route Mail Carriers Association v. United States Postal Service*,
 Case No. 75-1894 (N.D. Cal. Dec. 4, 1975). ...............................................3, 21

*National Star Route Mail Contractors Association v. United States Postal Service*,
 223 F. Supp. 3d 14 (D.D.C. 2016). ...................................... 10-11, 14, 16, 20

*New York ex rel. Schneiderman v. Actavis PLC*,
 787 F.3d 638 (2d Cir. 2015) .........................................................................31

*Nye v. United States*,
 1858 WL 4649 (Ct. Cl. Dec. 7, 1858) ............................................................5

*Patriot, Inc. v. Department of Housing & Urban Development*,
 963 F. Supp. 1 (D.D.C. 1997). .....................................................................31

*Placeway Construction Corp. v. United States*,
 920 F.2d 903 (Fed. Cir. 1990) ......................................................................18

*Santa Barbara Applied Research, Inc. v. United States*,
 98 Fed. Cl. 536 (2011). ................................................................................15

*Triad Logistics Services Corp. v. United States*,
 2012 WL 5187846 (Cl. Ct. Feb. 29, 2012). .................................................15

*Volmar Construction, Inc. v. United States*,
 32 Fed. Cl. 746 (1995). ................................................................................18

*Winter v. Natural Resources Defense Council, Inc.*,
 555 U.S. 7 (2008) .........................................................................................19

## Statutes & Rules

28 U.S.C. § 1491 ................................................................................... 14-16

39 U.S.C. § 5005 ................................................................................... *passim*

41. U.S.C. § 7103 ................................................................................. 17-18

41 U.S.C. § 7104 ................................................................................... 16-17

## Other

11A Charles Alan Wright & Arthur R. Miller,
 *Federal Practice & Procedure* § 2948.1 (3d ed.) .........................................31

# I.   INTRODUCTION

Ignoring the requirements of 39 U.S.C. § 5005(c) and the warnings of a U.S. District Court judge that it must comply with that statute, the United States Postal Service ("Postal Service" or "USPS") is taking steps to terminate a group of mail transportation contracts and covert them to in-house Postal Vehicle Service.  This action violates 39 U.S.C. § 5005(c), which requires that in determining whether to obtain mail transportation by outside or internal modes, it "shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of the transportation service under each mode."  The Postal Service has a 45+ year history of complying with this requirement, and has even developed a special form (PS Form 5055) to conduct the cost comparison.  It was not used in this case.

Instead, the Postal Service takes this action in misguided adherence to an incorrect interpretation of a decision in a labor arbitration directing USPS to convert 110 Highway Contract Route (HCR) contracts to in-house Postal Vehicle Service (PVS).  A U.S. District Court judge has already stated that the arbitration award does not direct USPS to terminate and convert HCR contracts to PVS in disregard of § 5005(c).  The arbitrator also specifically retained jurisdiction to resolve any matters relating to implementing the remedy.

Rather than complying with the requirements of § 5005(c) in selecting which HCR contracts to convert to PVS, or going back to the arbitrator to resolve issues over the remedy, the Postal Service and its employees' union have, in secret, divvied up between themselves which HCR contracts to terminate and convert to PVS.  The Postal Service has failed to even attempt to comply with § 5005(c) in order to determine which mode best serves the public interest.  None of the Plaintiffs has been contacted by USPS in this regard, and all of the Plaintiffs have contracts that would not be converted to PVS if USPS had followed § 5005(c).

As a result, Plaintiffs—who did nothing wrong and whose contracts better serve the public interest and at a lower cost than PVS—will suffer irreparable harm from the Postal Service's actions.  The Postal Service is now actively recruiting Plaintiffs' drivers to perform this service as PVS drivers, and this recruitment has already caused disruptions to current operations.  If the contracts are terminated as planned, Plaintiffs will suffer irreparable economic loss.  The Postal Service's action may force some Plaintiffs into bankruptcy and others into absorbing large losses and underused equipment and facilities.

Plaintiffs seek to preserve the *status quo ante* by temporarily enjoining the Postal Service from taking any action to terminate their contracts or convert their routes to PVS.  Without temporary injunctive relief, the disruption caused by driver recruitment will continue to harm existing operations.  Temporary relief will also spare the Postal Service (an agency that can ill afford any unnecessary expenses) from further wasting time and money on acquiring equipment and recruiting personnel for bringing the work in-house in violation of § 5005(c).

Temporary relief is also urgently needed to prevent the Postal Service from taking the first official contractual step to end Plaintiffs' contracts.  The Postal Service plans to implement the conversion by September 1, 2017, and to do so, it is expected to soon issue notices under the "Termination with Notice" clause of its HCR contracts with Plaintiffs.  This clause allows USPS to terminate a contract without further cost consequences on 60-days advance written notice (or pay contractors for any short notice).  Once those termination notices are issued, Plaintiffs will face even greater driver recruitment and disruption of their operations.

Plaintiffs have established all four factors considered in granting temporary injunctive relief.  First, Plaintiffs are likely to succeed on the merits.  The planned termination and conversion of HCR contracts to in-house PVS drivers violates 39 U.S.C. § 5005(c) of the Postal

Reorganization Act.[1]  When these contracts were originally awarded, the Postal Service made

the analysis required by the statute and selected HCR service.  The Postal Service has not

performed a new analysis before converting back from HCR to PVS mode.  If it had done so, the

contracts would not have been chosen for termination and conversion to PVS.  Instead, the Postal

Service secretly selected Plaintiffs' contracts in negotiations with an employee union without

first attempting to determine which mode best serves the public interest or giving due

consideration to the cost of each mode of service.

The Postal Service's failure to comply with § 5005(c) is thus both a breach of contract

and a procurement error.  It is a breach of each Plaintiff's contract because the planned

terminations violate the duty of good faith and fair dealing, as that duty contemplates that the

Postal Service will not violate the law in the exercise of its contract rights.  It is also a

procurement error because the planned conversion from HCR to PVS mode is an agency

procurement and USPS has failed to comply with § 5005(c) in that process.

Second, temporary injunctive relief is needed to preserve the status quo and prevent

irreparable harm to Plaintiffs, who are the individuals and small businesses that now perform

these HCR contracts.  Many of these contracts have been operated by the same small, family-

owned HCR contractors for decades and form a substantial portion of their revenues.  If

injunctive relief is not issued, Plaintiffs will lose millions of dollars in revenue and will be forced

to lay off long-time employees.  Plaintiffs will be left with idled and under-utilized resources

---

[1] The Court's authority to require Postal Service compliance with 39 U.S.C. § 5005(c) is addressed in a 1975 case brought by the Star Route Association.  In that case, the U.S. District Court for the Northern District of California ordered the Postal Service to comply with 39 U.S.C. § 5005(c) and identified specific procedures to ensure compliance.  *See National Star Route Mail Carriers Assoc. v. United States Postal Service,* No. 75-1894 (N.D. Cal. Dec. 4, 1975) (copy attached as Ex. 1-A).

they must continue to pay for.  Importantly, the Postal Service has taken the position that Plaintiffs have no remedy at law for the monetary losses they will inevitably suffer.

Third, the balance of harm tips in favor of Plaintiffs.  The Postal Service will actually benefit economically from a temporary injunction because keeping the current HCR contracts in place will cost substantially less than operating the routes with PVS drivers.  An injunction to preserve the status quo will save the Postal Service millions of dollars in transportation costs and stop the Postal Service from wasting further funds on acquiring equipment and personnel to perform this work.  Further, injunctive relief will not harm the interests of any PVS employees. The routes in question are *not* currently being operated by PVS drivers, and no PVS drivers or other postal employees will lose their job or otherwise be impacted if these contracts are allowed to continue.  The arbitrator has also retained jurisdiction over the matter and can fashion an alternate remedy if needed.

Fourth, issuance of injunctive relief will serve the public interest.  The public has a strong interest in ensuring that federal agencies comply with the laws governing their conduct and that they perform their responsibilities in a cost-effective manner.  Here, the law requires the Postal Service to "use the mode of transportation which best serves the ***public interest***."  39 U.S.C. § 5005(c) (emphasis added).  Requiring compliance with a law designed to further the public interest is, plainly, in the public interest.

For these reasons, Plaintiffs seek a temporary restraining order and a preliminary injunction preventing the Postal Service from terminating their HCR contracts and converting their HCR routes to PVS without first performing the analysis required by § 5005(c).

## II.      QUESTION PRESENTED

The question presented is whether the Postal Service may disregard 39 U.S.C. § 5005(c)

in selecting between outside and inside modes of mail transportation.

## III.      STATEMENT OF THE CASE

### A.      Contracted HCR and In-House PVS Methods of Mail Transportation.

The Postal Service, and its predecessor agency the Post Office Department, have a long

history of contracting out mail transportation, with the first such contracts issued by the

Continental Congress in 1785.  (Declaration of John V. "Skip" Maraney, attached hereto as

Exhibit 1, ¶ 5.)  Some of this Court's earliest cases concerned mail transportation contracts.  *See,*

*e.g., Nye v. United States*, 1858 WL 4649 (Ct. Cl. Dec. 7, 1858).  Today, the Postal Service has

over 8,000 Highway Contract Route (HCR) contracts for the surface transportation of mail.  (*Id.*

¶¶ 4, 6.)  HCR contracts are fixed-priced contracts that are awarded on a competitive basis.  (*Id.*

¶ 4.)  HCR contracts are typically awarded for a four-year term, and they can be renewed for

additional terms upon mutual agreement.  (*Id.*)

HCR contracts differ from commercial transportation contracts in several ways.  (*Id.* ¶ 7.)

HCR drivers must go through a comprehensive background-screening process and obtain a

security clearance from the U.S. Postal Service Inspection Service.  (*Id.*)  HCR contracts

incorporate the requirements of the Service Contract Act.  (*Id.*)  Thus, HCR drivers must be paid

no less than the prevailing wages and benefits prescribed by the U.S. Department of Labor in

regularly updated Wage Determinations for their geographic area.  (*Id.*)  HCR contracts also

contain detailed specifications on the type of equipment that must be used.  (*Id.*)

Because of these special requirements, the Postal Service is the only customer for many HCR contractors.  (*Id.* ¶ 2.)  Indeed, this is the case for several Plaintiffs in this case.[2]  Because HCR contracts may be renewed by mutual agreement, many HCR contracts have been held by the same contractor for decades.[3]

The Postal Service also has its own in-house employee drivers who perform surface transportation of mail, referred to as the Postal Vehicle Service, or PVS.  (*Id.* ¶ 8.)  PVS drivers are represented by the American Postal Workers Union ("APWU").  (*Id.*)

When determining whether to use independent HCR contractors or in-house PVS drivers to provide mail transportation service, the Postal Service is required to select the mode that "best serves the public interest, giving due consideration to the cost of transportation service under each mode."  (*Id.* ¶ 9.)  This requirement was included in the Postal Reorganization Act of 1970 and is set forth in 39 U.S.C. § 5005(c).  (*Id.*)

Since at least 1973, the Postal Service has employed a specific form—PS Form 5505—to use in performing the § 5005(c) analysis.  (*Id.* ¶ 13 and Ex. 1-B.)  PS Form 5505 sets out a variety of driver and vehicle costs that the Postal Service examines when performing the required cost analysis.  (*Id.*)  The back of the form contains a detailed list of instructions on how the individual figures on the form should be determined.  (*Id.*)

---

[2] The Postal Service is the only client of Plaintiffs Mail Transportation Inc., Holton Truck Lines, Inc., Yung Lee, Inc., and W.B. Adams Trucking, Inc.  (Ex. 2 ¶ 7; Ex. 7 ¶ 3; Ex. 10 ¶ 2; Ex. 12 ¶ 5.)  Ninety percent of the business of Plaintiffs Foreman Brothers, Inc. and F.S.R. Trucking, Inc. is derived from HCR contracts.  (Ex. 3 ¶ 2; Ex. 8 ¶ 5.)  HCR contracts account for 95 percent of the business of Plaintiff Midwest Transport, Inc.  (Ex. 4 ¶ 6.)

[3] Specifically, Foreman Brothers, Inc. has been an HCR contractor since 1953, and Causley Trucking, Inc. obtained its first HCR contract in 1951.  (Ex. 3 ¶ 3; Ex. 11 ¶ 4.)  M.C. Eipperle, Inc. has held Contract 43491, which USPS intends to convert, since 1965.  (Ex. 5 ¶ 5.)  Taylor Postal Contracting, Inc. and its predecessors have transported mail for USPS since 1931, and the company has held its present HCR contracts for an average of 32 years.  (Ex. 6 ¶¶ 2, 5.)

**B.      The APWU Grievance and the August 18, 2016 Arbitration Award.**

On April 19, 2011, the American Postal Workers Union filed a grievance against the

Postal Service.  *In the Matter of the Arbitration between United States Postal Service and*

*American Postal Workers Union, AFL-CIO*, Case No. Q06C-4Q-C 11182451 (National

Arbitration Panel Aug. 18, 2016) (hereinafter, the "Arbitration Award," attached hereto as Ex.

1-C.)  The APWU contended that the Postal Service was not complying with its obligations

under the Collective Bargaining Agreement between APWU and the Postal Service (the

"National Agreement") to provide notice and enter discussions with the union before it awarded

HCR contracts for certain mail transportation routes.[4]  (Ex. 1-C at 1.)  The grievance eventually

led to an arbitration proceeding, in which the APWU sought various forms of relief, including

hundreds of millions of dollars in damages, a cease-and-desist order, and an order requiring the

Postal Service to terminate 110 *specific* HCR contract routes in favor of PVS drivers.  (*Id.*)

After more than five years of proceedings, the arbitrator resolved the APWU grievance in

an award dated August 18, 2016.  (*See* Ex. 1-C.)  The arbitrator found that the Postal Service had

engaged in wholesale and repeated violations of the notice and discussion provisions in the

National Agreement.  (*Id.* at 16.)

In fashioning a remedy for the Postal Service's notice violations, the arbitrator declined

to award any monetary damages.  (*Id.* at 19.)  Instead, the arbitrator issued the requested cease-

and-desist order, and he further ordered the Postal Service to convert up to 110 highway routes

from HCR contractors to PVS drivers.  (*Id.*)  Importantly, the arbitrator did *not* grant the

---

[4] The National Agreement also contains a cost-consideration requirement that is nearly identical to the requirements in § 5005(c).  Article 32.2.A of the National Agreement states: "In selecting the means to provide such transportation the Postal Service will give due consideration to public interest, efficiency, availability of equipment, and qualification of employees." (Ex. 1-C at 4.)

APWU's request to order the Postal Service to convert the 110 *specific* HCR contract routes for which notice was not given.  Instead, the arbitrator ordered that "the parties may substitute other route(s) to be converted to PVS service pursuant to this order based on particular circumstances." (*Id.*)

The flexibility in the arbitration award as to which contracts to convert to PVS is consistent with the arbitrator's finding that the evidence before him showed that HCR contracts were often less costly than PVS.  The union's own expert economist testified that PVS employees could perform only 41 of the 110 routes at issue for the same or lower cost as HCR. (*Id.* at 8.)  The expert economist further testified that performance by in-house PVS drivers instead of HCR drivers would cost the Postal Service an additional $3.5 million *per quarter*.  (*Id.* at 8.)  Similarly, the Postal Service's witnesses testified that "under current working conditions it was more efficient for the Postal Service to use HCRs than PVS."  (*Id.* at 15.)  As a result, the arbitrator recognized that—even if notice had been properly provided to APWU—there was "little likelihood" that any of the contested mail transportation routes would have been awarded to in-house PVS employees as opposed to less expensive HCR contractors.  (*Id.* at 18.)

In allowing the Postal Service the latitude to determine which routes to convert, the arbitrator created a remedy that allowed the Postal Service to comply with § 5005(c) in making that determination.  Nonetheless, if issues arose in performing that analysis and in complying with the Arbitration Award, the arbitrator specifically retained "jurisdiction to resolve any matters relating to implementation of this remedy." (*Id.* at 20.)

## C.    Actions Taken Following the Arbitration Award.

Neither the Postal Service nor the arbitrator notified any of the Plaintiffs about the August 2016 Arbitration Award.  (Ex. 1 ¶ 15; Ex. 2 ¶ 13; Ex. 3 ¶ 14; Ex. 4 ¶ 13; Ex. 5 ¶ 10; Ex. 6

¶ 12; Ex. 7 ¶ 29; Ex. 8 ¶ 16; Ex. 9 ¶ 6; Ex. 10 ¶ 11; Ex. 11 ¶ 16; Ex. 12 ¶ 14.)  Skip Maraney, the Executive Director of the Star Route Association (the "Association"), did not learn of the arbitration decision until sometime in September 2016.  (*Id.* ¶¶ 16.)  Many of the Plaintiffs did not learn about the arbitration or the decision to convert their contracts to in-house employees until sometime in June 2017.  (Ex. 2 ¶ 11; Ex. 3 ¶ 14; Ex. 4 ¶ 13; Ex. 5 ¶ 11; Ex. 7 ¶ 30; Ex. 8 ¶ 13; Ex. 10 ¶ 4; Ex. 11 ¶ 19; Ex. 12 ¶ 11).  Plaintiffs Midwest Transit, Inc. and F.S.R. Trucking, Inc. both learned about the planned termination and conversion of their contracts when their drivers saw letters at USPS facilities that discussed the "agreement" between the APWU and USPS to convert their routes.  (Ex. 4 ¶ 10 and Ex. 4-B; Ex. 8 ¶ 14 and Ex. 8-A.)

As soon as Maraney learned of the Arbitration Award, he initiated discussions with Postal Service officials in an effort to reverse the decision or prevent its implementation, but this effort failed.  (*Id.* ¶ 17.)  Since USPS believed the Arbitration Award required it to terminate and convert HCR contracts to PVS without regard to 39 U.S.C. § 5005(c), by letter dated October 7, 2016 the Star Route Association attorney asked USPS to seek to vacate the Award. (*Id.* ¶ 18 and Ex. 1-D (Hendel letter to Marshall (Oct. 7, 2016).)

On November 16, 2016, the Association received the Postal Service's response.  (Ex. 1 ¶ 19 and Ex. 1-E (Marshall letter to Hendel (Nov. 10, 2016).)  In its letter, the Postal Service stated that it did not intend to challenge the Arbitration Award.  (Ex. 1-E.)  The letter also noted that the impacted HCR contractors *would not have viable breach of contract claims* for the consequences of the early termination of their contracts.  (Ex. 1 ¶ 19; Ex. 1-E) (emphasis added.)

**D.      The 2016 District Court Proceeding.**

On November 30, 2016, the Association brought an action in the U.S. District Court for the District of Columbia seeking to enjoin the Postal Service from following the Arbitration

Award.  *National Star Route Mail Contractors Association, Inc. v. United States Postal Service*, No. 16-2350-CKK (D.D.C. filed Nov. 30, 2016) (hereinafter the "2016 Proceeding").  The District Court dismissed the 2016 Proceeding, finding the Association's action premature because the Postal Service had not yet made the final decision on which routes to transfer to PVS.  223 F. Supp. 3d 14, 28-29 (D.D.C. 2016).  The District Court also found that it lacked jurisdiction because the "claims sound in contract and are *subject to the exclusive jurisdiction of the Court of Federal Claims*."  *Id.* at 36 (emphasis added).

In reviewing the Arbitration Award, the District Court made frequent reference to the "wide latitude" and "flexibility" that the award afforded the Postal Service in determining which routes were best suited to conversion to PVS.  *Id.* at 23.  The court's opinion notes that the Arbitration Award "does not require that the 110 routes identified in the grievance . . . be converted, but rather required that number of routes be converted to PVS routes."  *Id.* at 23-24.  As a result, the Arbitration Award "implicitly acknowledges that conversion of some or all of these routes might not be feasible or prudent."  *Id.* at 24.  Critically, the District Court believed that the Postal Service was required to *and able to* comply with § 5005(c) in determining which 110 routes to convert to PVS:

> The flexibility of this award is critical.  It affords the Postal Service an opportunity to examine its route assignments and design the proper combination of HCR and PVS routes that best serves the public interest.  Rather than undertake this complex analysis, *the Arbitration Award rather presumes that the Postal Service will comply with the requirements of § 5005 of the Postal Reorganization Act* and the related provisions of the National Agreement.

*Id.* (emphasis added).[5]  The District Court stated further that it "presumed, and the Arbitration Award contemplates, that the Postal Reorganization Act's § 5005 considerations will be applied."  *Id.  See also id.* at 33-34 ("The Arbitration Award presumes that the Postal Service will conduct [the § 5005(c)] analysis when deciding which contracts to terminate . . . .").

**E.      The Postal Service's Decision Regarding Which Routes to Terminate.**

Notwithstanding the District Court's interpretation of the Arbitration Award, after the action was dismissed the Postal Service continued to assert that the Arbitration Award required it to convert HCR contracts to PVS *without* regard to § 5005(c) and *without* performing the analysis the law requires.  (Ex. 1 ¶ 21.)  By letter dated June 20, 2017, the USPS General Counsel advised that the Postal Service and the APWU had reached an agreement on which 110 routes would be converted from independent HCR contractors to in-house PVS employees. (Ex. 13 (Marshall letter to Hendel (June 20, 2017).)  The June 20, 2017 letter set forth a timeline for the transition to in-house PVC services:

> Once the Postal Service has sufficient staffing in place for a particular route, formal notice of cancellation will be provided to the contractor operating the HCR.  The Postal Service and the APWU agreed that all 110 routes should be converted by September 1 . . . .

(*Id.*)  The General Counsel's letter attached a list of the routes that the Postal Service intended to convert.  (*Id.*)  A revised version of that list was sent on June 23, 2017.  (Ex. 14 (Kappler letter to Hendel (June 23, 2017).)  At no point in either letter did the Postal Serve state or otherwise indicate that it performed the § 5005(c) analysis in selecting the 110 HCR contracts slated for

---

[5] The District Court re-iterated this point later in its opinion: "[T]he Arbitration award provides the Postal Service with wide latitude to negotiate with the Union, *to apply the Postal Reorganization Act's § 5005 public-interest analysis* to identify which routes are best suited for conversion, . . . and to come back to the arbitrator to revisit the remedy, if necessary."  223 F. Supp. 3d at 28-29 (emphasis added).

termination and conversion to PVS.  (Ex. 13, 14.)  Similarly, in Maraney's communications with senior USPS officials, the Postal Service never stated an intention to comply with § 5005(c) in selecting which HCR contracts to terminate and convert to PVS.  To the contrary, they stated their belief that the arbitration award required them to convert HCR contracts to PVS *without* regard to that analysis.  (Ex. 1 ¶ 21.)

Since announcing in June 2017 the new list of 110 HCR contracts set for termination, Plaintiffs' employees have heard rumors of lay-offs and some have begun to look for new employment in anticipation of possibly losing their jobs.  (Ex. 2 ¶¶ 37, 40; Ex. 3 ¶ 13; Ex. 4 ¶ 32; Ex. 6 ¶ 15; Ex. 12 ¶ 34.)  In some instances, Plaintiffs' employees have been recruited by USPS or harassed by postal employees.  (Ex. 2 ¶ 38-40 and Ex. 2-B and 2-C; Ex. 3 ¶ 13; Ex. 6 ¶ 15; Ex. 7 ¶ 31; Ex. 9 ¶ 7; Ex. 10 ¶ 10; Ex. 11 ¶ 18; Ex. 12 ¶ 35.)

**F.      Plaintiffs' Converted Routes.**

Each Plaintiff holds at least one contract for an HCR route that is on the Postal Service's final list of HCR routes that it is converting to in-house PVS.  (Ex. 2 ¶ 15; Ex. 3 ¶ 10; Ex. 4 ¶¶ 11-12; Ex. 5 ¶ 11; Ex. 6 ¶ 13; Ex. 7 ¶¶ 8, 21; Ex. 9 ¶ 6; Ex. 10 ¶ 4 and Ex. 10-1; Ex. 11 ¶ 5; Ex. 12 ¶ 7.)  For each route the Postal Service is seeking to convert from HCR to PVS, the Plaintiff contractor offers unique qualifications and cost advantages that cannot readily be matched.  For example:

- The Detroit-based route of Foreman Brothers, Inc. requires specialized equipment due to special indoor-dock requirements in Detroit.  The Postal Service will be required to do what Foreman Brothers, Inc. has done—special order and retrofit trailers.  (Ex. 3 ¶ 16.)

- HCR contract 48018, operated by Taylor Postal Contracting, Inc. ("Taylor") covers two shifts that unavoidably run 9.5 hours each, which would require USPS to pay for nearly 1,000 overtime hours to PVS drivers.  The route also includes four shifts that run 2-4 hours in length, which Plaintiff staffs with part-time

12

drivers.  USPS labor contracts may require payment for hours in excess of the currently scheduled trip time for short trips like these.  (Ex. 6 ¶ 16.)

- M.C. Eipperle, Inc. has held HCR contract 43491, and ran its associated route, since 1965.  Each time the contract was up for renewal, an analysis was performed that compared Eipperle's cost to PVS, and each time, USPS found that Eipperle could perform the work more economically and more efficiently. Nothing has changed that would make PVS less expensive.  (Ex. 5 ¶ 12.)

- The Hawaii-based route for HCR contract 967L1, held by Hokulani Kigyo, LLC, d/b/a Professional Commercial Services ("Professional") involves transportation between the main postal and distribution center in Hawaii and a FedEx facility. Due to the constraints at the FedEx facility, certain truck sizes are required for the route, which the Postal Service would be required to purchase.  Upon information and belief, PVS drivers previously attempted to perform the work under this contract, but the work could not be completed satisfactorily and was contracted out to Professional.  (Ex. 8 ¶ 10.)

- The route operated by Causley Trucking, Inc. under HCR contract 48162 runs out of Ann Arbor, Michigan.  The Postal Service does not have facilities domiciled in Ann Arbor.  As a result, over 4,000 trips operating out of Ann Arbor will require rerouting to a PVS facility in Detroit, resulting in expanded USPS processing times, increased route mileage, and delayed service times.  (Ex. 11 ¶¶ 8, 26.)

- Five of the drivers of W.B. Adams, Inc. have driven the route scheduled for conversion for the entirety of the existence of the contract.  The route has unique characteristics that make it difficult to drive, including the presence of many hills that are difficult to navigate during the harsh Pennsylvania winter months.  The route also requires drivers to work 10-11 hour days, which, upon information and belief, PVS drivers are not able to do under union labor agreements. (Ex. 12 ¶ 33.)

Each Plaintiff has provided a declaration accompanying this motion explaining why its HCR contracts selected for termination and conversion are lower cost or better suited than PVS, or both.  There is no indication that the Postal Service has even attempted to perform—let alone reasonably performed—a new § 5005(c) analysis for any of these HCR contracts.

## IV.    ARGUMENT

Plaintiffs are entitled to injunctive relief enjoining the Postal Service from terminating their HCR contracts and in-sourcing the work to PVS because the Postal Service has not

conducted the mandatory analysis required by 39 U.S.C. § 5005(c).  As discussed below, the

Court possesses subject-matter jurisdiction over in-sourcing challenges such as this, and

Plaintiffs have standing, as interested parties and the incumbent contractors, to seek the relief

requested.  The Court also possesses jurisdiction to hear this dispute because it involves claims

against a U.S. agency for breach of contract.

**A.      Jurisdiction and Standing Are Present.**

In the 2016 Proceeding, the District Court held it lacked jurisdiction because the claims

were "subject to the exclusive jurisdiction of the Court of Federal Claims."  *Nat'l Star Route*,

223 F. Supp. 3d at 36.  The District Court would have transferred the case to this Court if it were

ripe for adjudication, but since USPS did not have a final list of contracts to be converted it

considered the matter premature.  *Id.*  Since the Postal Service has now issued a final list and

stated its intention to effect the conversions by September 1, 2017, this case is now ripe for

judicial review before this Court.  As discussed below, this Court has two separate grounds of

jurisdiction to hear and act on this matter.

> **1.      This Court Has Subject-Matter Jurisdiction Over Plaintiffs' Claims and
> Plaintiffs Have Standing Under 28 U.S.C. § 1491(b).**

Under 28 U.S.C. § 1491(b), this Court has jurisdiction to "render judgment on an action

by an interested party objecting to . . . any alleged violation of a statute or regulation in

connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  The Postal

Service's plan to convert these routes to in-house PVS is considered a "proposed procurement"

and provides the Court jurisdiction over this matter.

This Court has many times held that an agency decision to transfer services from an

outside contractor to in-house agency employees is made "in connection with a procurement or a

proposed procurement," and that incumbent contractors may have standing as "interested

parties" to challenge an alleged statutory violation.  *See Dellew Corp. v. United States*, 108 Fed. Cl. 357, 370 (2012); *Elmendorf Support Servs. Joint Venture v. United States*, 105 Fed. Cl. 203, 208 (2012); *Santa Barbara Applied Research, Inc. v. United States*, 98 Fed. Cl. 536, 543 (2011); *Triad Logistics Servs. Corp. v. United States*, 2012 WL 5187846, at *16 (Fed. Cl. Feb. 29, 2012); *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 574 (2005).

This Court's decision in *Dellew* holds specifically that the decision to discontinue the use of contractors so that the work can be performed by government personnel is "in connection with a procurement" and is therefore properly within the Court's protest jurisdiction.  *Dellew*, 108 Fed. Cl. at 370 (quoting *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1346 (Fed. Cir. 2008)); *see also Santa Barbara*, 98 Fed. Cl. at 543 ("The substance of the Air Force's decision has been to stop procuring services from [Plaintiff] and to instead use Air Force civilian employees to do the same work.  Thus, the in-sourcing decision was made for the purpose of determining the need for contract services and thus was made 'in connection with a procurement decision.'").  The decision in *Dellew* and in other similar cases also supports the conclusion that Plaintiffs in this case are interested parties with standing to protest.  "Absent the Air Force's decision to in-source the Contract, Dellew likely would continue to provide the . . . services to the Air Force in the future."  *Id.* at 371*; see also LABAT-Anderson*, 65 Fed. Cl. at 575 (incumbent whose contract was transferred in-house is an interested party because it "lost the opportunity to earn revenue by not being allowed to compete with the Government for the renewed contract"); *Elmendorf*, 105 Fed. Cl. at 208 ("Having concluded that there was a proposed procurement, we have no difficulty finding that plaintiff clearly has a financial interest in maintaining its incumbency.").

Each Plaintiff is an existing mail transportation contractor who has a contract set to be terminated and converted to in-house PVS without the mandatory analysis required by 39 U.S.C. § 5005(c).  The Court, therefore, has jurisdiction to hear this case because it is a challenge to an "alleged violation of a statute" that was made "in connection with a procurement or proposed procurement," a term which this Court has held in the cases cited above to include government decisions to transfer contracted-out services to in-house employees.

### 2. The Court Also Has Subject-Matter Jurisdiction Over Plaintiffs' Claims and Plaintiffs Have Standing Under 28 U.S.C. § 1491(a).

This Court has separate and independent jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  The Court also has jurisdiction to "render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [the Contract Disputes Act, or "CDA"], including a dispute concerning termination of a contract."  28 U.S.C. § 1491(a)(2).  Here, the Postal Service's plan to terminate each Plaintiff's contract(s) for the purpose of converting them to PVS in disregard of § 5005(c) is a breach of the implied duty of good faith and fair dealing in each existing HCR contract.

The CDA applies to "any express or implied contract . . . made by an executive agency" for, among other things, "the procurement of services."  41 U.S.C. § 7102(a)(3).  In the 2016 Proceeding, the U.S. District Court for the District of Columbia found that the HCR contractors' claims were subject to the CDA.  *Nat'l Star Route*, 223 F. Supp. 3d at 30.  Noting that, under the CDA, "the Court of Federal Claims has *exclusive* jurisdiction over claims founded upon an express or implied contract with the United States," the District Court found that the "jurisdictional bar of the Contract Disputes Act applies to claims arising from contracts made thereunder by the Postal Service."  *Id.* at 30-31 (emphasis original).  The District Court

ultimately held that HCR contractors' claims—whether they were asserted as claims for breach of contract or not—were "subject to the exclusive jurisdiction of the Court of Federal Claims" under to 28 U.S.C. § 1491(a) and the CDA. *Id.* at 36. Jurisdiction is likewise present in the current case, for the same reasons and grounds articulated by the District Court.

Under the CDA, a federal contractor must first submit its contract claim in writing to its contracting officer for a decision. 41 U.S.C. § 7103(a)(1), (2). Once a final decision is made on the written claim, the contractor may then appeal the adverse decision to the Court of Federal Claims. 41 U.S.C. § 7104(b)(1). "Compliance with the dispute resolution procedures set forth in the CDA is a prerequisite to the Court's exercise of jurisdiction over claims covered by that act." *ASI Constructors, Inc. v. United States*, 129 Fed. Cl. 707, 716 (2016). Therefore, for this Court to have jurisdiction over a CDA dispute, "there must be both a valid claim and a CO's final decision on that claim." *Id.* (internal citations omitted).

Plaintiffs have only learned about the planned termination of the HCR contracts within the last few weeks. In the short-time since they received notice, Plaintiffs have sent written claims to their contracting officers, pursuant to the CDA, asking for a final decision on whether converting Plaintiffs' contracts to in-house PVS without complying with 39 U.S.C. § 5005(c) breaches the implied duty of good faith and fair dealing. (*See* Ex. 2 ¶ 16 and Ex. 2-A; Ex. 3 ¶ 15 and Ex. 3-2; Ex. 4 ¶ 14 and Ex. 4-2; Ex. 5 ¶ 11 and Ex. 5-2; Ex. 6 ¶ 14 and Ex. 6-2; Ex. 7 ¶ 35 and Ex. 7-3; Ex. 8 ¶ 17 and Ex. 8-B; Ex. 9 ¶ 8 and Ex. 9-2; Ex. 10 ¶ 12 and Ex. 10-3; Ex. 11 ¶ 20 and Ex. 11-3.)[6]

---

[6] W.B. Adams, Inc. is the only Plaintiff that has not yet submitted a claim for contract interpretation. It is currently in the process of submitting one.

Although Plaintiffs have not yet received any contracting officer decisions in response to their claim letters, and though 60 days have not yet passed since they were submitted,[7] the Postal Service's General Counsel's June 20, 2017 letter may be taken as the agency's deemed denial of those claims for Contract Dispute Act purposes.  The USPS General Counsel's June 20, 2017 letter unequivocally confirms that the Postal Service will be terminating Plaintiffs' contracts and converting the work to in-house employees pursuant to the Arbitration Award, with all conversions to be completed by September 1, 2017.  (Ex. 13.)  The General Counsel would not issue such a letter if it considered such action to be a breach of contract.  And its November 10, 2016 letter already stated that impacted contractors "have no viable breach of contract claims." (Ex. 1-E.)  Agency officials are presumed to act in good faith and no agency official could, in good faith, allow subordinates to commit a breach of contract.  There is thus no plausible possibility that any USPS contracting officer would issue a final decision that conflicts with the General Counsel's letter.  The General Counsel's letter also makes the need for the individual contracting officer decisions futile and unnecessary.  In similar circumstances, courts have determined that a final decision was effectively made and allowed Plaintiffs to proceed.  *See Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990); *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1287-68 (Fed. Cir. 1999); *Volmar Constr., Inc. v. United States*, 32 Fed. Cl. 746, 754-55 (1995).

Alternatively, if a contracting officer's decision is still deemed necessary, this Court has authority under 41 U.S.C. § 7103(f)(4) to order a contracting officer to issue a decision "in a specified period of time."  There is no requirement that the 60-day period lapse before issuing

---

[7] Contracting officers have up to 60 days to address a claim over $100,000.  41 U.S.C. § 7103(f)(2).  "Failure by a contracting officer to issue a decision on a claim within the required time period is deemed to be a decision by the contracting officer denying the claim and authorizes an appeal . . . ."  41 U.S.C. § 7103(f)(5).

such an order.  Since the Postal Service has already made up its mind that it may terminate these contracts without committing a breach of contract, and that contractors have no viable breach of contract claims, the Postal Service should be directed to produce such a final decision immediately, and no later than its initial response to our pleadings.

**B.      Plaintiffs Are Entitled to Preliminary Injunctive Relief.**

The Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), sets forth the four-part test governing a district court's consideration of a motion for a temporary or preliminary injunction.  Under this test, a plaintiff seeking a temporary restraining order or preliminary injunction must establish the following:  (1) that the plaintiff is "likely to succeed on the merits"; (2) that the plaintiff is "likely to suffer irreparable harm in the absence of the preliminary relief"; (3) that the "balance of equities tips in [the plaintiff's] favor"; and (4) that the requested injunctive relief "is in the public interest."  *Winter*, 555 U.S. at 20.  *See also Dellew*, 108 Fed. Cl. at 369 (setting forth same four-part test in Court of Federal Claims case involving a bid protest).

All four factors support the entry of temporary and preliminary injunctive relief in favor of Plaintiffs.

**1.      Plaintiffs Are Likely to Succeed on the Merits.**

Plaintiffs have a strong likelihood of success on the merits on both counts asserted in the Complaint:  (1) violation of 39 U.S.C. § 5005(c); and (2) breach of the implied duty of good faith and fair dealing.

***i.      The Planned Conversion from HCR to In-House PVS Drivers Violates 39 U.S.C. § 5005(c).***

The Postal Service's plan to terminate Plaintiffs' 110 existing HCR contracts and convert them to PVS violates the law because it was made without regard to which mode of

transportation "best serves the public interest, due consideration being given to the cost of the transportation service under each mode." 39 U.S.C. § 5005(c).

Since at least 1975, USPS has documented its § 5005 analysis on a form dedicated to that purpose—PS Form 5505. (Ex. 1 ¶ 13 and Ex. 1-B.) This form requires USPS to compare a variety of driver and vehicle costs in performing its review, and it details how the various costs should be calculated. (*Id.*) USPS failed to use its own form or otherwise perform a cost comparison required by 5005(c) before determining to convert the contracts at issue here.

The Postal Service has essentially conceded that it did not make a new § 5005(c) determination concerning its planned change in transportation mode. Postal Service representatives have stated their belief that the Arbitration Award required them to convert HCR contracts to PVS *without* regard to § 5005(c) and *without* performing the analysis the law requires. (Ex. 1 ¶ 21.)

Contrary to the Postal Service's characterization, the Arbitration Award does not mandate that the Postal Service bypass § 5005(c)'s requirements, nor could the arbitrator have lawfully issued such an award. Rather, as repeatedly stated by the U.S. District Court in the 2016 proceeding, the Arbitration Award granted the Postal Service "wide latitude in determining how best to comply with the order," as well as "flexibility in determining what routes are best suited to conversion from HCR to PVS routes." *Nat'l Star Route*, 223 F. Supp. 3d at 23. The District Court found the "flexibility" of the Arbitration Award to be "critical," as it "afford[ed] the Postal Service an opportunity to examine its route assignments and design the proper combination of HCR and PVS routes that best serves the public interest." *Id.* at 24. Instead of finding that the Postal Service was barred by the Arbitration Award from conducting the § 5005(c) analysis, the District Court instead stated that "Arbitration Award rather presumes that the Postal Service will

20

comply with the requirements of § 5005 . . . ."  *Id.  See also id.* at 24 ("[I]t is presumed, and the

Arbitration Award contemplates, that the Postal Reorganization Act's § 5005 considerations will

be applied."); *id.* at 33-34 ("The Arbitration Award presumes that the Postal Service will conduct

[the § 5005(c)] analysis when deciding which contracts to terminate . . . .").

Therefore, according to the District Court, the Postal Service was more than capable of

complying with both § 5005(c) and the Arbitration Award, and it assumed that any decision as

what routes to convert would involve a § 5005(c) analysis:

> [T]he Arbitration Award provides the Postal Service with wide
> latitude to negotiate with the Union, *to apply the Postal
> Reorganization Act's § 5005 public-interest analysis* to identify
> which routes are best suited for conversion, to extend the
> timeframe for compliance with the Award, and to come back to the
> arbitrator to revisit the remedy if necessary.

*Id.* at 29-30 (emphasis added).

In addition to the District Court's statements, § 5005(c) was previously tested and

enforced through litigation.  In 1975, several years after the Postal Reorganization Act was

enacted, the National Star Route Association brought an action against the Postal Service

challenging its failure to properly apply this same statute.  *See National Star Route Mail Carriers

Assoc. v. United States Postal Service*, No. 75-1894 (N.D. Cal. Dec. 4, 1975) (order attached as

Ex. 1-A).  In that case, the court ordered the Postal Service to comply with 39 U.S.C. § 5005(c)

and to take very specific actions to ensure that it did so.  After the court entered the order, the

Postal Service abandoned its plan to convert the HCR contracts to PVS.  (Ex. 1 ¶ 12; Ex. 1-A.)

Despite this precedent and the clear and repeated statements from the District Court

regarding the Postal Service's obligation to comply with § 5005 in deciding which routes to

convert to PVS, the Postal Service has continued to deny this responsibility.  Instead, in the

months following the issuance of the District Court's opinion, there is no indication that the

Postal Service made *any* § 5005(c) analysis with regard to any of the 110 contacts it intends to convert.  (Ex. 1 at ¶ 21.)

Thus, in this action, there is no need to review how much discretion the Postal Service is afforded in making the § 5005(c) determination, how much "due consideration is required," or whether the Postal Service made the correct decision in looking at the various factors.  The Postal Service simply disregarded § 5005(c), without even attempting to give lip service to its requirements.[8]  Therefore, we are presented with a Postal Service plan to take an action that fundamentally violates 39 U.S.C. § 5005(c).  Since the Postal Service has not attempted to determine which mode of transportation "best serves the public interest, due consideration being given to the cost of the transportation service under each mode," its planned action violates § 5005(c).

> ## ii.     *The Postal Service's Termination of the Contracts in Violation of Law Breaches the Implied Duty of Good Faith and Fair Dealing.*

Every contract contains an implied duty of good faith and fair dealing.  *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014).  Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty.  *Id.*  "The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty . . . not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).

---

[8] If the Postal Service *had* attempted to make the § 5005(c) determination, the only rational result would have been to continue with the HCR mode of service.  As noted in arbitrator's decision, there is "little likelihood" that USPS would have chosen the PVS mode because doing so would have cost up to $3 million more *per quarter*.  (Ex. 1-C at 8, 15, 18.)

In entering into the HCR contracts, Plaintiffs had a reasonable expectation that USPS would comply with the law in its performance of its contractual obligations, including all requirements imposed by § 5005(c).  The Postal Service's determination to terminate Plaintiffs' contracts and convert them to in-house PVS service without complying with Section § 5005(c) breaches the Postal Service's implied duty of good faith and fair dealing to each Plaintiff.

Despite the Arbitration Award's mandate that the Postal Service convert 110 HCR contracts to PVS, there are multiple steps that the Postal Service could have taken to both comply with the Arbitration Award *and* comply with § 5005(c) and its contractual obligations to Plaintiffs to act in good faith.  For example, as suggested repeatedly throughout the opinion in the 2016 Proceeding, in selecting which of the 110 routes it would convert to PVS under the arbitrator's order, the Postal Service could have performed § 5005(c) reviews and selected routes that were more cost effective for the Postal Service to perform in-house.  USPS failed to take this mandatory step that the District Court assumed would be performed.

The Postal Service's lack of good faith is further exhibited by the following actions:

a.     Failing to ask the arbitrator to revise the remedy to avoid any conflict with 39 U.S.C. § 5005(c), even though the arbitrator explicitly retained jurisdiction to resolve any matters relating to the remedy;

b.     Deciding to terminate the selected HCR contracts and convert them to in-house PVS without consulting with each impacted contractor or seeking to elicit information about the route that could inform its decision, while at the same time engaging in frequent consultation with the APWU (a third party) on such matters; and

c.      Recruiting Plaintiffs' employees currently performing work under the

contractors' HCR contract(s) and allowing others to recruit Plaintiff's

employees on postal premises.

In each of these respects, the Postal Service's breach will destroy Plaintiffs' reasonable

expectations of the benefits of their contracts.  Plaintiffs' claim for breach of the implied

covenant of good faith and fair dealing is thus also likely to succeed on the merits.

**2.      Plaintiffs Will Suffer Irreparable Harm Without an Injunction.**

Without injunctive relief, the Plaintiffs will suffer irreparable harm.  In order to

implement the Arbitration Award, the Postal Service has stated that it is terminating the

Plaintiffs' HCR contracts.  Together, Plaintiffs will lose multiple millions of dollars in annual

revenue.  Many of the contracts have terms that extend for several additional years, making the

total loss even greater.[9]  And right now, at this moment, the Postal Service and the APWU are

recruiting Plaintiffs' employees to become PVS drivers, resulting in the loss of Plaintiffs' drivers

and disruption of Plaintiffs' operations.

In addition to the lost revenue and profit, Plaintiffs will be forced to lay off long-time

employees working directly on the HCR contract routes, as well as other employees who are

supporting those operations indirectly.  Plaintiffs will be left with idled and under-utilized

equipment, facilities, and personnel.  Many Plaintiffs have acquired their equipment and

facilities through leases or bank loans, and these financial obligations will continue even after the

---

[9] For example, the contract held by Eipperle does not expire until June 20, 2020.  (Ex. 5 ¶ 5.)  Contract No. 92350, held by MTI, and Contract No. 48010, held by Midwest, are set to run through June 30, 2019.  (Ex. 2 ¶ 23; Ex. 4 ¶ 19.)  MTI expects to lose approximately $2,525,000 in revenue through the remaining term of the current contract. ((Ex. 2 ¶ 28.) Midwest expect to lose approximately $938,000.  (Ex. 4 ¶ 25.)  The four contracts held by FSR have a total annual value of $2,777,693.58 and two of them extend into 2019. (Ex. 8 ¶¶ 8, 23, 63.)

work is gone.  As examples of the irreparable harm that will befall the impacted contractors, our

motion is accompanied by declarations from each Plaintiff.  Examples of the harm include:

*Mail Transportation, Inc.* ("MTI") derives 90 percent of its business revenue from HCR

Contract 92350, which is set to be converted to PVS.  (Ex. 2 ¶¶ 15, 17.)  MTI has performed this

HCR route since 1991; PVS has never performed this route.  (*Id.* ¶¶ 22 25.)  In the 25 years that

MTI has held this contract, it has never received any complaints relating to its performance.  (*Id.*

¶ 25.)  If the contract is converted to PVS, MTI will lose 90% of its revenue and profits and be

forced to lay off all but one full-time and one part-time driver.  (*Id.* ¶¶ 29-30.)  In purchasing

equipment and property needed to service the route, MTI obtained financing that coincided with

the four-year term of the contract, and termination of the contract will almost certainly result in

the bankruptcy of MTI.  (*Id.* ¶¶ 32-34.)  News of the impending termination of the contract has

already negatively affected MTI's workforce.  (*Id.* ¶ 37.)  One driver has given notice that he is

quitting, and another is planning on attending a group interview session with PVS.  (*Id.* ¶ 40.)

Other MTI employees have been recruited by PVS through flyers and other job postings.  (*Id.*

¶¶ 38-39.)

*Foreman Brothers, Inc.* ("Foreman") has been an HCR contractor for *over 60 years*, and

90 percent of its revenue is derived from USPS contracts.  (Ex. 3 ¶ 3.)  Foreman has won

numerous "Eagle Spirit Awards" from USPS for its excellent service, and its HCR contracts

have always been renewed.  (*Id.* ¶¶ 8-9.)  Foreman's HCR contract 48130 is on the list of routes

that will be converted to in-house PVS.  (*Id.* ¶ 6.)  If contract 48130 is converted to PVS,

Foreman will be required to significantly downsize its business operations for the *first time* in its

66-year history.  (*Id.* ¶ 10.)  It will lose at least $2.5 million in annual revenue; 20 full-time

drivers who were devoted to the route will be laid off; it will be required sell the 25 trailers and

12 tractors used to perform the contract at, likely, salvage rates; recently purchased GPS equipment used to improve the quality of service that is of value only for this route will be of no use; and other Foreman employees' time with be under-utilized, since their responsibilities include the performance of contract 48130.  (*Id.* ¶ 10.)  Foreman's drivers are already hearing rumors of the lay-offs that will occur if the contract is transferred, and the drivers are reporting that USPS is posting job listings for the route.  (*Id.* ¶ 13.)  As a result, there is a substantial risk that Foreman's employees will begin looking elsewhere for employment immediately despite Foreman's responsibility to continue to perform the HCR contract requirements.  (*Id.*)

If HCR Contract 48010, held by *Midwest Transport, Inc.* ("Midwest"), is terminated and converted to PVS, Midwest will be forced to lay-off the four full-time and two part-time drivers assigned to perform the contract.  (Ex. 4 ¶ 26.)  Three of its semi-truck tractors and 13 of its semi-truck trailers will be unused or underused.  (*Id.* ¶ 27.)  Midwest and its predecessor have operated this route since 1998, without receiving any complaints from USPS regarding its performance.  (*Id.* ¶¶ 9, 21.)

Fifteen months ago, the Postal Service approximately doubled HCR contract 43491, held by *M.C. Eipperle, Inc.* ("Eipperle"), requiring Eipperle to expand its operations and lease additional equipment.  (Ex. 5 ¶¶ 7-8.)  If that contract is terminated and converted to PVS, Eipperle would be required to lay-off 25 of its drivers and one of its two mechanics, many of whom have worked for Eipperle for 25 years or longer.  (*Id.* ¶ 9.)  Eipperle would have no use for the 11 tractors and 14 trailers that it devotes to this route, including the equipment recently leased, which will be subject to lease-termination penalties.  (*Id.* ¶¶ 8-9.)

*Taylor Postal Contracting, Inc.* ("Taylor") derives 40 percent of its revenue from HCR contract 48018, which it has operated since 1987.  (Ex. 6 ¶¶ 8, 11.)  If that contract is terminated,

Taylor would not be able to perform at least one other Postal Service contract and would be forced to give its notice of termination of that contract, causing further loss of revenue and profits.  (*Id.* ¶ 11)  Taylor would need to lay-off the 19 drivers assigned to this route, who have worked for Taylor for an average of almost 10 years.  (*Id.*)  PVS drivers have been telling Taylor's drivers that they will soon be out of a job and have encouraged Taylor's drivers to resign and work for USPS.  (*Id.* ¶ 15.)  These statements and the threat of termination are interfering with Taylor's present ability to perform its HCR contracts.  (*Id.*)

*Holton Truck Lines, Inc.* ("Holton") owns four HCR contracts that are set for termination and conversion to PVS.[10]  (Ex. 7 ¶¶ 8, 21.)  If USPS proceeds with the conversion of these four routes, Holton will lose around 70 percent of its revenue and will be forced to lay off over half of its total employees.  (*Id.* ¶ 33.)  Equipment purchased specifically for these routes—eight trailers and seven tractors—cannot be used on any of Holton's other routes and will need to be sold.  (*Id.*)  After hearing rumors about the planned route conversion from USPS employees, Holton has already had three employees give notice that they are taking other jobs.  (*Id.* ¶ 31.)  Other employees have been actively recruited by USPS and told that they should apply to USPS so that they could continue working.  (*Id.*)  Because of the uncertainty as to how long it will be performing these routes, Holton has had a difficult time hiring new drivers to replace those who have left.  (*Id.*)

*F.S.R. Trucking, Inc., d/b/a Postal Carrier Corp.* ("FSR") holds four HCR contracts that are subject to termination.  (Ex. 8 ¶ 7.)  One of these contracts, No. 33042, has been held by FSR since 1991 and has been renewed approximately six times.  (*Id.* ¶ 9.)  FSR has won several awards and commendations from USPS, including two Eagle Spirit Awards and the Excellence

---

[10] Three of these contracts are held by TNH Enterprises, and one is held by High Miler, Inc.; both companies are owned and operated by Holton.  (Ex. 7 ¶¶ 6, 8, 21.)

of Service Award.  (*Id.* ¶ 26.)  If the four contracts are ultimately terminated, FSR anticipates

that it will be forced to lay-off approximately 40-45 drivers and potentially other accounting,

managerial, and/or human resources staff.  (*Id.* ¶ 71.)  FSR will have approximately 20 semi-

truck tractors and 20 semi-truck trailers that will be unused or underused, and it may be forced to

return certain leased equipment early and incur penalties under those leasing contracts.  (*Id.*

¶¶ 73-75.)  News of the impending termination has already negatively affected FSR's workforce

and its ability to retain drivers. The Postal Service is recruiting FSR's drivers and causing the

drivers to believe that their jobs at FSR are in jeopardy.  (*Id.* ¶ 78.)

      Substantially all of the profits and a third of the revenue of *Hokulani Kigyo, LLC, d/b/a*

*Professional Commercial Services* ("Professional") stem from HCR contract 967L1, which is

scheduled to be converted to PVS.  (Ex. 9 ¶¶ 5-6.)  Professional will be required to lay-off the

three drivers and one other employee who provide services for the contract, and it will have no

use for the two 45-foot container trailers that it acquired specifically for the purpose of

performing this contract.  (*Id.* ¶ 9.)  Postal Service personnel have been communicating with

Professional's drivers regarding the scheduled termination and conversion, leading to negative

driver morale and causing Professional's employees a great deal of anxiety over their future job

security.  (*Id.* ¶ 7.)  Throughout its time providing service under this contract, Professional has

never missed a trip or load, and the Postal Service has repeated stated that Professional's work

has been excellent and extremely helpful.  (*Id.* ¶ 4.)

      The two HCR contracts held by *Yung Lee, Inc.* ("Yung Lee") represent 100% of Yung

Lee's business.  (Ex. 10 ¶ 2.)  One of those contracts is scheduled to be converted to PVS on

December 31, 2017.  (*Id.*)  The second contract, HCR 92352, is now also set to be converted in

the absence of the required § 5005(c) procedures.  (*Id.* ¶ 4.)  If the Postal Service terminates

Yung Lee's second HCR contract, it will eliminate the remaining 50 percent of Yung Lee's revenue, and it will be forced to lay off its remaining drivers.  (*Id.* ¶ 9.)  In anticipation of converting the route, USPS talked to Yung Lee's drivers about working for USPS, and two of his drivers have already interviewed for PVS positions.  (*Id.* ¶ 10.)

Without the revenue from HCR contracts 48162 and 48090—both set to be converted to PVS—*Causley Trucking, Inc.* ("Causley") will be forced to close its facility in Detroit.  (Ex. 11 ¶ 21.)  The loss of income for these two contracts would equal $1,909,095.04.  (*Id.* ¶ 6.)  The 16 Causley drivers who operate these routes will be laid off, many of whom have worked for Causley for 14 years or more, and Causley will also be forced to lay off two dispatchers, one administrative staff employee, and approximately two maintenance technicians.  (*Id.* ¶ 22.)  The equipment used on the two routes set for conversion cannot be transitioned to other uses, as the tractors used to transport U.S. mail can generally not be used to transport freight.  (*Id.* ¶ 23.)

*W.B. Adams Trucking, Inc.* ("WBA") purchased special equipment in order to perform HCR contract 194L4, including power lift gates that are necessary to load and unload mail at certain post offices along the route, and GPS units.  (Ex. 12 ¶¶ 30-11.)  If the contract is converted as scheduled, these purchases will be wasted.  (*Id.*)  WBA expects to lose approximately $1.74 million if its HCR contract is terminated early, and it anticipates that it will be forced to lay-off between eight and eleven drivers and two mechanics.  (*Id.* ¶¶ 26-27.)  News of the impending termination has negatively affected WBA's workforce and its ability to retain drivers.  (*Id.* ¶ 34.)  One driver has already provided notice of his resignation and intention to drive for PVS.  (*Id.* ¶ 35.)

These economic harms and business losses constitute irreparable harm justifying an injunction because (as admitted and acknowledged by USPS) the contractors would have no

remedy at law to recover any portion of their losses from the Postal Service.  (*See* Ex. 1-E.)

Courts regularly find plaintiffs to be facing irreparable harm when economic losses are not

recoverable at law.  *See, e.g., Nalco Co. v. Environmental Protection Agency*, 786 F. Supp. 2d

177, 188 (D.D.C. 2011) (finding irreparable harm where action would result in loss of customers

and no right of recourse against the government); *Clarke v. Office of Federal Housing Enterprise*

*Oversight,* 355 F. Supp. 2d 56, 65-66 (D.D.C. 2004) (economic losses constitute irreparable

harm when they are likely to be unrecoverable); *Hoffman-Laroche, Inc. v. Califano*, 453 F. Supp.

900, 903 (D.D.C. 1978) (loss of sales and good will for which there is no right of recourse

constitutes irreparable harm); *American Federation of Government Employees, AFL–CIO v.*

*United States*, 104 F. Supp. 2d 58, 76 (D.D.C. 2000) (finding irreparable harm based on

economic injury because plaintiffs would likely be unable to recover damages).

Moreover, the unilateral decision to transfer the HCR contracts to in-house PVS

employees without the required § 5005(c) analysis left Plaintiffs without any opportunity to bid

for the work, and "[t]he loss of an opportunity to compete for a contract also has been found to

constitute irreparable harm."  *Dellew*, 108 Fed. Cl. at 379.  *See also Impresa Construzioni Geom.*

*Domenico Garufi v. United States*, 52 Fed. Cl. 826, 828 (2002) (collecting cases stating same).

Considering the harm that Plaintiffs will suffer absent injunctive relief, their inability to

otherwise remedy that harm, and their loss of an opportunity to compete for this work, Plaintiffs

have amply satisfied the second preliminary injunction factor.

### 3.   The Balance of Harms Tips in Favor of Plaintiffs Because the Postal Service Will Not Be Harmed by the Entry of Injunctive Relief.

In contrast to the irreparable harms that would fall upon Plaintiffs without injunctive

relief, an injunction would cause no harm—irreparable or otherwise—to the Postal Service or to

its PVS drivers.  The Arbitration Award found that performing these routes by HCR mode is *less*

*costly* than using PVS drivers.  According to the APWU's own expert economist, using PVS

drivers for the identified routes instead of HCR contractors would cost $1.6 to $3.5 million more

*per quarter*.  (Ex. 1-C at 8, 15.)  Another APWU witness admitted that it was more efficient for

USPS to use HCR contractors than PVS employees.  (*Id.* at 15.)  Issuing injunctive relief will

actually benefit the Postal Service by preventing the increase in transportation cost that would

result from conversion to PVS.

Issuance of injunctive relief would also do no harm to any PVS drivers or other postal

employees.  The routes are currently performed by HCR drivers, so no PVS drivers or other

postal employees are at risk of losing their jobs from issuance of injunctive relief.  While the

Postal Service may have already begun to hire new employees and purchase equipment to take

over these HCR routes, such expenses were incurred in its own folly of taking such action in

disregard of 5005(c).  A court will not consider such self-inflicted harms when weighing the

injunctive relief factors.  *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 661

n.38 (2d Cir. 2015) ("Certainly, courts do not consider the harm a party suffers from being

prevented from violating the law.").  *See also Lee v. Christian Coalition of Am., Inc.*, 160 F.

Supp. 2d 14, 33 (D.D.C. 2001) (stating that harm is not considered when it is self-inflicted); 11A

Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed.)

(same).  In any case, Plaintiffs' harms dwarf any harms incurred by the Postal Service.

### 4.      Injunctive Relief Will Serve the Public Interest.

Injunctive relief would serve the public interest in the enforcement of federal law.  *See,*

*e.g., Patriot, Inc. v. Dep't of Housing & Urban Dev.*, 963 F. Supp. 1, 6 (D.D.C. 1997) ("[T]he

public interest is best served by having federal agencies comply with the requirements of federal

law . . . .").  Here, there is a longstanding statutory requirement that the Postal Service select the

mode of transportation that "best serves the public interest, due consideration being given to the cost of the transportation service under each mode." 39 U.S.C. § 5005(c). The Postal Service has made no attempt to comply with mandatory legal requirements, and the public has an interest in the law being enforced.

Moreover, the very purpose of § 5005(c) is to require the Postal Service to consider which mode of transportation "*best serves the public interest*." 39 U.S.C. § 5005(c) (emphasis added). Thus, it is undeniable that enforcement of the law—that requiring the Postal Service to consider whether HCR or PVS is in the best interest of the public—supports the fourth preliminary injunction factor.

## V. CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court issue a temporary restraining order and preliminary injunction that prevents the Postal Service from terminating Plaintiffs' HCR contracts and converting them to PVS without performing the analysis required by 39 U.S.C. § 5005(c) and from taking any further action in support of this effort, including the recruitment of Plaintiffs' employees.

**DATED** this ___12th___ day of ___July___ 2017.


Respectfully submitted,


_____s/ David P. Hendel_____
David P. Hendel
HUSCH BLACKWELL LLP
750 17th St., NW, Suite 900
Washington, DC  20006-4675
Tel: 202-378-2356
Fax: 202-378-2319
david.hendel@huschblackwell.com

_____ s/ Brian P. Waagner _____
Brian P. Waagner
HUSCH BLACKWELL LLP
750 17th St., NW, Suite 900
Washington, DC  20006-4675
Tel: (202) 378-2355
Fax: (202) 378-2319
brian.waagner@huschblackwell.com

## APPENDIX

**Exhibit 1**     Declaration of John V. "Skip" Maraney

        Attach. A:     Order directing the Postal Service to comply with 39 U.S.C. § 5005(c), issued December 4, 1975 (*National Star Route Mail Carriers Assoc. v. United States Postal Service,* No. 75-1894 (N.D. Cal. Dec. 4, 1975).

        Attach. B:     PS Form 5505

        Attach. C:     Arbitration decision and award in matter of *United States Postal Service and American Postal Workers Union, AFL-CIO,* No. C06C-4Q-C 11182451 (Aug. 18, 2016).

        Attach. D:     Star Route Association attorney David Hendel's letter to USPS General Counsel Thomas Marshall requesting that USPS seek to vacate the arbitration award (Oct. 7, 2016).

        Attach. E:     Postal Service General Counsel Marshall's letter to Association Attorney Hendel (Nov. 10, 2016).

**Exhibit 2**     Declaration of Alan Gotta on behalf of Mail Transportation, Inc.

        Attach. A:     Claim for Contract Interpretation sent to Antoine L. Slaughter of USPS from Alan Gotta.

        Attach. B:     USPS Hiring Flyer

        Attach. C:     USPS Job Posting

**Exhibit 3**     Declaration of Jill Farris on behalf of Foreman Brothers, Inc.

        Attach. 1:     Excepts of HCR Contract 48130

        Attach. 2:     Claim for Contract Interpretation sent to Raphette Alston of USPS from Jill Farris.

**Exhibit 4**     Declaration of Michael Correll on behalf of Midwest Transport, Inc.

        Attach. A:     Excepts of HCR Contract 48010

        Attach. B:     Photograph of AFL-CIO letter

        Attach. C:     Claim for Contract Interpretation sent to Keith Harris of USPS from Doug Heidorn.

**Exhibit 5**     Declaration of Dale Brunt on behalf of M.C. Eipperle, Inc.

    Attach. 1:     Excerpts of HCR Contract 43491

    Attach. 2:     Claim for Contract Interpretation sent to USPS contracting officer by Dale Brunt.

**Exhibit 6**     Declaration of George Taylor on behalf of Taylor Postal Contracting, Inc.

    Attach. 1:     Excepts of HCR Contract 48018

    Attach. 2:     Claim for Contract Interpretation sent to Jewell Powell of USPS by George Taylor.

**Exhibit 7**     Declaration of Nola Holton on behalf of Holton Truck Lines, Inc.

    Attach. 1:     Excerpts of HCR Contracts 890L0, 89042, and 89044.

    Attach. 2:     Excerpts of HCR Contract 89036.

    Attach. 3:     Claim for Contract Interpretation sent to Antoine L. Slaughter of USPS by Nola Holton.

**Exhibit 8**     Declaration of Frederick S. Riceputo on behalf of F.S.R. Trucking, Inc., d/b/a Postal Carrier Corp.

    Attach. A:     AFL-CIO letter

    Attach. B:     Claim for Contract Interpretation sent to Keith L. Harris of USPS by Frederick S. Riceputo

**Exhibit 9**     Declaration of Eugene Nishimura on behalf of Hokulani Kigyo, d/b/a Professional Commercial Services

    Attach. 1:     Excerpts of HCR Contract 967L1

    Attach. 2:     Claim for Contract Interpretation sent to Shirley Lowry of USPS by Eugene Nishimura

**Exhibit 10**     Declaration of Yung Lee on behalf of Yung Lee, Inc.

    Attach. 1:     Email from Paul Horner of USPS to Yung Lee

    Attach. 2:     Excerpts of HCR Contract 92352

Attach. 3:     Claim for Contract Interpretation sent to Paul Horner of USPS from Yung Lee

**<u>Exhibit 11</u>**    Declaration of Greg Causley on behalf of Causley Trucking, Inc.

Attach. 1:     Excerpts of HCR Contract 48162

Attach. 2:     Excerpts of HCR Contract 48090

Attach. 3:     Claim for Contract Interpretation sent to USPS from Greg Causley

**<u>Exhibit 12</u>**    Declaration of Walter B. Adams on behalf of W.B. Adams Trucking, Inc.

Attach. A:     Email from Gibsy Benlizar of USPS to Walter B. Adams

**<u>Exhibit 13</u>**    USPS General Counsel Thomas Marshall's letter to Star Route Association attorney David Hendel (June 20, 2017) (without attachment)

**<u>Exhibit 14</u>**    USPS Deputy General Counsel Charles F. Kappler's letter to Star Route Association David Hendel (June 23, 2017) (with attachment)

# EXHIBIT 1

**IN THE
UNITED STATES COURT OF FEDERAL CLAIMS
(BID PROTEST)**

|  |  |  |
|---|---|---|
| MAIL TRANSPORTATION, INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| UNITED STATES, | ) | Judge_____ |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF JOHN V. "SKIP" MARANEY

John V. "Skip" Maraney, pursuant to 28 U.S.C. § 1746, states as follows:

1. I am Executive Director of the National Star Route Mail Contractors Association (hereinafter the Star Route Association or Association).

2. The Star Route Association is a non-profit corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Washington, DC. The membership of the Star Route Association is comprised of individuals and small, family-owned businesses that transport and deliver mail under contracts with the United States Postal Service. The Association was founded in 1935 and currently has over 3,000 members. Approximately 85 percent of our members have no other business than transporting mail under their U.S. Postal Service contracts.

3. I have served as Executive Director of the Association since December 1969. I have testified before Congress on behalf of our members on multiple occasions, and I am in regular contact with our members and with Postal Service officials.

**Background on mail transportation service**

4.  Postal Service contracts for the surface transportation of mail are called Highway

Contract Route (HCR) contracts.  HCR contracts are fixed-priced contracts awarded on a

competitive basis, typically for a four-year term, and can be renewed for additional terms upon

mutual agreement.

5.  The Postal Service, and its predecessor agency the Post Office Department, have a

long history of contracting out mail transportation service.  My research shows that the first

contract to haul mail was in 1785 when a contractor in Shrewsbury, MA was awarded a contract

by the Continental Congress to transport mail in New England.  In 1845, the Post Office

Department solicited competitive bids from stagecoach companies to haul mail.  The famed Pony

Express Mail Service was also contracted out.

6.  The long and storied history of contracted out mail transportation service has

continued through today.  According to a report by the U.S. Postal Service Office of Inspector

General, as of June 1, 2016 there were over 8,300 HCR contracts with a projected annual cost of

about $3 billion.  HCR contracts are the largest single group of contracts in the Postal Service

and are managed by approximately 100 postal employees.  *Management and Oversight of*

*Highway Contract Routes*, USPS OIG Report No. NL-AR-16-006, at 1 (Sept. 30, 2016).

7.  HCR contracts differ from commercial transportation contracts in several ways.  HCR

drivers must go through a comprehensive background screening process and obtain a security

clearance from the U.S. Postal Service Inspection Service.  HCR contracts incorporate the

requirements of the Service Contract Act.  Thus, HCR drivers must be paid no less than the

prevailing wages and benefits prescribed by the U.S. Department of Labor in regularly updated

Wage Determinations for their geographic area.  HCR contracts also contain detailed

specifications on the type of equipment that must be used.

8.  The Postal Service has its own employees who also perform surface transportation of

mail.  This is known as the Postal Vehicle Service (PVS).  PVS drivers are unionized and

represented by the American Postal Workers Union (APWU).

**The Postal Service's HCR v. PVS cost comparison process**

9.  When determining whether to use HCR drivers or PVS drivers to provide mail

transportation service, the Postal Service is required use the mode of transportation (HCR or

PVS) that best serves the public interest, due consideration being given to the cost of the

transportation service under each mode.  This requirement was included in the Postal

Reorganization Act of 1970 and is set forth in 39 U.S.C. § 5005(c).

10.     I am personally familiar with the approach that the Postal Service uses to meet the

requirements of 39 U.S.C. § 5005(c), and particularly with the requirement that it give "due

consideration … to the cost of the transportation service under each mode."  Since 1970, when

the Postal Service was created by the Postal Reorganization Act, the Postal Service has complied

with this requirement by conducting cost comparisons between HCR and PVS modes of

transportation.

11.     I am aware of the Postal Service's HCR/PVS cost comparison process because I

have had frequent discussions with Postal Service officials over many years concerning the

information used in such cost comparisons.  Typically, my discussions with the Postal Service

involve instances where we believe the Postal Service has not included all of the costs associated

with PVS in its cost comparison.

12.     I was Executive Director of the Star Route Association in 1975 when the Association filed suit against the Postal Service in the U.S. District Court for the Northern District of California for non-compliance with 39 U.S.C. § 5005(c).  Ultimately, the Court ordered the Postal Service to comply with 39 U.S.C. § 5005(c).  Specifically, before converting any HCR contracts to PVS, the Court required the Postal Service to give at least 30 days advance notice to the contractor, along with the final cost data on the comparative cost of HCR and PVS service. The Court also ordered the Postal Service to make available for depositions its senior personnel responsible for the preparation and evaluation of cost data.  After the court entered this Order, the Postal Service abandoned its plan to convert the HCR contracts to PVS.  **Attachment A** to my declaration is a copy of the December 4, 1975 Order issued by the U.S. District Court for the Northern District of California in that action.

13.     The Postal Service developed and uses a special form to perform the cost comparison between HCR and PVS transportation modes.  PS Form 5505, entitled "COST EVALUATION—POSTAL VEHICLE SERVICE VS CONTRACT SERVICE," sets out a variety of driver and vehicle costs that the Postal Service examines when performing the cost analysis contemplated by Section 5005(c).  **Attachment B** is a version of PS Form 5505 used in 1975 when it was provided as Exhibit 3 to my August 29, 1975 affidavit in the 1975 District Court action.   The back of the form contains a detailed list of instructions on how the individual figures on the form should be determined.

14.     The Postal Service continues to use PS Form 5505 when comparing cost between HCR and PVS modes of transportation.

**August 18, 2016 arbitration decision and award**

15.     Neither I nor any of our Association members were notified of the arbitration proceeding that led to the August 18, 2016 decision that led to the current attempted conversion of HCR routes.

16.     I first learned of the arbitration proceeding sometime in September 2016, well after the arbitration decision had been issued.  I obtained a copy of that decision, which is attached as **Attachment C** to this declaration, from the Internet.  The Association was previously unaware of this proceeding.  Neither the Star Route Association nor any of our members were provided an opportunity to attend, intervene, provide evidence, or otherwise be heard.

**Actions taken after learning of arbitration award**

17.     After learning of the arbitration award, I spoke with various Postal Service officials in an effort to forestall implementation of the conversion and minimize its impact on HCR contractors.  My efforts have not been successful.

18.     On October 7, 2016, our Association Attorney sent a letter to the U.S. Postal Service General Counsel requesting that USPS seek to vacate the arbitration award.  The October 7 letter explained that implementing the award would violate 39 U.S.C. § 5005(c) and the impacted HCR contractors' Fifth Amendment due process rights.  A copy of the Association's October 7 letter is attached as **Attachment D.**

19.     On November 16, 2016, we received the Postal Service's response letter, which was dated November 10, 2016.  The Postal Service stated that it would not seek to vacate the arbitration award and offered no relief to the impacted contractors.  The Postal Service stated that the impacted contractors would not have "viable breach of contract claims" against the Postal Service.  A copy of the Postal Service's November 10 letter is attached as **Attachment E**.

20.     On November 30, 2016, the Association brought an action an action in the U.S. District Court for the District of Columbia seeking to enjoin the Postal Service from following the arbitration award. *National Star Route Mail Contractors Association, Inc. v. United States Postal Service*, Case 1:16-cv-02350 (D.D.C.). The District Court ultimately dismissed the Association's action for lack of jurisdiction on December 19, 2016.

21.     Following the dismissal of the District Court action, I continued to communicate with senior Postal Service representatives about which HCR contracts the Postal Service planned to terminate and convert to PVS.   No USPS representative mentioned to me any Postal Service attempt to comply with Section 5005(c) in determining which HCR contracts to terminate and convert to PVS, or even any attempt to perform a cost comparison or complete PS Form 5505. To the contrary, the Postal Service representatives stated that they believed the arbitration award required them to convert HCR contracts to PVS *without* regard to Section 5005(c) and without performing the analysis it requires.

I declare under penalty of perjury that the foregoing is true and correct.

John V. "Skip" Maraney

Executed on:

_July 6, 2017_
Date

FILED

DEC -4 1975

WILLIAM L. WHITTAKER, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NATIONAL STAR ROUTE MAIL CARRIERS
ASSOCIATION, etc., et al.,

                Plaintiffs,

        v.

UNITED STATES POSTAL SERVICE,

                Defendant.

CIVIL NO. C-75-1894-SW

ORDER re MOTIONS, etc.

       This action having come regularly on for hearing before the Court on November 7, 1975 on the defendant's Motion to Dismiss or for Summary Judgment and the Motion of the American Postal Workers Union to Intervene; and

       The attorneys for the respective parties having been heard, and the Court fully advised in the premises, and the motions duly submitted,

       IT IS HEREBY ORDERED that:

       1.  The defendant's motion to dismiss the plaintiffs' contract cause of action is granted;

       2.  The remainder of the defendant's motion and the motion to intervene are taken under advisement.

       3.  Pursuant to the Stipulation of counsel filed October 28, 1975, RPB Enterprises, Inc. is substituted for Rubin P. Braverman as a plaintiff in the action and any reference to Rubin P. Braverman in any of the plaintiffs' preceding pleadings shall be read as



"RPB Enterprises, Inc." unless otherwise indicated by reference.

4.   Pursuant to Title 39, U.S. Code §5005(c), the defendant shall give due consideration to cost in determining what mode of transportation to select.  For purposes of this action, the procedure shall be as follows:

(a)   In the event the defendant determines to terminate any of the contracts for the conversion of service from Contract to Postal Vehicle Service, the defendant shall provide the plaintiffs, together with notice of termination but not less than thirty days prior to the effective date thereof, copies of defendant's final cost data in regard to the comparative costs of Postal Vehicle Service and Contract Service.

(b)   Within ten days after such notice, the defendant shall make available to the plaintiffs for depositions in Washington, D.C., its senior personnel responsible for preparation and evaluation of such cost data.

5.   The action is continued for Status Conference before the Court at 10:00 a.m., on December 4, 1975, in lieu of the Pre-Trial Conference previously ordered for that time and date.

Dated: 12 - 4 - 75

_Dennis Williams_
UNITED STATES DISTRICT JUDGE

APPROVED for Plaintiffs:

_William Denzer_

_A. Wilkin_

APPROVED for Defendant:

_William H_ (Melvin Rosenberg)

Attorney, Transportation, United States Postal Service

APPROVED for proposed Intervenor:

_David MacDonald_

-2-



MAIL PROCESSING GROUP
Washington, DC 20260

April 20, 1973

Mr. John V. Maraney
Executive Director
National Star Route Mail Carriers' Association
324 East Capitol Street
Washington, D. C. 20003

Dear Mr. Maraney:

This refers to your April 9, 1973 letter regarding revision of our
Form 5505. A copy of the proposed revised form is attached.

Any comments you may have to offer will be appreciated.

Sincerely yours,

T. E. Weir, Jr., Manager
Surface Transportation Branch
Transportation Services Division

Attachment

*Exhibit 3. P.1*



EXHIBIT

B

# COST EVALUATION-POSTAL VEHICLE SERVICE VS CONTRACT SERVICE
*(See instructions on reverse)*

| 1. ROUTE NO. | 2. TYPE OF ROUTE | 3. ANNUAL MILES | 4. ANNUAL ESTIMATED GROSS HOURS | 5. |
|---|---|---|---|---|

☐ EXISTING CONTRACT  
☐ EXISTING P.V.S.  
☐ PROPOSED SERVICE

6. FROM
7. TO

**8. NUMBER OF VEHICLES NEEDED**

| PASSENGER CAR OR STATION WAGON | TRUCK, LESS THAN 300 CU. FT. | 300 TO 600 CU. FT. | 600 TO 900 CU. FT. | VAN OVER 900 CU. FT. | BUS | TRACTOR | TRAILERS |
|---|---|---|---|---|---|---|---|

___FEET ___FEET ___FEET ___FEET ___FEET

9. CRAFT OF POSTAL EMPLOYEE ☐ MV OPERATOR ☐ CARRIER ☐ CLERK

10. USUAL LEVEL OF EMPLOYEE TO BE ASSIGNED

## DRIVER COST

| | | | |
|---|---|---|---|
| 11. WEEKDAY HOURS *(From Form 4533)* | | X252.32 | |
| 12. SATURDAY HOURS | | X 52.18 | |
| 13. SUNDAY HOURS | | X 51.75 | |
| 14. HOLIDAY HOURS | | X 9.00 | |
| 15. ANNUAL HOURS *(Sum of Lines 11-14)* | | | |
| 16. DEDUCT HOURS OF SERVICE COMBINED WITH TRIPS OTHERWISE REQUIRED | | | |
| 17. ADJUSTED NORMAL ANNUAL HOURS | | | |
| 18. ADJUSTED FOR CONTINGENCIES *(Line 17 x 1.03)* | | | |
| 19. PRODUCTIVE RATE PER HOUR $ | ADM. SUPPORT X1.012 | ADS. RATE = | |
| 20. ADJUSTED RATE *(Line 19)* | | HOURS (18) X | |
| 21. ABNORMAL COST, IF ANY *(See Instructions)* | | | |
| 22. TOTAL ANNUAL DRIVER COST | | $ | |

## VEHICLE COST

| | M/M CODE | COST PER HOUR HOURS *(Line 18)* | UNWEIGHTED COST |
|---|---|---|---|
| 23. | | | $ |
| 24. FACTOR FOR MECHANICS FEC COST | UNWEIGHTED COST $ | WEIGHTED COST $ | |
| 25. MPH THIS RTE. | LOCAL AVG. MPH | EXCESS MPH | |
| 26. COST PER MILE-OPERATING SUPPLIES FOR M/M USED @ 10% | | $ | |
| 27. COST PER MILE-PARTS AND MATERIAL FOR M/M USED @ 10% | | $ | |
| 28. COST PER MILE-LABOR M/M USED @ 10% | | $ | |
| 29. NO. OF TIRES ON GROUND X 50.801 = | | $ | |
| 30. TOTAL WEIGHTED COST PER *(Sum of Lines 26-29)* | | $ | |
| 31. | EX. CPM *(Line 10)* | EX. MPH *(Line 25)* | EX. COST PER HOUR | TOT. EXCESS COST |
| 32. TRAILER COST NO. ANNUAL COST $ | | | |
| 33. TOTAL VEHICLE COST | | $ | |
| 34. TOLL FEES *(Attach Statement)* | | $ | |

PROPOSED REVISION

| | |
|---|---|
| 35. TOTAL POSTAL VEHICLE OPERATING COST VEHICLES AND DRIVERS *(Line 22 + 33)* | $ |
| 36. TOTAL ANNUAL COST FOR CONTRACT OPERATION ☐ CURRENT RATE ☐ ESTIMATED RATE | $ |
| 37. TAXES FOREGONE IF POSTAL OPERATED *(Line 35 X 20%)* DIFFERENTIAL FOR EXISTING AND OTHER FOREGONE ITEMS NOT PAID BY POSTAL VEHICLE SERVICE | $ |

38. RECOMMENDATION BY POSTMASTER *(Vehicle Service or Contract)*
☐ POSTAL VEHICLE SERVICE ☐ CONTRACT _____ *(Signature)* _____ *(Date)*

39. RECOMMENDATION BY DISTRICT MANAGER *(Vehicle Service or Contract)*
☐ POSTAL VEHICLE SERVICE ☐ CONTRACT _____ *(Signature)* _____ *(Date)*

40. DECISION OF REGIONAL POSTMASTER GENERAL *(or his designated alternate(s))*
☐ POSTAL VEHICLE SERVICE ☐ CONTRACT _____ *(Signature)* _____ *(Date)*

Form 5505

*Exhibit 3-P.2*

Owner operated contract routes (generally $20,000 a year and less) and similar Postal vehicle Service Operations will be excluded from detailed cost comparisons.

Postmaster completes Item 1 through 37 and sends to the District Manager. The District Manager reviews and sends to the Regional Postmaster General.

The Regional Postmaster General, or his designated alternate(s), with advice from his assistants for Mail Processing, Customer Services, and Support, will review and approve the proposed service. If the annual cost is $300,000 or more, send the file to Director Logistics Office for coordination with the Director, Office of Vehicle Systems.

| Item | |
|---|---|
| 1. | Contract number of existing contract route. Leave blank if no contract exists. |
| 2. | Show whether predominantly city or open road driving (approximate % of miles each). |
| 3. | Annual miles of existing contract or computed miles for advertisement. |
| 4. | Estimated gross annual hours required to perform the service under contract. |
| 5. | Check appropriate box to show whether the service is existing contract, existing postal vehicle service, or proposed service. |
| 6. | Show headout point or core city. |
| 7. | If service operates primarily between two points, show outer point. |
| 8. | Number and type(s) of vehicle(s) required by statement of service specified as per attached contract. If tandem axles (tractors and/or trailers) are required - indicate. |
| 9 & 10. | Craft and level of employee who would be used if postal operated. |
| 11-14. | Prepare actual schedules on Form 4533 covering all service being considered. Include loading, shuttle, and unproductive paid layover time. The postmaster is expected to perform all service within the hours indicated if decision is to provide postal vehicle service. Multiply the total daily hours represented by Forms 4533 by the multipliers shown on the form. Use Multipliers from perpetual frequency table for unusual frequencies. |
| 15. | Total lines 11, 12, 13, and 14. |
| 16. | When service under consideration is, or can be, combined with trips of service that must be performed even if the service under consideration did not exist, then the annual hours of such necessary service should be entered here. Explain entries in Item 16 by memorandum. |
| 17. | Item 15 less Item 16. |
| 18. | Adjustment to allow for additional paid hours caused by late running. |
| 19. | Productive rate per hour is considerably higher than the payroll rate since it allows for annual, sick and holiday leave, and the USPS portion of fringe benefits. Obtain the latest accounting period basic hourly rate from the regional office based on the National Payroll Summary Report for the craft of employee(s). Multiply the basic rate by 2080 annual hours and divide the results by 1768 hours to allow for annual, sick and holiday leave. Multiply the results by 1.085 percentage to allow for the USPS portion of fringe benefits to equal the productive hourly rate. |
| 20. | Hours from Line 18 times the adjusted rate from Line 19. Result is the normal driver cost. |
| 21. | Additional pay for night differential, Sunday and Holiday Premium applicable to service covered by Forms 4533 (see instruction 11-14). |
| 22. | Sum of lines 20 and 21. |
| 23. | Use the Make/Model Cost Reports from the Accounting Division, Finance Department. Show make/model of vehicle(s) to be used and cost per hour for it. Multiply the cost per hour by the hours from line 18. The result is the unweighted vehicle cost. |

| Item | |
|---|---|
| 24. | Make/Model Cost Reports include full vehicle costs except for benefits for mechanics and paragemen provided by the Bureau of Employees Compensation for job related injuries. Multiply the unweighted cost by the factor shown. The result is the normal weighted vehicle cost that includes the B.E.C. cost. |
| 25-29. | Most postal operations are in city traffic with very low miles per hour caused by traffic and a substantial proportion of time at docks. Considerably more gasoline, oil and tires are used per hour in over-the-road miles as well as some additional maintenance. These sections are designed to make an equitable charge against postal vehicles when service is largely over highways or freeways. If more than one make/model will be used, distribute the total hours from Line 18 to each make/model and compute each on a separate Form 5505 and show the total only on a summary Form 5505. |
| 25. | Obtain miles per hour, this case, by dividing the miles, Section 3, by the hours, Line 15. If the mileage stated in Item 3 is not realistic, compute miles in the same manner hours are computed, Items 11 through 15. Subtract the local average miles per hour from the miles per hour, this case, to obtain the excess miles per hour. If the difference is less than 1 mile per hour, ignore it and proceed to Line 33. |
| 26. | If more than 1 m.p.h., show 100% of the regional cost per mile from the M/M Cost Report for OPERATING SUPPLIES (gasoline and oil). (Use the regional year-to-date cost for the last full fiscal year.) |
| 27. | Enter 10% of the cost per mile for PARTS and MATERIALS for the make/model(s) being considered. |
| 28. | Enter 10% of the cost per mile for LABOR for the Make/Model being considered. |
| 29. | Cost for tires and tubes averages about one mill per mile for each wheel on the ground. Multiply the number of wheels of the vehicle to be used by $0.001. The result is the cost per mile for tires and tubes. |
| 30. | Sum of lines 26 through 29. This is the cost for each mile per hour in excess of normal. |
| 31. | Multiply excess cost per mile from line 30 by excess m.p.h., line 25. The result is the excess cost per hour for miles per hour greater than normal. Multiply excess cost per hour from line 31 by the annual hours from line 18. The result is the annual cost for miles per hour in excess of normal. |
| 32. | Multiply the number of trailers required for the service by the total annual cost per trailer from the make/model cost report for the last full fiscal year. |
| 33. | Annual vehicle cost, sum of lines 24, 31 and 32. |
| 34. | Identify the total cost of turnpike, bridge, tunnel tolls, etc. and enter this total in line 34. Attach a statement of toll fees to the 5505. |
| 35. | Sum of lines 22, 33, and 34. |
| 36. | For existing contracts, check the first box and state the current annual rate for the service in terms of the miles shown in Item 3. For proposed service, check the second box and estimate the annual cost based on similar service in the area. |
| 37. | Self-explanatory. |
| 38-40. | Self-explanatory. Comments on remarks should be shown in a transmittal letter. |

*Exhibit 3 - P.3*

NATIONAL ARBITRATION PANEL

_____

In the Matter of the Arbitration    )
    )
between    )
    )
UNITED STATES POSTAL SERVICE    )        Case No.  Q06C-4Q-C 11182451
    )
    and    )
    )
AMERICAN POSTAL WORKERS    )
UNION, AFL-CIO    )
    )

_____

BEFORE:  Shyam Das

APPEARANCES:

    For the Postal Service:    Julienne W. Bramesco, Esq.
                                      Redding C. Cates, Esq.

    For the APWU:    Darryl J. Anderson, Esq.

Place of Hearing:    Washington, D.C.

Dates of Hearing:    November 12, 2015
                                        November 13, 2015

Date of Award:    August 18, 2016

Relevant Contract Provision:    Article 32.2

Contract Year:    2010-2015

Type of Grievance:    Contract Interpretation

2                              Q06C-4Q-C 11182451

Award Summary:

.

The Postal Service violated the National Agreement by notifying the Union of
HCR contracts after they have been let.  The Postal Service is ordered to cease and desist such
violations and to comply with the notice and procedural provisions of Article 32.2.B before it
awards a Highway Contract Renewal (HCR) contract.

The Postal Service also is ordered to comply with the following remedy:

(1)  Within six months of the date of this Award (unless otherwise
     agreed), the Postal Service shall convert the 110 (or whatever
     number there continue to be) disputed routes remaining in
     service (out of the original 212 cited violations) to PVS service
     for a four-year period.

(2)  By agreement, the parties may substitute other route(s) to be
     converted to PVS service pursuant to this order based on
     particular circumstances.

(3)  I retain jurisdiction to resolve any matters relating to
     implementation of this remedy.

Shyam Das, Arbitrator

<u>BACKGROUND</u>                    Q06C-4Q-C 11182451

This grievance was filed by the APWU on April 19, 2011, alleging that the Postal Service had continuously violated the provisions of Article 15 and 32 by notifying the National Union of Highway Contract Renewal (HCR) contracts after they have been let.  The Union cited 212 violations that occurred in 2010.  The Union asked for a comprehensive remedy requiring that the 110 disputed routes remaining in service be converted from HCR routes to PVS routes for the regular HCR contract period of four years.  The Union is also seeking compensation for the time after the violations when the routes have remained in service as HCR routes.[1]

The parties exchanged 15-Day letters on May 31, 2011.  At an initial arbitration hearing on September 4, 2014, the Postal Service requested bifurcation to determine whether the remedy for violations of Article 32.2 previously had been adjudicated, Case No. Q94V-4Q-C 96044758 (Das 2004), hereinafter referred to as the St. Petersburg Award.  On March 16, 2015, I issued an Interim Award in the present case, which included the following Findings:

---

[1] The Union requests: (1) that the 110 HCR contracts at issue that are still in existence be terminated and the work in question assigned to PVS employees for a regular-contract standard four-year period; (2) that, as compensation for the violation of Article 32.2 by contracting out under the HCR contracts that are now inactive, the bargaining unit be awarded compensation in the amount of $61,678,277; (3) that, as compensation for the wrongful contracting out of bargaining unit work under the 110 active contracts at issue, the bargaining unit be awarded compensation in the amount of $265,082,961 for fiscal years 2010 through 2015; (4) that, as compensation for any further delay in assigning this work to PVS employees, the bargaining unit be awarded compensation in the amount of $10,195,499 (or the appropriate proportion of that amount if some of the work is assigned to PVS) for each pay period after the Award in this case in which any of the 110 active HCR contracts has not been terminated and the work has not been assigned to PVS employees; (5) that the parties be instructed to meet and seek to reach an agreement on a remedy for all like or related violations of Article 32.2 that have occurred since the filing of the dispute in this case and that are the subject of a pending dispute between the parties; (6) that the Postal Service be ordered to cease and desist from failing to comply with the procedural requirements of Article 32.2; (7) that the Arbitrator retain jurisdiction to resolve any dispute about the implementation of this remedy award; and (8) that the Arbitrator retain jurisdiction to resolve any dispute over the validity of the various reasons offered by the Postal Service for its non-compliance with Article 32.2, including:

- That the renewed contracts were emergency contracts
- That the renewed contracts were short-term contracts
- That the renewed contracts were temporary contracts
- That the renewed contracts were being extended to permit compliance with Article 32.2.

In my 2004 St. Petersburg Award, which involved an admitted Article 32.2 notice violation involving work in St. Petersburg, I rejected the Union's contention that a uniform compensatory remedy such as it was seeking was required in all such cases.  I held that "a determination that one remedy fits all Article 32.2 notice violation cases is not warranted."  I provided a list of factors "an arbitrator conceivably could properly consider in fashioning a remedy for a violation of Article 32.2 of the sort at issue in this case."[3]  The statement of my Award was as follows:

> The National Agreement does not mandate the remedy
> sought by the Union for notice violations under Article
> 32.2.  The issue of remedy in the underlying grievance
> involving HCR 33549 in St. Petersburg is remanded to
> the local level, including regional arbitration if necessary.

The grievance in that particular case, as in the present case, was initiated at Step 4.  Article 32.2 notice violation grievances prior to the St. Petersburg case, to my knowledge, had been filed and grieved locally and -- if they went to arbitration -- were arbitrated at the regional level.[4]  I treated the issue of remedy as one that would turn mostly on local facts, which in a case like that -- which the Postal Service claimed was an isolated instance of a notice violation -- was appropriate.  In that case, I did not focus on the fact that notice under Article 32.2 and the procedure triggered by such notice occurs at the National level, that is, between Postal Headquarters and the National Union.

Res judicata does not apply in this case.  In St. Petersburg the Union was seeking a uniform remedy for every Article 32.2 notice violation regardless of other circumstances.  I ruled against that.  Here, the Union asserts the need and right to obtain an

_____

[3]The Postal Service conceded that the compensatory remedy the Union sought in that case could be appropriate in a particular case -- meaning a particular individual case -- depending on the circumstances.

[4] The Postal Service more generally maintained in that case that National level arbitrators consistently had rejected Union demands for blanket remedies, and, instead, remanded grievances from the National level to the regional level for resolution.

effective remedy at National arbitration for what it alleges is a systemic and pervasive failure by the Postal Service at the National level to provide the required Article 32.2 notice in literally hundreds of cases.  The Union alleges that the Postal Service knowingly and repeatedly violated Article 32.2 and characterizes the Postal Service's action as, in effect, an abrogation of the parties' contract.  Whatever the merits of the Union's contentions or its proposed remedy, this grievance raises different issues than the St. Petersburg case.  Moreover, the Union's complaint really cannot be addressed on a case-by-case basis particularly at the regional arbitration level.  The St. Petersburg Award rejected the notion of one remedy fits all Article 32.2 notice cases.  It did not address the issue of a comprehensive remedy for the sort of National level violation of Article 32.2 alleged by the Union in this case.

The Postal Service further argues that the Union has not identified an interpretive issue to be decided in this case, pointing out that there is no dispute regarding the language of Article 32.2 and that the issue of remedy was presented and decided in the St. Petersburg Award.

To be sure, the Union cannot simply consolidate multiple separate notice violation claims each of which needs to be considered on its own merits with respect to whether there was a violation and, if so, what is the appropriate remedy.  That would not raise an interpretive issue.  But if the evidence establishes what the Union alleges in this case -- a wholesale abrogation or disregard of the notice requirements in Article 32.2 by the Postal Service at the National level -- then the issue of whether the Postal Service's actions or inactions warrant the sort of comprehensive and extraordinary remedy the Union seeks -- which can only be obtained in National arbitration -- could constitute an interpretive issue for purposes of Article 15.  See my decisions in the September 6, 2002 Interim Award in the St. Petersburg case (Case No. Q94V-4Q-C 96044758) and in Case Nos. Q06C-4Q-C 10032106/10005587 (2010) and the National Awards cited therein.

The provisions in Article 15.2.Step 1(a) allowing for a class action grievance relate to class actions arising in a single office, not the situation posited here by the Union.  And the Union's ability to possibly file an unfair labor practice claim before the NLRB does not mean it is foreclosed from seeking a remedy under the grievance and arbitration provisions of the National Agreement.

Accordingly, I conclude that National arbitration of this grievance is not barred by res judicata and that, as set forth above, this grievance may present an interpretive issue properly to be decided in National arbitration.  That will depend on the evidence developed at a hearing on the merits.

INTERIM AWARD

The arbitrability or jurisdictional issues raised by the Postal Service in opposition to arbitration of the Union's Step 4 grievance in this case are resolved on the basis set forth in the final paragraph of the above Findings.

There is no dispute that the Postal Service has nearly always used two types of services side by side for highway movement of mail: Highway Contract Services, which are contracted services, and Postal Vehicle Services (PVS) which is made up of APWU MVS craft employees.  Article 32.2.A provides:

The American Postal Workers Union, AFL-CIO, and the United States Postal Service recognize the importance of service to the public and cost to the Postal Service in selecting the proper mode for the highway movement of mail.  In selecting the means to provide such transportation the Postal Service will give due consideration to public interest, cost, efficiency, availability of equipment, and qualification of employees.

Article 32.2 requires the Postal Service to provide the Union at the National level with notice, which includes certain information, prior to the installation of HCR service so that the Union can provide a bid for that work.[2]  This information, as specified in Article 32.2.C, includes:

1.      A statement of service including frequency, time of departure and arrival, annual mileage, and proposed effective date of contract.

2.      Equipment requirements.  If not comparable to standard USPS equipment available at that facility, the reasons

---

[2] Article 32.2.G defines the routes that are subject to Article 32.2.  Generally excluded are routes longer than 350 miles round-trip or more than 8 hours in operating time from terminus to terminus.

therefore along with the cubic foot justification are to be provided.

3.      A statement as to whether the proposed contract is a renewal of an existing contract and/or a partial or completely new contract solicitation.

4.      For contract renewals, the current contractual cost is to be provided along with any specifics, if the terms of the renewal are modified to whatever degree.

5.      If the new contract solicitation replaces in part or in whole existing Postal Vehicle Service (PVS) service, specifics as to the existing PVS service are to be provided as to the span of operating time, equipment utilization, annual cost, how the PVS employees impacted will otherwise be utilized and the projected United States Postal Service cost for subcontracting the work in question.

The Agreement also specifies in Article 32.2.B, the time period for the exchange of information and meetings between the parties:

This information will be furnished at least sixty (60) days prior to the scheduled Installation of the service.  Within forty (40) days of being furnished such information, the Union may request a meeting to discuss specific contract(s).  Within forty-five (45) days of being furnished such information, the parties will exchange the basic cost analyses in order to facilitate discussions.  The parties will meet on or before the sixtieth (60th) day.  At no time will the subject highway contract(s) for which a meeting has been requested be awarded prior to the actual meeting.

(Emphasis added.)

The Postal Service acknowledges that it provided late notice -- after the HCR contracts had been renewed -- during the period covered by this grievance, but stresses that the parties subsequently engaged in the substantive procedures outlined in Article 32.2.B as referenced above.  The parties held meetings, exchanged documents, and discussed the relative costs of HCR versus PVS.  The parties disagree about whether those meetings truly afforded the Union the opportunity to make a competitive bid for the contracted services or if they were merely perfunctory and meaningless since the contracts already had been awarded.

## APWU POSITION

The Union contends that the Postal Service's use of HCR contractors is excessive and inefficient.  More importantly, the Union has done all it can to get the Postal Service to comply with Article 32.2 and it argues that it is entitled to an effective remedy now.  The Union presented arguments and testimony which it says show why a prospective remedy is necessary to correct the contract violations in this case and why the remedy can be provided without imposing an undue hardship on the Postal Service.

At the outset, the Union stresses that HCR routes are contracted out bargaining unit work, and that all 212 contracts at issue in this case had been renewed before the Postal Service gave Article 32.2 notice to the Union.  In every case, the Union provided a cost estimate for the PVS to perform the service in question and requested an Article 32.2 meeting.  No manager with Surface Transportation Operations (STO) responsibilities participated in the discussions.  Of the 212 routes in the original dispute, 110 are ongoing.   The contracts all began in 2010 and expired in 2014, and the Union received renewal notices on fewer than 50 of them.

By way of background, the Union asserts that Article 32.2 procedures were generally followed until around 2008, but the Union considered the process to be unfair and regularly voiced its complaints to the Postal Service.  As Union witnesses testified, the Union's major complaints, besides its confirmed belief that non-notifications were widespread, were that the cost comparisons being done by the Postal Service were incorrect and unfair, and that the Postal Service paid no attention to the Union's arguments on other factors the Postal Service had to give due consideration under Article 32.2.  In particular, it points to changes in Form 5505 made in 1992, which the Union failed to timely grieve under Article 19.  These changes and the manner in which the Postal Service administered Form 5505 resulted in:  (i) double counting of trucks; (ii) overstatement of PVS management and tort costs and understatement of HCR administrative costs; and (iii) failure to take into account Postal Service payment of HCR fuel costs.  The Postal Service also ignored information about overlapping runs that could be

combined to save money, part-time flexible drivers not working full time, full-time drivers on standby time, and idle trucks that could be used to haul mail then being hauled by HCRs.

The 212 violations at issue here, the Union maintains, are part of a broader pattern of violations that began years earlier and continued after this dispute was filed in 2011. The remedies requested by the Union are based on those 212 violations, but the Postal Service has not complied with Article 32.2 in any case since 2010, which means there are many more than 212 cases at issue and there is a need for the remedies sought by the Union.

The Union asserts that Labor Relations representatives sought to characterize later violations as efforts to comply with the contract.  Many of the violations in this case were repeated four years later when the contracts in dispute were renewed. In the St. Petersburg case, the Union was seeking a uniform remedy to be applied in individual cases.  Here, the Union says it is seeking a remedy for the wholesale violation of Article 32.2.  The Union also claims that after St. Petersburg, the Postal Service moved to dismiss article 32.2 arbitrations at both the regional and the national level.   The Postal Service, having established through the St. Petersburg arbitration that remedies must be sought case by case at the local level, then sought to cut off Regional Arbitration of cases that originated at the local level, on the ground that the 32.2 notice obligation is owed to the National Union, not to the locals.  It was simultaneously opposing the Union in this case on the ground that is was necessary to seek remedies for the notice violations at issue by proceeding to Regional Arbitration, and arguing in Regional Arbitration that Regional Arbitrators have no jurisdiction over such cases because the notice obligation is owed to the National Union.  The Union argues that the Postal Service, by moving to dismiss this case on the ground that the St. Petersburg Award precluded the Union from seeking the remedy it seeks here, was trying to force all 212 violations at issue down into a Regional Arbitration system where they could be defeated, or at least neutralized, one by one. Moreover, at the Regional level, no effective remedy could be provided for the systemic and wholesale violations of Article 32.2 that occurred at the National level.

According to the Union, the Louisville Dynamic Routing Project, paid for by the Union, shows how the Postal Service can convert HCR Contracts to PVS and save money.  The

Union paid more than $900,000 to Satish Jindel and SJC Consulting, Inc. in an effort to persuade the Postal Service that, by using the flexibility and cost-saving features of the 2010 National Agreement and by combining PVS and HCR Routes, the Postal Service would find that using the PVS would be less costly than subcontracting the highway transportation of mail. Jindel, who was introduced to the Union through his consulting work with the Postal Service, developed, and SJC Consulting carried out, what the Union now refers to as the Louisville Dynamic Routing Project.  Jindel concluded, as supported by his testimony at arbitration, that by using route optimization combining PVS and HCR routes, and by using PSEs as permitted under paragraph 2 of the parties' Motor Vehicle Craft Jobs MOU, substantial savings could be obtained.

The Union also insists that converting all 110 remaining HCR Routes in dispute to PVS would not be costly for the Postal Service.  The Union's principal consulting economist, Kathryn Kobe, compared the cost of the still-operating HCR contacts -- using costs provided to the Union by the Postal Service under paragraph 2 of the 2010 MOU on Motor Vehicle Craft Jobs -- with the costs that the Postal Service would incur if it were to use PVS employees to perform the same work.[3]  Kobe testified about her calculations for the first and third quarters in 2015.  In Quarter 1, 2015, in 41 cases, which represent 41% of the 110 active routes, the estimated costs for the PVS routes were the same or lower than those for HCR routes.  The total cost by which the PVS estimates exceeded the HCR estimates for all 110 active routes was $3.5 million.  In Quarter 3, 2015, in 57 cases, which represent 52% of the 110 active routes, the estimated costs for the PVS routes were the same or lower than those for the HCR routes. The total cost by which the PVS estimates exceeded the HCR estimates for all 110 active routes was $1.6 million.  The Union notes that the cost differential between the PVS and HCR is small, and the Postal Service data is not as reliable as it should be.  The Postal Service could

---

[3] Under paragraph 2 of the MOU, in addition to agreeing to convert a minimum of 600 HCR routes to PVS without reference to the relative cost of the two services or any other factor, the Postal Service agreed to a joint review of approximately 8,000 other existing HCRs to determine whether the contracts for those routes could be terminated and the routes converted to PVS routes without increasing Postal Service costs.

reduce costs further by combining HCR routes with PVS routes -- the Louisville Dynamic Routing concept -- and be certain that overall costs would be lower than current costs.

The Union stresses that there is precedent for the remedies it requests in this case.[4]  The language of Article 32.2.B is mandatory and unambiguous:  "At no time will the subject highway contract(s) for which a meeting has been requested be awarded prior to the actual meeting."  It asserts that if the language were applied literally, then all 212 routes at issue in this case were subcontracted in violation of a condition precedent, and those subcontracts are void, or voidable.  The Union references the time limits in other articles of the CBA, but says that in this case it is not suggesting that every Postal Service failure to provide an Article 32.2 notice 60 days before installation of the service is as fatal as a Union failure to grieve a discharge within 14 days or a Union failure to file an Article 19 challenge within 90 days.  Rather than arguing, as it did in the St. Petersburg case, that a single standard should be set and applied to all similar cases, here the Union is asserting that the Postal Service engaged in a protracted, willful, wholesale violation of Article 32.2.  The Union is seeking a remedy sufficiently effective to compensate for the 212 violations that occurred in the context of what it contends was the virtual abrogation of Article 32.2 by the Postal Service.

Although the Union distinguishes this case from the St. Petersburg case, it discusses the six St. Petersburg factors and how each might be applied to this case. Additionally, the Union cites as a seventh factor "the nature of the bargaining relationship," which was mentioned by Arbitrator Mittenthal in a passage from a 1989 decision (Case Nos. H1C-NA-C 97 et al.)  quoted in the St. Petersburg Award.  The first factor is whether the specific work at issue previously was performed by Postal Service employees or was new work. Here, the Union argues that this criterion favors their requested remedy.  The Postal Service has acknowledged the interchangeability of PVS and HCR work and under the terms of the 2010 National Agreement, the HCR routes will not cost significantly more when converted to PVS and may cost less.  The second factor is whether the Union was deprived of a meaningful opportunity to propose alternatives to subcontracting or -- as the Postal Service claimed in the

---

[4] The monetary remedies requested by the Union were calculated by Kobe based on labor costs using the contractual bargaining unit wage rates specified in Article 32.2.

Case 1:17-cv-00934-VJW Document 3 Filed 07/12/17 Page 65 of 262

St. Petersburg case -- whether the verifiable difference in costs was so great that there is no chance that the Union could have persuaded the Postal Service to assign this work to its employees.  The Union explains that the phrase "meaningful opportunity to propose alternatives to subcontracting" has two components, (1) the opportunity to meet in good faith to propose alternatives and show why PVS would be a better choice than the pending HCR route, and (2) the substance of the proposed alternatives.  According to the Union, the evidence shows that the Postal Service knowingly, willfully, and intentionally denied the Union a meaningful opportunity to make proposals and present evidence under Article 32.2.  Additionally, the Postal Service distorted substantive information made available to the Union by overstating PVS costs and understating HCR costs.  The third factor is whether there are circumstances other than costs that might have come into play, such as in this case that, at the time the violations at issue occurred, there was excess PVS capacity.  The fourth factor is the nature of the circumstances which resulted in the failure to provide notice to the Union, and the fifth factor is whether this was a very rare inadvertent exception -- as the Postal Service claimed in the St. Petersburg case -- or was just one example of a more widespread failure to provide notice -- as the Union's witness suggested might have been the case.  The Union argues with regard to these two factors that the Postal Service's widespread violations of Article 32.2 in the present case were knowing and willful.  The sixth factor is the nature of the impact of the subcontracting on the bargaining unit.  The Union contends that had the Article 32.2 meetings been held in good faith, they might have been productive.  The seventh factor is the nature of the bargaining relationship.  The Union stresses that this factor weighs heavily in favor of awarding an effective remedy for the violations at issue now.  The Postal Service has tried to gain Postal Service compliance with Article 32.2 for years with no results.  A direction that the Postal Service merely start complying with Article 32.2 in the future would be no remedy at all.

        The Union also points to arbitration precedent which it claims supports the provision of a strong remedy in this case.  Arbitrators have broad powers to fashion necessary and appropriate remedies.[5]  That authority extends to remedies for violation of contract provisions that do not expressly make provision for a remedy in the event they are breached.

---

[5]See:  Case No. H4N-NA-C-21 et al. (Mittenthal 1986), citing United Steelworkers of America v. Enterprise Wheel & Car Corp., 80 S. Ct. 1358, 1361 (1960).

Additionally, the arbitrator needs creativity and a deep understanding of the parties'
relationship.[6]   Here, the Postal Service continuously violated the requirements under Article
32.2.  There is strong precedent holding that the Postal Service cannot avoid a remedy in this
case by arguing that, even if it had complied with Article 32.2 and given due consideration to all
the factors there, no work would have been awarded to the Union.  The Union cites Case No.
Q94V-4Q-C 96044758 (Das 2004) where the following passage from Arbitrator Mittenthal in
Case Nos. H1C-NA-C 97 et al. (1989), was adopted:

> Arbitrators have an extremely large measure of discretion in
> determining how a contract violation should be remedied.  They
> can and should consider the nature of the wrong done, the
> damage (or lack thereof) to the employees, the practical impact of
> the remedy sought, the nature of the bargaining relationship, and
> other such matters.

The case here is not one of an isolated and inadvertent event.  The Postal Service violated
Article 32.2.B in a wholesale manner and did nothing to correct those violations.  It renewed
hundreds of HCR contracts without giving due consideration to the factors it must consider
under Article 32.2 before it awards or renews a contract.  Furthermore, the Union points out that
in the AOI subcontracting case, Case No. Q94T-4Q-C 97031616 (Interim Supplemental Award)
(Das 2013), a simplistic "do-over" approach as proposed by the Postal Service was found not to
be appropriate.  The Union stresses that in that case I wrote:  "I am not persuaded that directing
the parties to reenact the Article 32 [Section 1.B] process more than 15 years after the fact --
with the Postal Service in control of the final outcome -- would be an appropriate remedy in this
case."  Instead, the parties were directed to present evidence and arguments taking into
account the discussion of remedy in the St. Petersburg case.  Therefore, the Union asserts that
giving the Postal Service a "do over" is not appropriate.

As several National Arbitrators have recognized, the Union asserts, the
procedures required by Article 32.1.B and Article 32.2.B are an integral part of the "due
consideration" of five factors that is required by Article 32.1.A and Article 32.2.A.  The Union

---

[6] See:  Case No. H7C-NA-C 36 et al. (Mittenthal 1994); and Case No. H4C-NA-C 77 et al.
(Mittenthal 1988).

presents information in the Article 32.2 meeting based on those five factors:  "public interest, cost, efficiency, availability of equipment, and qualification of employees."  Thus, the Union argues that the notice and meeting provisions of Article 32.2.B are part and parcel of the due consideration requirements of Article 32.2.A.  According to the Union, without hearing the facts and arguments provided by the Union in the Article 32.2 meeting, the Postal Service cannot give issues relating to subcontracting due consideration.  Because the notice must be accompanied by detailed information, which is then followed by a meeting, much more is at stake than just notice.  The Union contends that the Postal Service is not giving the specified factors due consideration unless it considers the information and arguments presented by the Union before it makes its decision to award or renew the contract.  The Union stresses that the gravamen of the requirement in 32.2.B is that "[a]t no time will the subject highway contract(s) for which a meeting has been requested be awarded prior to the actual meeting."

The Union insists the Postal Service misstated the issue in this case when it said it would like it to be: "[w]hat's the appropriate remedy for a procedural violation to Article 32.2.B when the Postal Service fails to timely notify the Union of HCR renewals."  The actual issue, the Union insists, is about what remedy to apply for 212 documented and undenied violations that occurred in 2010, when the Postal Service had completely stopped providing timely notices and meetings under Article 32.2.  This case is not a re-play of the St. Petersburg case, but must be informed by the evidence presented here.  Also, more than notice occurs under Article 32.2. B.  The Union reiterates that notice under 32.2.B initiates and underpins the due consideration requirement of 32.2.A.

Finally, the Union asserts that the Postal Services arguments are unavailing.  Notice and meeting after the contract is awarded and the work has begun is not compliance under the contract.  Article 32.2 makes it clear that notices, exchanges of information and meetings are to take place prior to the scheduled installation of service.   Notice and meetings after the contract is awarded plainly is in violation of the contract.  The Union stresses that the Postal Service presented no evidence that the late notices led to meetings and information exchanges that were the equivalent of timely compliance.  The absence of any STO manager at any meeting makes it clear that no STO manager was giving any serious attention to what the

Union was saying in the untimely meetings.  Restoration of the status quo ante in this case requires that the contracts awarded without prior compliance with Article 32.2 be rescinded. The additional remedies requested by the Union are required to provide a meaningful remedy to the Union in this case.  It is not possible, here, literally to restore the status quo ante.  Even if it were feasible to reenact the Article 32.2 process, the reenactment would provide no remedy for the willful violations of the requirements of Article 32.2 that occurred in this case.

## POSTAL SERVICE POSITION

        The Postal Service argues that the Unions demand for damages is unjustified and unsupported.  The Postal Service acknowledges its procedural violations, but points out that those violations did not preclude the Union from actively engaging with management in the substance of the Article 32.2.B renewal process.  There is neither legal nor factual support for an award that includes massive monetary back pay and a redistribution of work to the Union moving forward at greater cost to the Postal Service.  The Postal Service insists that the Union should not be awarded a windfall or what would amount to punitive damages.

        The Postal Service stresses that an arbitration remedy must find its essence in the agreement.  Although an arbitrator has broad discretion to construct an appropriate remedy, there are certain guiding principles established in arbitration precedent that are reflected in Elkouri and Elkouri, How Arbitration Works 18-16 (7th ed. 2012) (Kenneth May, Ed.).   The purpose of an arbitration remedy is to restore the status quo; that is, to place the parties in no better or worse position than they would have been in had there been no contract violation. Damages must be proven with reasonable certainty and should normally correspond to the specific monetary losses suffered. Speculative damages are to be avoided.

        The Postal Service insists the Union's request that the bargaining unit be awarded all HCR work and economic damages for years of work performed by HCRs is groundless.  The Union has not shown that "but for" the tardy notice of renewal, the Postal Service would have removed the work for each and every HCR contract and awarded the work

to the Union.   The Postal Service argues that the Union has not proved this causal connection, which is necessary in order to be entitled to damages.

The Postal Service contends that the Union got everything it was entitled to under Article 32.2.B. The Union was not financially damaged by the tardy notice because the Postal Service gave it every benefit of the bargain.  The Postal Service complied with the other provisions of Article 32.2 once notice was provided. The Union had the chance to present its cost comparison information, which the Postal Service says is all that is required under Article 32.2.  The Postal Service acknowledges the late notices, but stresses that the evidence shows a continuous and consistent attempt on the part of the Postal Service to comply with the spirit -- if not the words -- of the contract provision.

The Postal Service explains that in 2013 it attempted to rectify the contract violation by awarding certain HCR contracts on a temporary extension basis so that the parties could have the opportunity to meet and discuss the renewal before a final, more long-term contract was entered into.  The Postal Service stresses that it never refused to meet or respond to the Unions information requests and it fully participated in the process.[7]  The process required by Article 32.2 was completed, the Postal Service stresses, despite the late notice.

The Postal Service argues that the Union is asking the arbitrator to re-write the contract.  The Union introduced much of its evidence as background in an attempt to use this grievance as an opportunity to advance its real claim: that the Postal Service allegedly fails to properly compare HCR and MVS costs for certain routes that the Union contends it can perform more cheaply.  Although there are some limitations on subcontracting, Article 32.2.B does not change the Postal Services right to subcontract if the proper procedures are followed.  The Union is not seeking a remedy for late notice, the Postal Service insists, but is seeking a remedy to re-write contract language that it does not like.

---

[7] The Labor Relations Specialist who met with the Union testified that she served as a liaison between STO managers and the Union, obtaining and providing information when requested by the APWU.

        The Postal Service argues that a cease and desist order is the only appropriate
remedy for the notice violation in this case.   The cease and desist remedy has been used in the
past where the Union suffered no quantifiable harm.  The Postal Service contends that
precedent shows that arbitrators have not awarded monetary relief for an Article 32
subcontracting violation where the bargaining unit did not suffer any monetary harm.  Here, the
HCRs in question were existing contracts, thus no employee was harmed when the work
continued to be performed by HCR.  Also, the employees who were engaged in PVS work
continued to do their work without interruption.  The HCRs in question were not new contracts --
the work at issue was HCR work -- yet the Union argues that the arbitrator should award them
this work because they can do it more cheaply.  However, Article 32.2 only gives the Union the
opportunity to bid for the HCR work, and does not guarantee receiving the work.

        The Postal Service asserts that the Union has not demonstrated that the Postal
Service's tardy notice would have made a substantive difference in the ultimate decision to
continue to subcontract the work.  The evidence suggests that the Postal Service would still
have renewed the HCRs.  It also points to one of the Union's own witnesses, Satish Jindel, who
suggested that under current working conditions it was more efficient for the Postal Service to
use HCRs than PVS.   The issue of whether the HCR or PVS employees can perform a route
more cheaply is not at issue in this case.  The time to litigate the proper cost comparison
method is in the actual grievances addressing that issue.

        The Postal Service further argues that the arbitrator should not consider the
Union's expert report on damages to calculate a monetary remedy for two reasons. The Union's
economist, did not establish causation between the alleged harm resulting from the Postal
Services failure to timely notify the Union and the calculation performed.   Also, even setting the
issue of causation aside, this report should not be relied upon to support a damage calculation
because Kobe made a series of errors in her calculation methodology.  One example is that she
mistakenly used a figure from the Make and Model Report that represented all Postal Vehicles,
instead of the subset of the figure that represented the actual number of trucks used by PVS.
Because of the mistakes she made there is no way that Kobe's report could be considered an
accurate representation of damages.

Finally, the Postal Service says that not only was the Union not financially harmed because of the late notice, but also the Postal Service did not benefit by it.  There were no cost savings, because it continued to pay employees and contractors, and it renewed routes that were already contracted out.  It did not save any time, because it continued to send people to attend meetings.  Moreover, the Postal Service stresses that it did not receive unfair profits by remaining with its HCR contractors, because those were already existing agreements.

<div align="center">FINDINGS</div>

Article 32.2.B of the National Agreement provides that the requisite notice ("information") "will be" furnished to the Union at least sixty days prior to the scheduled installation of highway contract service.  This includes HCR renewals.  The Union has forty days in which to request a meeting to discuss a specific contract.  The parties then are to exchange basic cost analyses within forty-five days and meet on or before the sixtieth day since the notice.  In no uncertain terms, Article 32.2.B states:

> At no time will the subject highway contract(s) for which a meeting
> has been requested be awarded prior to the actual meeting.

Timely notice is a necessary prerequisite for the Union to exercise its right to request a meeting before which the Postal Service is proscribed from awarding a highway contract.

The Postal Service in this case has not disputed that during 2010 and in subsequent years it engaged in wholesale and repeated violations of its obligation not to award an HCR contract before:  providing notice, giving the Union the opportunity to request a meeting, and, if a meeting is requested, exchanging basic cost analyses and meeting with the Union to discuss the subject contract.  The Postal Service has not offered an explanation for why it failed to comply with Article 32.2.B or to take effective corrective action even after the filing of this National grievance in 2011.[8]  Consistent with my March 16, 2015 Interim Award in

---

[8] The Postal Service claims it did attempt to comply with the spirit -- if not the words -- of Article 32.2.B and it cites the awarding of temporary extension contracts in 2013 to allow additional

this case, the Union has presented an interpretive issue for purposes of Article 15.  A remedy for this extraordinary notice violation -- involving notice to be given to the Union at the National level -- is not one that effectively can be dealt with at the local level or through separate grievances tied to individual HCRs.

The Postal Service claims that the Union nonetheless got the full benefit of its bargain with the Postal Service when notices ultimately were provided after the HCR contracts had been awarded.  According to the Postal Service, the Union then had the opportunity -- which it evidently availed itself of -- to request a meeting and the parties then proceeded in accordance with the procedures in Article 32.2.B.  But discussion and review and consideration by the Postal Service of the factors in Article 32.2.A <u>after</u> a service contract has been let cannot be presumed to be equivalent to the procedure the National Agreement provides for and, critically, is not what the parties bargained for.

A cease and desist order, as the Postal Service proposes, of course, is warranted.  It is proper and necessary, but is not by itself sufficient given the nature of the Postal Service's violation, including that it was systemic, knowing and not shown to have resulted from circumstances beyond management's control.  At the same time, any additional remedy must be related to and proportional to the harm -- as best it can be determined -- to the Union and the bargaining unit.

This case is about the Postal Service's failure to timely comply with the notice and discussion provisions and the "At no time..." provision in Article 32.2.B.  This case does not encompass issues relating to the Union's myriad complaints regarding the substance of the cost analyses and the discussions between the parties and their impact on the Postal Service's application of the "due consideration" provision in Article 32.2.A.  Much of the Union's evidence, ostensibly presented as background, focused on those other issues.  The Union is correct that the notice requirement in Article 32.2.B initiates the process that leads to exchange of cost analyses, discussion and ultimate consideration by the Postal Service of the factors in Article

---

time to follow the procedure mandated by the contract, but it did not establish that it had brought the process back into compliance.  Moreover, as the Union urges, this use of temporary contracts may not have been authorized by Article 32.2.

32.2.A, but the import of this evidence was to show that, from the Union's perspective, in most HCR contract renewal cases -- even where timely notice was provided and Article 32.2.B procedures adhered to -- the Union effectively was confronted with a stacked deck -- in part because of its own failure years ago to challenge revisions to Form 5505.

The Union cites two decisions by Arbitrator Mittenthal in support of its monetary remedy claim in this case. The first case, Case No. H4C-NA-C 77 et al. (1988), involved the Postal Service's widespread and continuing violations of a requirement that 90% of the workforce be full-time employees. Arbitrator Mittenthal rejected Postal Service arguments against granting specific relief for those violations in a National level grievance. But his award provided for back pay to part-time employees who would have been converted to full-time status if the Postal Service had complied with the contract. These were identifiable employees who had lost earnings as a result of the Postal Service's violation. The second case, Case No. H7C-NA-C 36 et al., involved the Postal Service's repeated violation of a 5% cap on the hiring of casual employees. The work performed by the excess casuals was work that contractually should have been performed by bargaining unit employees. Although he recognized that there was only a slim possibility of identifying the injured employees, Arbitrator Mittenthal remanded the remedy question to the parties for further consideration, concluding that: "Some form of monetary remedy is plainly justified." In that case, however, not only was the actual harm to the bargaining unit -- if not identifiable employees -- clear, but, as Arbitrator Mittenthal stressed:

> It [the Postal Service] had been ordered by an earlier award to
> 'cease and desist' from exceeding the casual ceiling.
> Notwithstanding this order, it plainly exceeded the casual ceiling in
> some twenty different accounting periods over five years.

The situation in the present case differs in that there is little likelihood, as a general matter, that even if the Postal Service had provided timely notice and otherwise followed the procedure mandated by Article 32.2.B the Postal Service would have retrieved the HCR work at issue for performance by the bargaining unit rather than renewing the contracts.[9] The Union's own evidence supports this conclusion. Other changes -- not at issue in this case

---

[9] The result in some individual cases may be different, but those cases are not before me.

-- would have been required for the Union to make any substantial inroads.  Moreover, in this case, the Postal Service was not in violation of an existing cease and desist order.[10]

In sum, I am not persuaded that granting the Union's requested monetary remedy is appropriate or justified in this case.  As previously indicated, however, the Postal Service's widespread and repeated disregard for the requirement of timely notice and continuing violation of the "At no time..." provision in Article 32.2.B requires more than a cease and desist order.  The Postal Service had ample opportunity to correct its ways and has offered no compelling explanation for not having done so in response to this 2011 grievance.

Accordingly, in addition to a cease and desist order directing the Postal Service to comply with the notice and procedural provisions of Article 32.2.B before it awards an HCR contract, I will grant the following remedy:

(1)   Within six months of the date of this Award (unless otherwise agreed), the Postal Service shall convert the 110 (or whatever number there continue to be) disputed routes remaining in service (out of the original 212 cited violations) to PVS service for a four-year period.[11]

(2)   By agreement, the parties may substitute other route(s) to be converted to PVS service pursuant to this order based on particular circumstances.

Part of the context I have taken into account in providing this particular remedy is that the Postal Service's violation of Article 32.2 is not limited to the 212 cited violations that occurred in 2010, but has been widespread and repeated.  Together with the cease and desist order, this is

---

[10] Such an order is included in the remedy to be granted in this case, and any future violations will have to be evaluated for remedy purposes in that context.

[11] I recognize that the Postal Service may be required to idemnify contractors, but that is a risk it took by awarding contracts in contradiction to Article 32.2.B.

20                           Q06C-4Q-C 11182451

intended to remedy the harm to the Union and the bargaining unit arising from these violations and to impress upon the Postal Service its obligation to fully comply with the procedures it agreed to with the Union.

<u>AWARD</u>

The Postal Service violated the National Agreement by notifying the Union of HCR contracts after they have been let.  The Postal Service is ordered to cease and desist such violations and to comply with the notice and procedural provisions of Article 32.2.B before it awards a Highway Contract Renewal (HCR) contract.

The Postal Service also is ordered to comply with the following remedy:

(1)  Within six months of the date of this Award (unless otherwise agreed), the Postal Service shall convert the 110 (or whatever number there continue to be) disputed routes remaining in service (out of the original 212 cited violations) to PVS service for a four-year period.

(2)  By agreement, the parties may substitute other route(s) to be converted to PVS service pursuant to this order based on particular circumstances.

(3)  I retain jurisdiction to resolve any matters relating to implementation of this remedy.

Shyam Das, Arbitrator

# HUSCH BLACKWELL

David P. Hendel
Attorney

Husch Blackwell LLP
750 17th Street, N.W., Suite 900
Washington, D.C. 20006-4656
Direct: 202.378.2356. Fax: 202.378.2318
david.hendel@huschblackwell.com

October 7, 2016

Thomas J. Marshall, Esq.
General Counsel and Executive Vice President
U.S. Postal Service
475 L'Enfant Plaza, SW, Room 6100
Washington, DC  20260-1100

**Re:** **Request that USPS Take Action to Vacate Unlawful Arbitration Award**

Dear Mr. Marshall:

The National Star Route Mail Contractors Association hereby requests that the Postal Service take prompt action to vacate the attached August 18, 2016 arbitration award because it requires the Postal Service to violate the law by converting 110 HCR contracts into PVS service. The arbitration award is unlawful because it violates 39 U.S.C. § 5005(c).  That statute mandates that the Postal Service, in making arrangements for mail transportation service, must consider the public interest and the cost of each mode of service.  Since the arbitrator's decision does not mention or allow the Postal Service to comply with this statutory requirement, the award is against public policy and may be successfully vacated under 39 U.S.C. § 1208(b) of the Postal Reorganization Act and 29 U.S.C. § 185(a) of the Labor Management Relations Act.

The arbitration award imposed a remedy that requires the Postal Service to "convert" 110 routes currently operated by HCR contractors to Postal Vehicle Service (PVS) by February 18, 2017.  The arbitrator ordered this remedy despite his finding that there is "little likelihood" that these contracts would have been converted to PVS under even ideal bidding conditions.  The Postal Service's own cost comparisons further confirm that PVS is more expensive than the existing HCR service.  Thus, the arbitration award violates 39 U.S.C. § 5005(c), which obligates the Postal Service to give due consideration to the costs of various modes of mail transportation service:

> The Postal Service, in determining whether to obtain transportation of mail by contract under subsection (a)(3) of this section or by Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of the transportation service under each mode. [39 U.S.C. § 5005(c).]



Congress required the Postal Service to consider the public interest and give due consideration to cost before making new arrangements for mail transportation service.  There are no exceptions that allow non-compliance with this requirement.  The arbitration decision does not mention this law, and by

# HUSCH BLACKWELL

Thomas J. Marshall, Esq.
October 7, 2016
Page 2

ordering the conversion of 110 contracts to PVS service without allowing the Postal Service to consider cost and the public interest, the award violates it. This case therefore presents a classic example of an arbitration award that is against public policy because it failed to take into account, and comply with, statutory requirements.

      The arbitrator's decision not only will disrupt 110 existing HCR contracts and increase mail transportation costs for years to come, but it will also require the Postal Service to violate the law. The arbitration award allows no room for the Postal Service to give due consideration to the public interest or cost, so compliance with the award requires the Postal Service to violate 39 U.S.C. § 5005(c). The arbitration award thus places the Postal Service in an untenable position.

      Because the arbitration award fails to mention or comply with 39 U.S.C. § 5005(c), the Postal Service may bring an action in U.S. district court to vacate the award as against public policy. The Supreme Court has recognized that a reviewing court may vacate an arbitration award if it is "contrary to public policy," as that policy is expressed in statutory provisions. *Eastern Associated Coal Corp. v. United Mine Workers*, 531 U.S. 57, 62 (2000). By requiring the Postal Service to convert 110 routes to PVS without determining whether that "best serves the public interest" and without giving "due consideration" to cost, the award forces the Postal Service to violate § 5005(c). An arbitration award that forces the Postal Service to violate the law is intrinsically against public policy and thus likely to be vacated.

      Separately, the arbitration award was made without any notice or opportunity to be heard from the contractors who will now lose their contracts and whose economic interest will be substantially impacted. Thus, if the Postal Service does not seek to vacate the arbitration decision, the Postal Service could be subject to a legal action by the Association and impacted contractors based on Fifth Amendment due process concerns. In addition, impacted contractors could potentially bring actions for breach of contract.

      We therefore request that the Postal Service take action to vacate the arbitration award as against public policy. Such an action must be filed within 90 days of the August 18, 2016 award. Since time is of the essence, we also ask that we be promptly advised once the Postal Service has decided whether or not it intends to take such action.

      Sincerely,

David P. Hendel
Counsel for the National Star Route Mail Contractors
      Association

# HUSCH BLACKWELL

Thomas J. Marshall, Esq.
October 7, 2016
Page 3


cc:     The Honorable Megan J. Brennan, USPS Postmaster General
        Skip Maraney, Executive Director, NSRMCA
        John Sheehy, President, NSRMCA

Attachment

THOMAS J. MARSHALL
GENERAL COUNSEL
AND EXECUTIVE VICE PRESIDENT

RECEIVED
11/16/16


**UNITED STATES POSTAL SERVICE**

November 10, 2016

Mr. David P. Hendel
Attorney
Husch Blackwell LLP
750 17th Street, NW, Suite 900
Washington, DC 20006-4656

SUBJECT: Vacatur of Highway Contract Route Arbitration Award

Dear Mr. Hendel:

This letter is in response to your October 7, 2016 request, on behalf of the National Star Route Mail Contractors Association, that the Postal Service seek to vacate Arbitrator Das's August 18, 2016 arbitration award on public policy grounds, or face legal action for breach of contract. The Postal Service has reviewed your request and respectfully disagrees with your analysis.

The gravamen of your claim is that the arbitration award in question is unlawful because it violates public policy set forth in 39 U.S.C. § 5005(c), which requires the Postal Service to give due consideration to the public interest, including costs, in determining whether to transport mail using internal resources or by contract. Having researched the issues, the Postal Service disagrees that there is a viable ground for vacatur on the basis of public policy. The Postal Service is also unpersuaded that there are viable breach of contract claims. Moreover, the award doesn't require that internal rather than contract labor be used for all time. This is simply a transitional award to remedy a purported discrete violation of Article 32.2 of the collective bargaining agreement. On the expiration of the four-year period mandated by the award, the regular rules for selecting internal or contract labor apply.

As such, the Postal Service will not seek vacatur of Arbitrator Das's award.

Please do not hesitate to contact me if you have any further questions or concerns.

Sincerely,

Thomas J. Marshall

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-1100
PHONE: 202-268-5555
FAX: 202-268-6981
THOMAS.J.MARSHALL@USPS.GOV
www.usps.com


EXHIBIT
D

# EXHIBIT 2

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| MAIL TRANSPORTATION, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. _____ |
| | ) |
| UNITED STATES, | ) Judge _____ |
| | ) |
| Defendant. | ) |
| | ) |

## <u>DECLARATION OF ALAN GOTTA</u>

I, Alan Gotta, declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I make this Declaration based on my own personal knowledge and in my capacity as President of Mail Transportation Inc. ("MTI").

2.      As President of MTI, I manage and perform many of MTI's day-to-day operations. I am over the age of eighteen and competent to testify about the matters stated herein.

3.      In 1991, my wife, Robin Gotta, and I began operating MTI. ("MTI"). Robin and I are the sole owners of MTI and are responsible for oversight of business operations. MTI is our sole source of income.

4.      MTI employs ten drivers, nine of which are employed on a full-time basis. MTI is operated out of my family home in Redlands, California by my wife and me.

5.      MTI owns ten tractors, twelve trailers, and a fully-stocked mobile service truck, that is on-call twenty-four hours per day, seven days per week.

6.      MTI transports U.S. mail by semi-truck for the United States Postal Service ("USPS").

7.      MTI's only client is USPS. MTI does not perform any non-USPS business.

8.      One of MTI's contracts with USPS (Contract No. 92350) is valued at $1,377,267 annually.

9.      Contract No. 92350 provides for a four-year term, with the option to renew at the end of each term.

10.     MTI has held Contract No. 92350 since 1991. Contract No. 92350 has been renewed six times since 1991.

11.     On or about May 15, 2017, I first learned that USPS intended to terminate Contract No. 92350 and have the route covered by Contract No. 92350 performed by the Postal Vehicle Service ("PVS").

12.     I was told this information by USPS workers at the USPS facility in San Bernardino, CA. I subsequently confirmed USPS's intention of terminating Contract No. 92350 through a National Star Route Mail Contractors Association representative. I also contacted MTI's Contracting Officer with USPS, Mr. Antoine L. Slaughter, who also confirmed what I had been told.

13.     I was never given notice of the arbitration that led to the award issued on August 18, 2016.

14.     I never participated or presented evidence in that arbitration proceeding, nor was I ever afforded an opportunity to do so.

15.     MTI's Contract No. 92350 was on the list of 110 contracts to be terminated.

16.     On or about June 29, 2017, I sent a letter to Mr. Slaughter, asserting a claim for an interpretation of the contract terms of Contract No. 92350 pursuant to the Contract Disputes Act

and a provision of Contract No. 92350. A true and correct copy of that letter is attached hereto as **Exhibit A**.

<div align="center">

**Contract No. 92350**

</div>

17.     Contract No. 92350 accounts for 90% of MTI's business revenue.

18.     Contract No. 92350 requires MTI to provide mail transportation services along a route that begins in San Bernardino, California and ends in Mecca, California.

19.     There are several stops along this route, including the following cities, all of which are in California: Palm Springs, North Palm Springs, Cathedral City, Desert Hot Springs, Thousand Palms, Indio, Coachella, Thermal, Beaumont, Banning, Moreno Valley, and Yucaipa.

20.     In performing services under Contract No. 92350, MTI drives approximately 585,000 miles annually. MTI performs 16 trips per day on this route and performs services Monday through Saturday.

21.     All ten of MTI's drivers are used to perform Contract No. 92350. MTI drivers work 23,701 driver hours annually in performing Contract No. 92350.

22.     PVS has never performed this route.

23.     Contract No. 92350 was last renewed in 2015 and is currently up for renewal on June 30, 2019.

24.     Contract No. 92350 has already been renewed by USPS six times and we had no reason to believe that it would not be renewed again in 2019.

25.     MTI was awarded Contract No. 92350 in 1991. In the twenty-six years that MTI has held Contract No. 92350, it has never received any complaints or grievances from USPS regarding its performance.

26.     Contract No. 92350 has a Termination Notice clause that requires 60-days advance written notice to terminate without cost to either party.

27.     If USPS terminates Contract No. 92350, MTI will suffer serious harm.

28.     MTI will lose approximately $2,525,000 in revenue through the remaining term of its current contract, as well as the potential for more than $1.3 million in revenue annually thereafter.

29.     Ninety percent of MTI's revenue, and profits, will be lost.

30.     MTI will also be forced to lay-off the vast majority of its drivers, reducing its work force to only one full-time driver and one part-time driver, leaving eight employees without work.

31.     The vast majority of MTI's tractor and trailer fleet will go unused, including its mobile service truck. Some of this equipment have large monthly payments that MTI will be unable to pay because of the termination of Contract No. 92350.

32.     MTI takes the term of its USPS contracts into account when purchasing necessary equipment to service its contracts. For example, certain truck payments are scheduled to coincide with the end of the current four-year term, in 2019. MTI purchased this equipment, and setup this payment schedule, in reliance upon Contract No. 92350.

33.     MTI also owns an approximately two-acre parcel in Redlands, where tractors and trailers are parked when not in use. MTI purchased this parcel in 2009, at a cost of approximately $380,000, when USPS stopped permitting MTI to park its tractors and trailers at USPS facilities. MTI still owes money on this parcel and purchased this parcel in reliance upon its (at that time) nearly two decade business relationship with USPS under Contract No. 92350.

34.     Termination of Contract No. 92350 will almost certainly result in bankruptcy of MTI and possibly personal bankruptcy for my wife and me, the sole owners of MTI.

35.     MTI has never had one of its USPS contracts terminated in its history.

36.     Based on my experience, PVS will not be able to perform Contract No. 92350 better than MTI or at a lower cost. This is due to a number of factors, including:

a.      I personally perform all repairs for MTI's fleet, using our mobile service truck. This permits MTI to perform repairs at a lower cost and to perform repairs much more quickly than by using a third-party service.

b.      MTI's drivers are not restricted by the terms of any collective bargaining agreement. As a result, MTI drivers are able to perform simple repairs in the field, through direction over the telephone. This also results in cost savings. It is my understanding that PVS drivers are prohibited from engaging in this kind of work.

c.      The route under Contract No. 92350 is in one of the hottest parts of the country. In certain areas contained in the route, the temperature can rise to 122 degrees Fahrenheit. As a result, it is very important to have prepared, adequately trained drivers who are experienced in operating diesel trucks in desert climates. It is my understanding that PVS has no such drivers.

d.      MTI's tractors are California Air Resources Board ("CARB") Compliant and equipped with pre-pass permits, which permit faster, more efficient travel along postal routes. Without this equipment, which MTI has purchased and installed on its trucks in order to perform Contract No. 92350, deliveries cannot be timely made. I understand that USPS does not own trucks with this technology.

37.     News of the impending termination of Contract No. 92350 has already negatively affected MTI's workforce and our ability to retain drivers. Because of the uncertainty of MTI's continued viability as an operating business, drivers have expressed fears about not having a job after September 1, 2017.

38.     This problem has been compounded by the fact that PVS is now actively recruiting MTI's drivers to work for PVS once Contract No. 92350 is terminated. For example, PVS has been handing out flyers at facilities along the route covered by Contract No. 92350. A true and correct copy of a flyer given to one of MTI's drivers is attached hereto as **Exhibit B**.

39.     PVS has also been posting employment positions for "PSE Tractor Trailer Operator for San Bernardino Processing & Distribution Centers" online. A true and correct copy of such a posting is attached hereto as **Exhibit C**.

40.     One of MTI's drivers has told me that he is attending a group interview session with PVS on July 7. MTI also recently received notice from another driver that he will be quitting and his last day working for MTI will be July 10, 2017. Given the current threat of termination of Contract No. 92350, and the accompanying ninety percent loss of its business, MTI cannot effectively dissuade its drivers from exploring alternative employment opportunities. If drivers continue to leave MTI, it will be very difficult for us to cover our driving schedule.

PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY THAT THE STATEMENTS IN THIS DECLARATION ARE TRUE AND CORRECT BASED UPON MY PERSONAL KNOWLEDGE.

Dated this 5th Day of July, 2017.


_____
Alan Gotta

6

Mail Transportation Inc.
1509 Blossom Ct.
Redlands, CA   92373
(909) 793-5659

June 29, 2017

**By Email and Certified Mail – Return Receipt Requested**

Antoine L. Slaughter
USPS
Contracting Officer

      **Re:**     **Claim for contract interpretation under HCR Contract No. 92350**

Dear Contracting Officer:

      This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms.  We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment).  We ask for a contracting officer's final decision on this claim as soon as possible.

      **Background**

      This contract was originally awarded on 08-03-1991.  The current contract term runs from 07-01-15 through 06-30-2019.  In the 26 years we have had this contract we have never been on any type of probation.  We have a reputation of being dependable, reliable and always on time.

      On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts.  On August 18, 2016, the arbitrator issued a decision sustaining the grievance.  While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months.  The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

      In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c).  That statute requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

> "The Postal Service, in determining whether to obtain transportation of mail by contract under subsection (a)(3) of this section or by Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of the transportation service under each mode." [39 U.S.C. § 5005(c).]


EXHIBIT
A

To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest. The arbitrator's decision did not mention this statute or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct [a § 5005(c)] analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest. We also understand that the Postal Service has not raised the issue of 39 U.S.C. § 5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

### Claim for contract interpretation

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this service to PVS without comporting with the requirements of 39 U.S.C. § 5005(c). In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest? We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not intend to perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty. Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due consideration to cost (commonly known as a cost comparison) and determine which mode of transportation best serves the public interest. We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this contract to PVS to carry out the arbitration decision. We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of good faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal Service to take an action that violates the law. Converting our contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale. Doing so would violate the duty of good faith and fair dealing. We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that would not violate § 5005(c). Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages. Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter. A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.

Sincerely,

Alan Gotta, President
Mail Transporation Inc.

 **UNITED STATES**
*POSTAL SERVICE* ®

# USPSNEWSBREAK

*San Diego District*

JOB WILL BE POSTED -
MAY25, 2017 THRU
JUNE 1, 2017 ONLY

## ****APPLY NOW****

## THE UNITED STATES POSTAL SERVICE IS NOW HIRING PART TIME FLEXIBLE TRACTOR TRAILER OPERATORS FOR THE SAN BERNADINO PROCESSING & DISTRIBUTION CENTER

### LOCATION:
### SAN BERNADINO P&DC
### 1900 W REDLAND BLVD
### REDLAND CA 92373

➢ **CAREER POSTION**
➢ **WORK HOURS VARY**
➢ **DAYS OFF – VARY**
➢ **MUST BE AVAILABLE TO WORK ALL 3 SHIFTS**
➢ **DAY – EVENING – GRAVEYARD**
➢ **HOURLY WAGES $21.28**

**Applicants must have a valid state commercial driver's license (CDL) CLASS A, a safe driving record and at least 2 years of unsupervised experience.**

➢ THE TTO POSITION WILL BE POSTED -
➢ MAY25, 2017 thru JUNE 1, 2017 ONLY

All interested applciants can apply at the USPS career employement website on-line at:
https://about.usps.com/careers/welcome.htm

OR VISIT EDD and CRAIGLIST

*PLEASE COPY AND POST ON ALL EMPLOYEE BULLETIN BOARDS.*

USPS Eagle symbol and logotype are trademarks of the United States Postal Service. All rights reserved.


EXHIBIT
B

CL  inland empire > jobs > government

reply below

Posted 12 days ago on: 2017-06-23 1:20pm

Contact Information:

# (PSE) Postal Support Employee (TTO) Tractor Trailer Operator (San Bernardino, Ca.)

compensation: **$ 18.02 per hour**

employment type: **part-time**

PSE Tractor Trailer Operator for San Bernardino Processing & Distribution Centers

Opened: June 23, 2017 Closes: July 3, 2017

Non-Career (temporary) employment up to 360 days

*MUST HAVE A "CLASS A" DRIVER'S LICENSE*

PSE TRACTOR-TRAILER OPERATORS are non-career employees who are responsible for operating mail trucks or tractor-trailers to pick-up and deliver bulk mail at Stations, Processing & Distribution Facilities and terminal points within a time schedule and in accordance with instructions regarding the route assigned. They are also responsible for trailer spotting operations. Heavy lifting is required.

Successful candidate must be available to work any schedule assigned i.e. grave yard, evening or day.

APPLICANTS MUST HAVE A VALID U.S. DRIVER'S LICENSE WITH A MINIMUM OF 2 YEARS OF CONTINUOUS SAFE DRIVING HISTORY. Check posting on our website for specific information on qualifications.

QR Code Link to This Post

To Apply:
www.usps.com/employment
Click Search to find out latest job openings
In the KEYWORDS field, Tractor Trailer Operator
In the LOCATION field, California
Click START

No contact info?
if the poster didn't include a phone number, email, or
other contact info, craigslist can notify them via email.  Send Note!



# EXHIBIT 3

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| MAIL TRANSPORTATION, INC., et al,   ) | |
|        ) | |
|     Plaintiffs,   ) | |
|        ) | |
|     v.   ) | Case No. _____ |
|        ) | |
| UNITED STATES,   ) | Judge_____ |
|        ) | |
|     Defendant.   ) | |

## <u>DECLARATION OF JILL FARRIS</u>

I, Jill Farris, declare pursuant to 28 U.S.C. § 1746 as follows:

1.　　I am the Vice-President and co-owner of Foreman Brothers, Inc. ("Foreman").   I have been in this position for 35 years. In this capacity, I am familiar with and responsible for overseeing all aspect of Foreman's business, including but not limited to finance, operations, contract matters, and human resources matters.  I have personal knowledge of the facts stated herein, and if called upon to testify I could testify competently to these facts.

2.　　Foreman is a family owned and operated business, initially founded by my father and his three brothers in 1951.

3.　　Foreman has been an HCR contractor since 1953.  These HCR contracts with the United States Postal Service ("USPS") represent the majority of our business.  90 percent of our total revenue is derived from USPS contracts.

4.　　Foreman's principal facility is located in Detroit, Michigan, with rental property in Pittsburgh, Pennsylvania and Indianapolis, Indiana.  Foreman operates mostly in southern and southeast Michigan; the majority of Foreman's business is located in Detroit and the surrounding

suburban areas, but reaches as far as Lansing and Traverse City, Michigan.  Specific locations include, Detroit GWY and NDC, to which we provide destination services 7 days a week; and Plymouth, Metroplex, Livonia, Inkster, Garden City, Northville and Lansing.  Our drivers make well over 200 trips daily to these various locations.  To the best of my knowledge, these routes have never been performed by PVS.

5.      Foreman presently has 110 drivers, 69 tractors, and 105 trailers.  Foreman currently holds 10 HCR contracts.

6.      Foreman's HCR contract 48130 will be converted to PVS.  This contract is valued at approximately $2.5 million and represents approximately 18 percent of Foreman's annual revenue.  22 of our drivers are dedicated full-time, specifically to performing HCR contract 48130. We also have 1 part-time driver dedicated specifically to performing this HCR contract. Annually, our HCR contract 48130 dedicated drivers drive approximately 45,500 hours.

7.      HCR contract 48130 requires a minimum of 17 45-foot trailers that must be retrofitted or special ordered in order to meet the facility warehouse specifications of the locations on the contract routes.  In order to meet demands for service, Foreman exceeds this number and maintains 25 trailers for HCR contract 48130 routes.  HCR contract 48130 requires a minimum of 12 tractors; however, Foreman exceeds this number and maintains 15 tractors in order to meet demands for service.  HCR contract 48130 contains a termination clause that requires the USPS to provide at least 60 days-notice prior to terminating the contract. A true and correct copy of relevant excerpts of this contract is attached hereto as **Exhibit 1**.

8.      Foreman's HCR contracts have always been renewed by USPS due to Foreman's provision of excellent service and its competitive cost.

9.      Foreman has received numerous Eagle Spirit Awards from USPS for its excellent service.  A minimum of five years of service is required to establish eligibility for the award. Nominees and awardees must be cooperative, responsive, flexible to meet the needs of the Postal Service and customers, and must present a positive public image.

10.      On or about June 19, 2017, I learned that Foreman's HCR contract 48130 was set to be converted to PVS.  If this occurs, it will have a significant impact on Foreman's revenue, profits, and work force.  Foreman will be required to significantly downsize its business operations, which it has never had to do in its over 66 years of operation.

      a.      Foreman will experience a $2.5 million loss in annual revenue.

      b.      Foreman will be forced to lay-off 20 of its full-time drivers.

      c.      Foreman will be forced to sell its 25 trailers and at least 12 tractors dedicated to the contracts.  Given current market conditions and the unique trailer capacity (45-foot), Foreman cannot expect to receive more than salvage value for these trailers and tractors.

      d.      Other personnel, such as Foreman's dispatcher, will be under-utilized.

      e.      Foreman recently purchased 17 additional GPS units at the specific direction of USPS that will be of no use to Foreman's operations without HCR contract 48130.

      f.      Foreman has designed its HCR and non-HCR contracts to deliver the most effective service to its customers and most efficiently employ its drivers.  For example, the contracts often share routes to accomplish better service and minimize lay-overs and driver overtime and split shifts.  Accordingly, the loss of HCR contract 48130 would significantly impact the efficiency of Foreman's operations.

11.     Foreman has successfully run the routes related to its HCR contracts for over 60 years.  Historically, Foreman's HCR contracts have been competitively compared with APWU.  But for the PVS conversion, there is no reason to believe Foreman's HCR contract 48130 would not be renewed.

12.     Foreman has never been confronted with the sudden expiration of a non-emergency contract that would require it to provide notice to its employees of potential lay-offs and to bid on other business.  While Foreman understands that USPS may provide 60 days-notice of termination under the terms of HCR contract 48130, it did not contemplate or accept that this risk of termination would result from USPS failing to comply with its statutory authority on how it must obtain mail transportation.

13.     Because of the PVS conversion, my drivers are hearing rumors of lay-offs and are reporting that USPS has posted job listings.  I am concerned Foreman's drivers will leave our employ despite the continued demand to meet Foreman's HCR contract requirements.

14.     Neither I, nor any other Foreman representative was given notice of the arbitration proceeding with the APWU that resulted in USPS converting HCR contract 48130 to PVS.  Neither I, nor any other Foreman representative was allowed to participate or present evidence in the arbitration.  As noted above, I did not learn of the arbitration or the decision to convert Foreman's HCR contract 48130 to PVS, until June 19, 2017.

15.     On or about June 22, 2017, I sent a claim letter via e-mail to Jewell Powell and Raphette Alston of USPS requesting clarification of the conversion of service to PVS and compliance with the requirements of 39 U.S.C. § 5005(c).  I received confirmation that USPS received my claim letter, but have not received a substantive response.  A true and correct copy of this correspondence is attached hereto as **Exhibit 2**.

16.     I do not believe that PVS will be able to perform Foreman's contract better than Foreman.

a.     Foreman has an established relationship with its suburban post office locations that allows Foreman drivers to deliver mail even when those facilities are closed.  Foreman drivers have keys to the Garden City, Northville, Plymouth, Inkster, Livonia, and other suburban locations to load and unload mail during off hours.  Foreman drivers regularly load and unload mail, and perform services traditional USPS drivers are not permitted to do.  USPS will likely have to employ additional personnel to handle the loading and unloading at closed postal facilities.

b.     It is unlikely that PVS will be able to employ enough drivers to perform these services.  The Detroit area has a severe driver shortage, which has forced Foreman to lease drivers at great expense to itself, despite engaging in extensive advertising to recruit additional drivers.

c.     The routes require special equipment that is costly to obtain.  Specifically, the equipment necessary for Foreman's HCR contract 48130 routes is specialized due to Detroit area indoor dock requirements.  As noted above, Foreman has retrofitted and special ordered 45-foot trailers specifically for these routes.  These trailers are not adaptable to other purposes.

d.     Foreman's HCR contract 48130 routes are low mileage and heavy labor. As noted above, Foreman has worked to make these routes as efficient as possible by integrating them with other contract routes.

e.     PVS will not be able to perform Foreman's HCR contract 48130 at a lower cost because of the procedures Foreman employs for maintaining efficiency (noted

above) and its negotiated benefits and lower employee wages.  Foreman is also not obligated to make employee pension payments.

I declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief.

_Jill Farris_

Jill Farris

Executed in ___7/3___ on _____, 2017.

**UNITED STATES POSTAL SERVICE®**

## TRANSPORTATION SERVICES RENEWAL CONTRACT
## FOR REGULAR SERVICE

### 1. RENEWAL PURSUANT TO

| a. CONTRACT NO. | b. EXPIRATION DATE OF EXPIRING CONTRACT | c. BEGIN CONTRACT TERM | d. END CONTRACT TERM |
|---|---|---|---|
| 48130 | 06/30/2014 | 07/01/2014 | 06/30/2018 |

| e. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | CITY & STATE |
|---|---|---|
| | DETROIT P&DC, MI | NORTHVILLE, MI |

### 2. RATE OF COMPENSATION

| a. CONTRACT RATE (Specify if Other Than Annual) | b. ANNUAL MILEAGE | c. RATE PER MILE |
|---|---|---|
| $2,146,365.47 PER ANNUM | 1,111,540.9 | $1.93098 |

### 3. SUPPLIER

| a. NAME (Print or Type) | b. ADDRESS (Street, City, State, ZIP+4) |
|---|---|
| FOREMAN BROTHERS INC | 1799 14TH ST<br>DETROIT MI 48216-1839 |

| c. TELEPHONE NO. | d. DOT NO. | e. SOCIAL SECURITY NO. OR EMPLOYER IDENTIFICATION NO. |
|---|---|---|
| 313-961-5049 | 100802 | |

| f. LEGAL RESIDENT OF<br>(Complete if Supplier is an Individual) | | g. ENGAGED IN BUSINESS IN<br>(Complete if Supplier is a Partnership or Corporation) | |
|---|---|---|---|
| COUNTY | STATE | COUNTY<br>WAYNE | STATE<br>MI |

### 4. CONTRACT

This form, your proposal, the Statement of Work and all attachments are incorporated into the renewal contract.

The above referenced contract, for the period specified, is hereby renewed with the rate(s) and service(s) prevailing at the end of the current contract.

| 5. SUPPLIER | 6. U.S. POSTAL SERVICE |
|---|---|
| *Jill Farris* 5/5/14<br>(Signature of Supplier)          (Date)<br>JILL FARRIS V.P.<br>(Name and Title of Supplier) | *[signature]*          MAY 3 1 2014<br>(Signature of Contracting Officer)          (Date)<br>CONTRACTING OFFICER<br>(Title of Contracting Officer) |

COMMENTS  (For U.S. Postal Service Use Only)

PS Form 7447
September 2001

EXHIBIT
1

# ADDENDUM TO TERMS AND CONDITIONS (Transportation Routes)

HCR: __48130__

The supplier agrees to the GPS Tracking Requirement terms that are described __if checked__:

| | |
|---|---|
| ☐ | **GPS Tracking Requirement**<br><br>*The supplier shall, at all times while its vehicle(s) is/are hauling or contain any mail under this contract, maintain a Global Positioning Satellite (GPS) system in the vehicle(s) that reports the location of the vehicle to the Postal Service not less frequently than every 30 minutes. <u>Compliance to the requirement must reach a minimum of 95% success rate (accurate data transmitted to and received by the Postal Service).</u> The supplier is responsible for providing the following information to the Postal Service:*<br><br>a.  *Supplier Name.*<br>b.  *Action: Arrival, Departure, En-Route.*<br>c.  *Event Date/Time:  The date/time when "pinged".*<br>d.  *Location by Latitude/Longitude: The location of the vehicle.*<br>e.  *Route: Route/Contract Number.*<br>f.  *Trip: Specific Trip Number.*<br>g.  *Origin Segment Facility Location by Address or NASS ("A" in A to B).*<br>h.  *Destination Segment Facility Location by Address or NASS ("B" in A to B).* |

The following checked termination clause applies to this contract:

| | |
|---|---|
| ☒ | 2.3.3a  Termination with Notice |
| ☐ | 2.3.2b  Termination for the Postal Service's Convenience |

√ Terms and Conditions, Issue 12, dated January 15, 2013, will apply.

√ Fuel Management Plan dated June 2013, will apply.

_JILL FARRIS_
Supplier (printed)

_Jill Farris_
Supplier (signed)

_5/8/14_
Date

Bert Manchego
Contracting Officer (printed)

Contracting Officer (Signed)

Date

the contracting officer, accompanied by full supporting documentation of costs, no later than 90 days after the performance of such extra trips. When the contracting officer has ordered several extra trips under a single order, the 90-day period begins on the date of performance of the last trip performed under such order. Failure to agree to such compensation above pro rata pay shall be resolved under the Claims and Disputes clause.

c.   Detours

When the regular line of travel of a contract route is impassable and the supplier performs full service over another and longer line of travel, the supplier's compensation shall be equitably increased for such service, provided, however, that such increase:

(1)   Comprises at least $1.00 (one dollar) in any month, and

(2)   Does not exceed an amount determined by multiplying the additional miles actually traveled by the rate per mile that applies to the trip on which the detour was made, determined by dividing the regular compensation for the trip by the regular number of miles.

Note   No payments will be made with respect to any detour not reported to the contracting officer or the contracting officer's designee within 90 days after the detoured service is performed.  Supplier will use reasonable efforts to minimize additional costs or delays resulting from detours.

d   The supplier shall proceed diligently in accordance with service changes and extra trips ordered unilaterally by the contracting officer. Disputes concerning such orders shall be resolved pursuant to the Claims and Disputes clause. The supplier's claim for equitable adjustment must be asserted within 30 days of receiving a written change order. A later claim may be acted upon — but not after final payment under this contract — if the contracting officer decides that the facts justify such action.

e.   Liquidated Damages.

See Section 2.3.3.


## 2.3.3  Termination of Contracts

The Postal Service reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the supplier must immediately stop all work and must immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the supplier will be paid a percentage of the work performed prior to the notice of termination  The supplier will not be paid for any work performed or costs incurred which reasonably could have been avoided.

The clauses below captioned "Termination with Notice" and "Termination for the Postal Service's Convenience" are in the alternative, so that only one of them is applicable to this contract, and not the other.  The designation of which of the two clauses applies will be established prior to renewal or award. If no such designation has been made, the clause captioned "Termination for the Postal Service's Convenience" will be assumed to be the designated clause.

If, within 60 days after the supplier is notified of a partial Termination with Notice or Termination for the Postal Service's Convenience, the supplier and contracting officer cannot bilaterally reach agreement on a new contract rate, the contracting officer will process the service change to include the Postal Service's last offer and issue a final decision letter.

## 2.3.3a  Termination with Notice

The contracting officer or the supplier, on 60 days written notice, may terminate this contract or the right to perform under it, in whole or in part, without cost to either party.

### 2.3.3b  Termination for the Postal Service's Convenience

The Postal Service reserves the right to terminate a regular contract, or any part thereof, for its sole convenience. In the event of such termination, the supplier must immediately stop all work and must immediately cause any and all of its suppliers and subcontractors to cease work. After termination, the supplier may submit to the contracting officer a termination claim in the form and with the certification prescribed by the contracting officer. The claim must be submitted promptly, but in no event more than 180 days after the effective date of termination, unless an extension in writing is granted by the contracting officer. However, if the contracting officer determines that the facts justify such action, any termination claim may be received and acted upon at any time after the 180-day period. Upon failure of the supplier to submit a termination claim within the time allowed, the contracting officer may determine, on the basis of information available, the amount, if any, due the supplier by reason of the termination and will pay that amount.  The supplier will not be required to comply with the cost accounting standards and principles for this purpose  The supplier will not be paid for any work performed or costs incurred which reasonably could have been avoided.  The supplier and the contracting officer shall agree upon the whole or any part of the amount to be paid (including an allowance for the fee) to the supplier by reason of the termination. The supplier has the right of review through the contracting officer to the next higher level contracting authority and/or under the *Claims and Disputes* clause of the determination made by the contracting officer pertaining to the financial amount **ONLY.**  If the supplier fails to request an extension of time, the supplier will have no right of review.

The Postal Service may, under the terms and conditions it may prescribe, make partial payments against costs incurred by the supplier in connection with the terminated portion of the contract whenever, in the opinion of the contracting officer, the aggregate of the partial payments is within the amount to which the supplier will be entitled. If the total of these payments exceeds the amount finally determined to be due under this clause, the excess must be repaid to the Postal Service upon demand, together with interest calculated in accordance with the *Interest* clause of this contract, for the period from the date the excess payment is received by the supplier to the date on which the excess is repaid to the Postal Service  However, no interest will be charged with respect to an excess payment attributable to a reduction in the supplier's claim by reason of retention or other disposition of termination inventory, until 10 days after the date of the retention or disposition

### 2.3.3c  Clause B-72 Termination on Notice - Emergency Contracts (February 2009) (Modified)

This contract may be terminated by the Postal Service upon notice of not less than 24 hours, or by the supplier upon notice of not less than 15 days without cost.

## 2.3.4  Safety Rating (Federal Motor Carrier Safety Administration)

If the supplier is notified by the Federal Motor Carrier Safety Administration (FMCSA) that there is a proposed safety rating or determination of a rating of "unsatisfactory" of the supplier (as described in 49 CFR § 385.11), the supplier must notify the contracting officer within five business days of receipt of its receipt of notice from the FMCSA. Should the supplier fail to do so, the contracting officer may terminate any and all of the supplier's contracts for default.  In addition, the contracting officer may terminate any and all of the supplier's contracts for default based upon a proposed safety rating or determination of a rating of "unsatisfactory" of the supplier (as described in 49 CFR § 385.11) by the FMCSA.

# *Foreman Bros. Inc.*

**US MAIL CONTRACTOR**
DETROIT, MICHIGAN

1799 14th St.
Detroit, MI 48216
Phone: (313) 961-5049  Fax: (313) 961-4521

**By Email and Certified Mail – Return Receipt Requested**

Raphette Alston
LDT@USPS.gov
1200 Mercantile Lane
Suite 109
Largo, MD  20774-5389

**Re:    Claim for contract interpretation under HCR Contract No.   48130**

Dear Ms Alston:

This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms. We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment).  We ask for a contracting officer's final decision on this claim as soon as possible.

**Background**

This contract was originally awarded in the early 1960's. The current mileage on the contract is 1,112,892 and the RPM is 2.25. The contract was renewed in 2009 for a 2 year term with a PVS comparison and at the end of the contract term it was extended for 1 year 3 times. The current contract term is 7/1/14 thru 6/30/18. The contract requirements state (7) 40 ft and (10) 45 ft trailers but in reality we give you (17) 45 ft and anywhere from 5 to 8 additional trailers for free. We must provide additional trailers to be pre-loaded and make the schedules on time. There are 106 trips on this current schedule and 45,500 hours. Many of the offices served are closed when our drivers get there and they are given keys to the offices to leave the mail in the vestibules. Many of these trips are loaded and unloaded by the drivers.

On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before



EXHIBIT
2

awarding certain HCR contracts.  On August 18, 2016, the arbitrator issued a decision sustaining the grievance.  While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months.  The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c).  That statute requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

> "The Postal Service, in determining whether to obtain transportation of mail by contract under subsection (a)(3) of this section or by Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of the transportation service under each mode." [39 U.S.C. § 5005(c).]

To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest.  The arbitrator's decision did not mention this statute or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct [a § 5005(c)] analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26.  We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest.  We also understand that the Postal Service has not raised the issue of 39 U.S.C. § 5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

**Claim for contract interpretation**

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this service to PVS without comporting with the requirements of 39 U.S.C. § 5005(c).  In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest?  We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not

intend to perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty. Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due consideration to cost (commonly known as a cost comparison) and determine which mode of transportation best serves the public interest. We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this convert to PVS to carry out the arbitration decision. We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of good faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal Service to take an action that violates the law. Converting our contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale. Doing so would violate the duty of good faith and fair dealing. We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that would not violate § 5005(c). Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages. Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter. A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.

Sincerely,

*Jill Farris*

Jill Farris, VP
Foreman Bros. Inc.
1799 14th St.
Detroit, MI  48216

CC:   David Hendel
      Skip Maraney
      John Sheehy
      Jewell Powell

# EXHIBIT 4

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| MAIL TRANSPORTATION, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Case No. _____ |
| | ) |
| UNITED STATES, | )   Judge _____ |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF MICHAEL CORRELL

I, Michael Correll, declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I make this Declaration based on my own personal knowledge and in my capacity as General Manager of Midwest Transport, Inc.

2.      I am over the age of eighteen and competent to testify about the matters stated herein.

3.      In approximately 2003, Midwest Transport, Inc. purchased substantially all of the assets of Midwest Transit, Inc., a transportation company that was founded in or about March 1980. Among the assets purchased by Midwest Transport, Inc. were a number of U.S. Mail transportation service contracts, including Contract No. 48010, which is discussed in greater detail below.

4.      In total, Midwest Transport, Inc. or Midwest Transit, Inc. have been continuously performing mail transportation services as a contractor for the United States Postal Service ("USPS") for over thirty-seven years. For purposes of this declaration, the two companies that

have continuously operated as a USPS contractor for thirty-seven years will be referred to simply as "Midwest," unless a relevant distinction is required.

5.      Midwest employs approximately 568 drivers and owns approximately 512 semi-truck tractors and 702 semi-truck trailers.

6.      Midwest transports U.S. mail by semi-truck for the USPS, pursuant to a number of contracts. These contracts constitute more than 95% of Midwest's operating revenue.

7.      One of Midwest's contracts with USPS (Contract No. 48010) is valued at $648,912.55 annually.

8.      Contract No. 48010 provides for a four-year term, with the option to renew at the end of each term. A true and correct copy of a portion of Contract No. 48010 is attached hereto as **Exhibit A**.

9.      Midwest has held Contract No. 48010 since 1998. I believe that Contract No. 48010 has been renewed approximately four times since 1998.

10.     On or about June 2, 2017, I first learned that USPS intended to terminate Contract No. 48010 and have the route covered by Contract No. 48010 performed by the Postal Vehicle Service ("PVS").

11.     I was made aware of USPS's intention to terminate Contract No. 48010 when one of our managers notified our office that a driver had indicated that a letter authored by the American Postal Workers Union, AFL-CIO was posted at a USPS mail facility in Detroit, MI, indicating that "110 contract routes [are] to be converted" including Contract No. 48010. A true and correct copy of a photograph of this posting is attached hereto as **Exhibit B**.

12.     I subsequently confirmed that Contract No. 48010 was on the list of contracts to be terminated by USPS through consultation with counsel. Midwest was not otherwise informed

of USPS's intent to terminate Contract No. 48010. To date, Midwest has not been directly contacted by USPS regarding a proposed termination of Contract No. 48010.

13.      To my knowledge, Midwest was never given notice of the arbitration that led to the award issued on August 18, 2016. Midwest never participated or presented evidence in that arbitration proceeding, nor was it ever afforded an opportunity to do so.

14.      On or about July 6, 2017, Doug Heidorn from our office sent a letter to Midwest's contracting officer, Keith Harris, asserting a claim for an interpretation of the contract terms of Contract No. 48010 pursuant to the Contract Disputes Act and a provision of Contract No. 48010. A true and correct copy of that letter is attached hereto as **Exhibit C**.

### Contract No. 48010

15.      Contract No. 48010 requires Midwest to provide mail transportation services between two USPS facilities in the state of Michigan: the USPS Michigan Metroplex Processing and Distribution Center in Pontiac, MI and the Detroit Network Distribution Center in Allen Park, MI.

16.      In performing services under Contract No. 48010, Midwest drives approximately 240,145 miles annually. Midwest performs 24 trips per day on this route. Most service is performed Monday through Saturday, although there are trips which operate on Sunday.

17.      Midwest uses four full-time drivers and two part-time drivers to perform Contract No. 48010. Midwest drivers work 10,783 driver hours annually in performing Contract No. 48010.

18.      To the best of my knowledge, PVS has never performed this route.

19.      Contract No. 48010 was last renewed in 2015 and is currently up for renewal on June 30, 2019.

20.     Contract No. 48010 has already been renewed by USPS approximately four times and we had no reason to believe that it would not be renewed again in 2019.

21.     Midwest was awarded Contract No. 48010 in 1998. In the nineteen years that Midwest has held Contract No. 48101, to the best of my knowledge, Midwest has never received any complaints or grievances from USPS regarding its performance.

22.     To the contrary, Midwest has been an exemplary contractor, including an on-time delivery rate of 99.6% between January 1, 2017 and June 16, 2017.

23.     Midwest also received USPS's "Eagle Spirit" award in 2005, which, according to USPS's website, is awarded "to recognize the outstanding contributions of companies and individuals who transport mail under contract."

24.     Contract No. 48010 has a Termination Notice clause that requires 60-days advance written notice to terminate without cost to either party.

25.     If USPS terminates Contract No. 48010, Midwest will lose approximately $938,000 in revenue through the remaining term of its current contract, as well as the potential for more than $648,000 in revenue annually thereafter.

26.     Midwest will also be forced to lay-off all of its drivers (four full-time, two part-time) assigned to perform the work under Contract No. 48010.

27.     Midwest will have three semi-truck tractors and thirteen semi-truck trailers that will be unused or underused if USPS terminates Contract No. 48010.

28.     Midwest also purchased three global positioning system ("GPS") devices for its tractors, at an approximate cost of $1,000 each, in order to perform its obligations under Contract No. 48010. These devices will go unused if Contract No. 48010 is terminated.

29.     Midwest takes the term of its USPS contracts into account when assessing hiring needs to service its contracts. It is much easier to plan for personnel changes when contracts expire pursuant to their terms.

30.     Midwest accepted the risk that operational changes or USPS network changes concerning the route might result in termination, but we did not contemplate or accept the risk that termination would result from USPS failing to live up to its union agreements or other USPS wrongful conduct.

31.     I do not believe PVS will not be able to perform Contract No. 48010 better than Midwest or at a lower cost. This is due to a number of factors, including:

    a.     Midwest has nearly twenty years of experience providing exemplary service traveling the route covered by Contract No. 48010, while PVS has none.

    b.     Our drivers know, understand and anticipate the needs of the respective facilities, while PVS will need to recruit and hire drivers and purchase equipment to service Contract No. 48010. It will be very difficult, if not impossible, to achieve 99.6% on-time delivery given these hurdles faced by PVS.

    c.     Midwest covers extra trips for USPS around various holidays that PVS will need to plan for and may not be able to adequately service.

32.     News of the impending termination of Contract No. 48010 has already negatively affected Midwest's workforce and our ability to retain drivers. For example, the notice attached hereto as Exhibit B has lead drivers to believe that their jobs are in jeopardy, which undermines the trust between drivers and management.

33.     News of the impending termination of Contract No. 48010 has reverberated throughout our company, leading to false rumors concerning the financial stability and performance of Midwest under its USPS contracts.

PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY THAT THE STATEMENTS IN THIS DECLARATION ARE TRUE AND CORRECT BASED UPON MY PERSONAL KNOWLEDGE.

Dated this _10_ Day of July, 2017.

_[signature]_
_____
Michael Correll

| UNITED STATES POSTAL SERVICE® | **CONTRACT ROUTE SERVICE ORDER** | | 1. CONTRACT RATE  OLD:   NO  NEW:   CHANGE |
|---|---|---|---|
| 2. CONTRACT NO.  48010 | 3. BEGIN CONTRACT TERM  10/01/2015 | 4. END CONTRACT TERM  06/30/2017 | |
| 5. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE  MICHIGAN METROPLEX P&DC, MI | | CITY & STATE  DETROIT PRIORITY MAIL CTR, MI |
| 6. NAME AND ADDRESS OF SUPPLIER  MIDWEST TRANSPORT INC  PO BOX 8608  ROBINSON IL 62454-8608 | | | 7. THIS SPACE FOR ASC USE ONLY |

8. THE FOLLOWING ORDER IS HEREBY ISSUED

CONTRACT TERM MODIFICATION

Effective close of business 05/01/2017, the term of this contract is amended in accordance with the attached PS Form 7406, "Amendment to Transportation Services Contract."

New Contract Term: 10/01/2015 - 06/30/2019

| 9. SIGNATURE OF CONTRACTING OFFICER | | 10. DISTRIBUTION |
|---|---|---|
| | Digitally signed by Keith Harris , CPSM, C.P.M  Date: 2017.05.30 11:10:24 -05'00' | 1 - Contracting Officer |
| 11. TITLE OF CONTRACTING OFFICER  CONTRACTING OFFICER | | 2 - Accounting Service Center |
| | | 3 - Administrative Official |
| 12. ADDRESS OF CONTRACTING OFFICER  PNT OFFICE - PNT@USPS.GOV  225 N. HUMPHREYS BLVD, RM 1089  MEMPHIS TN 38166-7071 | | 4 - Supplier  5 - P&DC/F  6 - Customer Service District  7 - En Route Offices |

| 13a. DATE ORDERED | b. ORDER NO.  300-12655-17 | c. ROUTE ORDER NO.  20 | d. BUDGET ACCOUNT NO.  53614 | e. FINANCE NO.  25-8231 |
|---|---|---|---|---|

PS Form 7440
September 2001

**EXHIBIT**

**A**

**PS FORM 7440   -   CONTINUATION SHEET - 1**

CONTRACT NO.  48010          MICHIGAN METROPLEX P&DC, MI  TO  DETROIT PRIORITY MAIL CTR, MI

EFFECTIVE DATE 05/01/2017          ORDER NO. 300-12655-17

SPECIAL RATE INFORMATION

| COST SEG | DESCRIPTION | BEGIN DATE | END DATE | OLD SPECIAL RATE | NEW SPECIAL RATE | FINANCE NUMBER | BUDGET ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|
| A | LATE SLIP - HIRED DRIVER RATE | 10/01/2015 | 06/30/2019 | 33.95435 | 33.95435 | 25-8231 | 53138 |

PS Form 7440
September 2001

**UNITED STATES POSTAL SERVICE®**   AMENDMENT TO TRANSPORTATION SERVICES CONTRACT

## 1. AMENDMENT PURSUANT TO

| a. CONTRACT NO. | b. AMENDMENT NO. | c. EFFECTIVE DATE | d. BEGIN CONTRACT TERM | e. END CONTRACT TERM |
|---|---|---|---|---|
| 48010 | 3 | 05/01/2017 | 10/01/2015 | 06/30/2017 |

| f. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE MICHIGAN METROPLEX P&DC, MI | CITY & STATE DETROIT PRIORITY MAIL CTR, MI |
|---|---|---|

## 2. SUPPLIER

| a. NAME AND ADDRESS OF SUPPLIER | b. DOT NO. | c. SSN/EIN |
|---|---|---|
| MIDWEST TRANSPORT INC<br>PO BOX 8608<br>ROBINSON IL 62454-8608 | 1084722 | 71-0930845 |

d. TELEPHONE NO.

618-544-3399 EXT: 1313

## 3. DESCRIPTION OF AMENDMENT

CONTRACT TERM MODIFICATION

Effective close of business 05/01/2017 supplier agrees to the new contract term dates at the prevailing rate in force.

CONTRACT RATE:   $648,912.55 PER ANNUM

New Contract Term: 10/01/2015 to 06/30/2019

Except as provided herein, all terms and conditions of the contract described in block 1 remain unchanged and in full force and effect.

4. The parties have caused this amendment to be executed, effective the date set forth in block 1c.

| PRINCIPAL | U.S. POSTAL SERVICE |
|---|---|
| *(signature)*   5/24/17 | *(signature)* Digitally signed by Keith Harris CPSM, C.P.M Date: 2017.05.30 10:44:11 -05'00' |
| (Signature of person authorized to sign)   (Date) | (Signature)   (Date) |
| NAME AND TITLE OF SIGNER<br>*Douglas A Heisdorn*<br>*Director of Postal Contracting* | TITLE OF CONTRACTING OFFICER<br>CONTRACTING OFFICER |

PS Form 7406
September 2001

CONTRACT NO.   48010

EFFECTIVE DATE 05/01/2017

MICHIGAN METROPLEX P&DC, MI TO DETROIT PRIORITY MAIL C

SPECIAL RATE INFORMATION

| COST SEG | DESCRIPTION | BEGIN DATE | END DATE | OLD SPECIAL RATE | NEW SPECIAL RATE | FINANCE NUMBER | BUDGET ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|
| A | LATE SLIP - HIRED DRIVER RATE | 10/01/2015 | 06/30/2019 | 33.95435 | 33.95435 | 25-8231 | 53138 |

SIGNATURE BLOCK

| | |
|---|---|
| _Douglas a- Heidorn_ 5/24/17 | Digitally signed by Keith Harris CPSM, C.P.M Date: 2017.05.30 11:10:54 -05'00' |
| (Signature of Supplier)                (Date) | (Signature of Contracting Officer)                (Date) |

PS Form 7406
September 2001

# American Postal Workers Union AFL-CIO

1300 L Street, NW, Washington, DC 20005

April 28, 2017

Michael O. Foster
Director
Motor Vehicle
Service Division
202-842-4240(Office)
202-842-8517 (Fax)

Javier Pineres
Assistant Director
Motor Vehicle
Service Division
202-842-4240(Office)
202-842-8517 (Fax)

**National Executive Board**

Mark Dimondstein
President

Debby Szeredy
Executive Vice President

Elizabeth "Liz" Powell
Secretary-Treasurer

Vance Zimmerman
Director, Industrial Relations

Clint Burelson
Director, Clerk Division

Steven G. Raymer
Director, Maintenance Division

Michael O. Foster
Director, MVS Division

Stephen R. Brooks
Director, Support Services Division

Sharyn M. Stone
Coordinator, Central Region

Mike Gallagher
Coordinator, Eastern Region

John H. Dirzius
Coordinator, Northeast Region

Kennith L. Beasley
Coordinator, Southern Region

Omar M. Gonzalez
Coordinator, Western Region

Joseph G. Wrobel, MVS Director
480-481 Area Local
810 Livernois Ave
Ferndale, MI 48220

Re: Das Award Q06C-4Q-C 11182451 110 PVS Routes

Dear Brother Wrobel,

As you may be aware, on August 18, 2016, Arbitrator Shyam Das ruled in National Case No. Q06C-4Q-C 1118245 that the Postal Service must convert 110 Highway Contract Routes to Postal Vehicle Service. This was a major win for the Motor Vehicle Craft, and the Union and the Postal Service have recently come to an agreement on the 110 contract routes to be converted.

These routes will include:

| Route | Area | Site Name | Annual Hours |
|-------|------|-----------|--------------|
| 48090 | GL | Michigan Metroplex P&DC, MI | 7,514 |
| 480M4 | GL | Michigan Metroplex P&DC, MI | 1,263 |
| 48010 | GL | Michigan Metroplex P&DC, MI | 9,962 |
| 48018 | GL | Michigan Metroplex P&DC, MI | 27,636 |

We will be sending further notification as the timeline for implementation is finalized. Please contact our office at 202-842-4240 with any questions or concerns.

In Solidarity,

Michael O. Foster, Director
Motor Vehicle Service Division

Javier Pineres, Assistant Director
Motor Vehicle Service Division

MOF:EKW
opeiu#2/afl-cio

CC: Roscoe C. Woods, Jr., President
William Wright, National Business Agent, Central Region



**EXHIBIT**

**B**

Midwest Transport, Inc
PO Box 8608
Robinson, IL  62454
(618) 544-3399 x1316

July 6, 2017

**By Email and Certified Mail – Return Receipt Requested**

Mr. Keith Harris
Contracting Officer
USPS

Re:     **Claim for contract interpretation under HCR Contract No. <u>48010</u>**

Dear Contracting Officer:

This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms.  We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment). We ask for a contracting officer's final decision on this claim as soon as possible.

**Background**

This contract was originally awarded on July 1, 1998.  The current contract term runs from 10/1/2015 through 6/30/2019.

On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts.  On August 18, 2016, the arbitrator issued a decision sustaining the grievance.  While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months.  The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c).  That statute requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

> "The Postal Service, in determining whether to obtain transportation of
> mail by contract under subsection (a)(3) of this section or by



> Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of the transportation service under each mode." [39 U.S.C. § 5005(c).]

To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest. The arbitrator's decision did not mention this statute or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct [a § 5005(c)] analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest. We also understand that the Postal Service has not raised the issue of 39 U.S.C. § 5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

**Claim for contract interpretation**

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this service to PVS without comporting with the requirements of 39 U.S.C. § 5005(c). In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest? We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not intend to perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty. Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due consideration to cost (commonly known as a cost comparison) and determine which mode of transportation best serves the public interest. We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this contract to PVS to carry out the arbitration decision. We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of good faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal Service to take an action that violates the law. Converting our contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale. Doing so would violate the duty of good faith and fair dealing. We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that would not violate § 5005(c). Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages.  Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter.  A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.

Sincerely,

*Douglas A. Heidorn*
*Director of Postal Contracting for Michael K. Correll, General Manager*

Michael K. Correll, General Manager

# EXHIBIT 5

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

|  |  |  |  |
|---|---|---|---|
| MAIL TRANSPORTATION, INC., et al, | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| v. | ) | Case No. _____ | |
| | ) | | |
| UNITED STATES, | ) | Judge _____ | |
| | ) | | |
| Defendant. | ) | | |

## DECLARATION OF DALE BRUNT

I, Dale Brunt, declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the following is true and correct:

1.     I am the Corporate Secretary and one of the owners of Eipperle, Inc. ("Eipperle"). I have worked for Eipperle since 1967.  As Corporate Secretary and owner I am closely involved with all aspects of the day-to-day operations of the company, including with respect to financial, employment, operations, and contracting matters.

2.     Eipperle was founded in 1965.  It was initially known as "M.C. Eipperle", but changed its name to Eipperle, Inc. when it incorporated in 1971.   Eipperle is located in Monroe, Michigan and its business is concentrated in Southeastern Michigan and Northeastern Ohio. Eipperle has contracted with the Postal Service to perform what are now known as HCR contracts since 1965.

3.     Eipperle has 40 employees, 27 of whom are full-time and 13 of whom are part-time.  Approximately 70% of Eipperle's revenue comes from its HCR contracts.

4.     Approximately one month ago, a Postal Service employee whom I work with provided me with information that indicated that Eipperle's largest HCR contract, HCR 43491, was set to be converted to PVS.  HCR 43491 provides approximately 70% of the revenue that Eipperle derives from its HCR contracts.

5.     Eipperle has held HCR 43491 since July 1, 1965 when it was awarded to Eipperle following a competitive procurement.  It has been renewed every four years since then.  The most recent contract term is for July 1, 2016 through June 30, 2020.  True and correct copies of excerpts from HCR 43491 are attached as Exhibit 1.

6.     During the course of its performance of HCR 43491, Eipperle has won the Eagle Spirit award twice.  It is my understanding that to be eligible to be nominated for the Eagle Spirit award a contactor must have had at least five years of service and must be cooperative, responsive, flexible to meet the needs of the Postal Service and customers, and present a positive public image. Eipperle typically maintains an on-time rating of better than 99%.

7.     The HCR 43491 route begins in Toledo and goes to Detroit, where there are three major mail facilities.  HCR 43491 doubled approximately fifteen months ago, after Toledo stopped all mail processing at its facility and raw mail needed to be hauled to Detroit for processing.  The annual price of the contract is presently $2,377,861.

8.     Approximately 25 of Eipperle's drivers work on HCR 43491; of those 25 drivers, 18 are devoted full-time to just this contract.  The performance of HCR 43491 requires 37,716 driver hours annually.   Eipperle uses 11 tractors and 14 trailers for the performance of work under the contract.  Eight of those trailers are owned by the Postal Service.  After the work under the contract doubled approximately 15 months ago, Eipperle entered into four-year leases for three tractors and five trailers in order to accommodate the additional work.

2

9.      The loss of HCR 43491 would have an immediate, negative impact on Eipperle. Eipperle would lose 70% of its mail revenue, which comprises the majority of Eipperle's business.  Eipperle would need to lay off 25 drivers and one of its two mechanics, many of whom have worked for Eipperle for 25 or more years.  Eipperle would have no use for the equipment currently being used for the performance of this work, including the equipment that Eipperle recently leased.

10.     The Postal Service has never provided Eipperle with any official notice of its intent to convert HCR to PVS.  I was not aware of the arbitration proceeding between APWU and the Postal Service that resulted in the Postal Service making the conversion decision, and I did not have the opportunity to participate or present any evidence as part of that proceeding.

11.     On June 26, 2017, shortly after I learned about the possibility that HCR 43491 could be converted to PVS, I sent a claim for contract interpretation to the contracting officer for HCR 43491, seeking an interpretation regarding whether the "Termination with Notice" clause could be exercised for the purpose of converting the service under the contract to PVS without comporting with the requirements of 39 U.S.C. § 5005(c).  A true and correct copy of the claim letter is attached hereto as Exhibit 2.  I obtained confirmation that the claim letter was delivered to the contracting officer, but the contracting officer has not provided any response.

12.     Based on my decades of experience performing HCR 43491, I believe that it is highly unlikely that PVS could perform the work as efficiently or effectively as Eipperle.  On many of the occasions when HCR 43491 was up for renewal, Eipperle was required to go through a PVS comparison.  On each of these occasions, Eipperle has demonstrated that it could perform the work more economically and efficiently than PVS.  To my knowledge, since these

through a PVS comparison. On each of these occasions, Eipperle has demonstrated that it could perform the work more economically and efficiently than PVS. To my knowledge, since these comparisons were performed nothing has changed that would make PVS cheaper or better than Eipperle.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated this  6  7H  day of July, 2017.

Dale Brunt

POSTAL SERVICE.   CONTRACT ROUTE SERVICE ORDER   CONTRACT RATE

| | |
|---|---|
| OLD: | SEE |
| NEW: | ATTACHED |

| 2. CONTRACT NO. | 3. BEGIN CONTRACT TERM | 4. END CONTRACT TERM |
|---|---|---|
| 43491 | 07/01/2016 | 06/30/2020 |

| 5. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE |
|---|---|
| | TOLEDO P&DC, OH |

CITY & STATE
DETROIT NDC, MI

| 6. NAME AND ADDRESS OF SUPPLIER | 7. THIS SPACE FOR ASC USE ONLY |
|---|---|
| M C EIPPERLE INC<br>4800 W DUNBAR RD<br>MONROE MI 48161-9027 | |

8. THE FOLLOWING ORDER IS HEREBY ISSUED

NEGOTIATED SERVICE CHANGE

Contract requirements are changed pursuant to the Changes clause as shown on the attached Statement of Work and Specifications.

| 9. SIGNATURE OF CONTRACTING OFFICER | 10. DISTRIBUTION |
|---|---|
| *[signature]* Digitally signed by Keith Harris CPSM, C.P.M Date: 2017.06.23 12:35:13 -05'00' | 1 - Contracting Officer<br>2 - Accounting Service Center<br>3 - Administrative Official<br>4 - Supplier<br>5 - P&DC/F<br>6 - Customer Service District<br>7 - En Route Offices |

11. TITLE OF CONTRACTING OFFICER
TRANS CONTRACTING OFFICER

12. ADDRESS OF CONTRACTING OFFICER
LDT@USPS.GOV
1200 MERCANTILE LANE
SUITE 109
LARGO MD 20774-5389

| 13a. DATE ORDERED | b. ORDER NO.<br>150-20491-17 | c. ROUTE ORDER NO.<br>11 | d. BUDGET ACCOUNT NO. | e. FINANCE NO. |
|---|---|---|---|---|

S Form 7440
eptember 2001

EXHIBIT 1

PS 7440 CONTINUATION SHEET 2

CONTRACT NO. 43491

TOLEDO P&DC, OH TO DETROIT NDC, MI

EFFECTIVE DATE 07/01/2017          ORDER NO. 150-20491-17

| COST SEG | OLD CONTRACT RATE | PAYMENT METHOD | NEW CONTRACT RATE | PAYMENT METHOD | AMOUNT OF ADJUSTMENT | NEW ANNUAL MILEAGE | NEW RATE PER MILE | FINANCE NUMBER | BUDGET ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| A | $2,241,093.72 | PER ANNUM | $2,377,861.66 | PER ANNUM | $136,767.94 | 1,124,908.5 | $2.11383 | 38-8261 | 53131 |
| B | $13,296.38 | SERVICE PERIOD BASED | $13,956.01 | SERVICE PERIOD BASED | $659.63 | 5,104.0 | $2.73433 | 67-0404 | 53131 |
| C | $8,048.12 | SERVICE PERIOD BASED | $6,845.57 | SERVICE PERIOD BASED | <$1,202.55> | 1,856.0 | $3.68835 | 67-0404 | 53131 |
| D | $2,840.69 | SERVICE PERIOD BASED | $2,853.45 | SERVICE PERIOD BASED | $12.76 | 1,392.0 | $2.04989 | 67-0404 | 53131 |

SPECIAL RATE INFORMATION

| COST SEG | DESCRIPTION | BEGIN DATE | END DATE | OLD SPECIAL RATE | NEW SPECIAL RATE | FINANCE NUMBER | BUDGET ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|
| A | PER TRAILER MOVE | 02/01/2017 | 06/30/2020 | 8.50000 | 8.50000 | 38-8261 | 53127 |
| A | LATE SLIP - HIRED DRIVER RATE | 07/01/2017 | 06/30/2020 | 32.21939 | 32.19376 | 38-8261 | 53138 |

PS Form 7440
September 2001

# UNITED STATES POSTAL SERVICE®

## AMENDMENT TO TRANSPORTATION SERVICES CONTRACT

### 1. AMENDMENT PURSUANT TO

| a. CONTRACT NO. | b. AMENDMENT NO. | c. EFFECTIVE DATE | d. BEGIN CONTRACT TERM | e. END CONTRACT TERM |
|---|---|---|---|---|
| 43491 | 2 | 07/01/2017 | 07/01/2016 | 06/30/2020 |

| f. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE TOLEDO P&DC, OH | | CITY & STATE DETROIT NDC, MI | |

### 2. SUPPLIER

| a. NAME AND ADDRESS OF SUPPLIER | b. DOT NO. | c. SSN/EIN |
|---|---|---|
| M C EIPPERLE INC 4800 W DUNBAR RD MONROE MI 48161-9027 | 176862 | 38-1912307 |
| | d. TELEPHONE NO. 313-550-4565 | |

### 3. DESCRIPTION OF AMENDMENT

NEGOTIATED SERVICE CHANGE

Pursuant to the Changes Clause, amend contract requirements per the attached Statement of Work and Specifications.

NEW CONTRACT RATE:  SEE ATTACHED

Except as provided herein, all terms and conditions of the contract described in block 1 remain unchanged and in full force and effect.

### 4. The parties have caused this amendment to be executed, effective the date set forth in block 1c.

| PRINCIPAL | U.S. POSTAL SERVICE |
|---|---|
| *Dale Brunt* 6-22-17 | *Keith Harris* Digitally signed by Keith Harris CPSM, C.P.M Date: 2017.06.23 12:35:30 -05'00' |
| (Signature of person authorized to sign)   (Date) | (Signature) |
| NAME AND TITLE OF SIGNER *DALE BRUNT* *Corp. Sec ~ MCEI* | TITLE OF CONTRACTING OFFICER TRANS CONTRACTING OFFICER |

PS Form 7405
September 2001

CONTRACT NO.   43491
EFFECTIVE DATE 07/01/2017

TOLEDO P&DC, OH TO DETROIT NDC, MI

| COST SEG | OLD CONTRACT RATE | PAYMENT METHOD | NEW CONTRACT RATE | PAYMENT METHOD | AMOUNT OF ADJUSTMENT | NEW ANNUAL MILEAGE | NEW RATE PER MILE | FINANCE NUMBER | BUDGET ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| A | $2,241,093.72 | PER ANNUM | $2,377,861.66 | PER ANNUM | $136,767.94 | 1,124,906.5 | $2.11363 | 36-8261 | 53131 |
| B | $13,296.38 | SERVICE PERIOD BASED | $13,956.01 | SERVICE PERIOD BASED | $659.63 | 5,104.0 | $2.73433 | 67-0404 | 53131 |
| C | $6,048.12 | SERVICE PERIOD BASED | $6,845.67 | SERVICE PERIOD BASED | <$1,202.55> | 1,858.0 | $3.68235 | 67-0404 | 53131 |
| D | $2,840.69 | SERVICE PERIOD BASED | $2,853.45 | SERVICE PERIOD BASED | $12.76 | 1,392.0 | $2.04969 | 67-0404 | 53131 |

SPECIAL RATE INFORMATION

| COST SEG | DESCRIPTION | BEGIN DATE | END DATE | OLD SPECIAL RATE | NEW SPECIAL RATE | FINANCE NUMBER | BUDGET ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|
| A | PER TRAILER MOVE | 02/01/2017 | 06/30/2020 | 6.50000 | 6.50000 | 36-8261 | 53127 |
| A | LATE SLIP - HIRED DRIVER RATE | 07/01/2017 | 06/30/2020 | 32.21939 | 32.19376 | 36-8261 | 53135 |

SIGNATURE BLOCK

(Signature of Supplier)        6-22-17        (Date)

(Signature of Contracting Officer)        (Date)

Digitally signed by Keith
Harris CPSM, C.P.M
Date: 2017.06.23 12:36:01
-05'00'

PS Form 7408
September 2001



Rec'd in
Memphis
6-29-17

**By Email and Certified Mail – Return Receipt Requested**

Contracting Officer
USPS

**Re:   Claim for contract interpretation under HCR Contract No.** _43491_

Dear Contracting Officer:

This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms. We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment). We ask for a contracting officer's final decision on this claim as soon as possible.

**Background**

This contract was originally awarded on _7-1-1965_, and was renewed for an additional four year term, for the period of _7-1-16_ through _6-30-2020_.

On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts. On August 18, 2016, the arbitrator issued a decision sustaining the grievance. While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months. The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c). That statute requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

> "The Postal Service, in determining whether to obtain transportation of mail by contract under subsection (a)(3) of this section or by Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of the transportation service under each mode." [39 U.S.C. § 5005(c).]

To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest. The arbitrator's decision did not mention this statute or this requirement.

**EXHIBIT**
**2**

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct [a § 5005(c)] analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest. We also understand that the Postal Service has not raised the issue of 39 U.S.C. § 5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

### Claim for contract interpretation

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this service to PVS without comporting with the requirements of 39 U.S.C. § 5005(c). In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest? We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not intend to perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty. Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due consideration to cost (commonly known as a cost comparison) and determine which mode of transportation best serves the public interest. We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this convert to PVS to carry out the arbitration decision. We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of good faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal Service to take an action that violates the law. Converting our contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale. Doing so would violate the duty of good faith and fair dealing. We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that would not violate § 5005(c). Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages. Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter. A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.

Sincerely,

MCE/

# USPS Tracking® Results

FAQs > (http://faq.usps.com/?articleId=220900)

Track Another Package +

Remove ✕

**Tracking Number:** 70163560000102461165

▶  ▶  ▶ Delivered

**On Time**
**Updated Delivery Day:** Thursday, June 29, 2017 ⓘ

# Product & Tracking Information

See Available Actions

**Postal Product:**
Priority Mail™

**Features:**
Certified Mail™
Return Receipt
Up to $50 insurance included
Restrictions Apply ⓘ

**See tracking for related item:**
9590940213965329941620 (/go/TrackConfirmAction?
tLabels=9590940213965329941620)

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| June 29, 2017, 10:15 am | Delivered, Left with Individual | MEMPHIS, TN 38120 |

Your item was delivered to an individual at the address at 10:15 am on June 29, 2017 in MEMPHIS, TN 38120.

| June 29, 2017, 8:58 am | Arrived at Unit | MEMPHIS, TN 38119 |

# EXHIBIT 6

**IN THE
UNITED STATES COURT OF FEDERAL CLAIMS
(BID PROTEST)**

| | |
|---|---|
| MAIL TRANSPORTATION, INC., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| UNITED STATES, ) | Judge _____ |
| ) | |
| Defendant. ) | |

## <u>DECLARATION OF GEORGE TAYLOR</u>

I, George A. Taylor, declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury

that the following is true and correct:

1.      I am the President and Owner of Taylor Postal Contracting, Inc. ("Taylor").  In

this capacity, I am responsible for overseeing all aspects of Taylor's business, including but not

limited to finance, operations, contract matters, and employment matters.  I have personal

knowledge of the facts stated herein, and if called upon to testify I could testify competently to

these facts.

2.      Taylor has been engaged in performing mail transportation continuously since its

founding over 86 years ago, and has had no other business besides mail contracts.  My father,

George E. Taylor, founded the company in 1931.  Initially, the business was called George E.

Taylor Mail Contractor.  The company's first contract involved hauling mail between the

Jackson, Michigan Post Office and the Jackson train depot, a trip of ¼ mile, using a Ford Model

A.

3.      I began working for my father's business as an employee in 1972.  In 1978,

George E. Taylor Mail Contractor became a partnership between me and my father and was

renamed Taylor Postal Contracting.  In 1986 the business was incorporated and we changed its

name to its current name, Taylor Postal Contracting, Inc.  My father retired in the 1980's, at

which time I became the company's sole Owner and President.

4.      Taylor's principal office is located in Jackson, Michigan.  Taylor operates mostly

in southern and southeastern Michigan, mainly in the Detroit and Pontiac area.

5.      Taylor currently holds seven HCR contracts, two of which were awarded to

Taylor more than fifty years ago. The average length of time that Taylor has held this contracts is

32 years. Subject to periodic fluctuations in the price of fuel, those contracts are collectively

valued at approximately $3.5 million.

6.      Taylor presently has 41 drivers, the majority of whom are full-time.  Taylor has

13 straight trucks, 13 tractors, 15 trailers, and 1 service van.

7.      I recently learned that the largest and most profitable of Taylor's HCR contracts,

HCR 48018 is set to be converted to PVS.  HCR 48018 operates out of the Michigan Metroplex

located in Pontiac, Michigan ("the Metroplex").  It begins and ends in Pontiac with 17

intermediate destinations.  The total annual price for HCR 48018 is approximately $1.5 million,

which constitutes approximately 40% of Taylor's revenue.  A true and complete copy of excerpts

of HCR 48018 is attached hereto as Exhibit 1.

8.      The Postal Service initially awarded HCR 48018 to Taylor as the result of a

competitive procurement on or about July 1, 1987.  This contract serves 18 USPS facilities

within a 30-mile radius of the Metroplex.  The contract has been renewed every four years since

then, except the most recent renewal on July 1, 2015 was for a two year term that was

subsequently extended until June 30, 2019.   In 2009 it was combined with HCR 48036 (awarded in 1978) and HCR 48037 (awarded in 1982). The current plate for Parts A-E requires 474,905 annual miles, nine tractor-trailers, over 30,000 labor hours, and about 71,000 gallons of fuel. Ten of Taylor's full-time employees and nine of Taylor's part-time employees work on this contract.

9.      During the course of its performance of HCR 48018, Taylor has received a number of accolades and awards for its outstanding performance as contractor for the Postal Service.  Taylor consistently performs its Postal Service contracts on time; in 2016 its on time rating was 99.78% on time.  Taylor's best on-time rating was in 2012, at 99.95% on-time; Taylor's lowest on-time rating was 99.57% in 1998.  In 2014 Taylor made a proposal to the Postal Service that resulted in the Postal Service saving approximately $165,000 and 5,000 gallons of fuel each year.  Taylor provided the Postal Service with a second costs savings suggestion just this year, which saved the Postal Service approximately $14,000 by combining two of its contracts.

10.      Taylor received the Postal Service's Eagle Spirit award for excellence in contracting in 1995 and again in 2016.  It is my understanding that to be eligible to be nominated for the Eagle Spirit award a contactor must have had at least five years of service and must be cooperative, responsive, flexible to meet the needs of the Postal Service and customers, and present a positive public image.

11.      HCR 48018 comprises a substantial proportion (40%) of Taylor's revenue and the majority of its profits.  Thus, the Postal Service's conversion of HCR 48018 to PVS would have a dramatic, detrimental impact on Taylor's business as a whole.  Taylor would no longer be able to afford to perform at least one of its other Postal Service contracts that is only marginally profitable, and would be forced to give its notice of termination of that contract, causing further

loss of revenue and profits.  Taylor would need to lay off the 19 drivers assigned to work on HCR 48018, who have worked for Taylor on this contract for an average of 9.7 years.  Taylor would have no use for the equipment that is being used in the performance of HCR 48018.  I would likely have to sell my home and relocate based on the loss of revenue and income that would result from Taylor's loss of HCR 48018 and associated consequences.

12.     I was not provided with any notice of the arbitration proceeding with the APWU that resulted in USPS deciding to convert HCR contracts to PVS.  I had no opportunity to participate or present evidence in that action.  I first found out about the arbitration decision in late 2016, when the National Star Route Mail Contractors Association pursued legal action in federal district court.  At that time, HCR 48018 was not included on the list of contracts set for conversion and I did not know that Taylor would be impacted.

13.     Despite Taylor's longstanding and positive relationship with the Postal Service, the Postal Service has not yet provided Taylor with any official communication regarding its plans to convert HCR 48018 to PVS or afforded Taylor with any opportunity to be heard on this issue.  I first learned of the possibility that HCR 48018 would be converted to PVS by phone from a Postal Service employee who spoke with me anonymously around May 18, 2017.   This person had overheard a conversation and saw some confirming documents.  On May 30, 2017, I received a text message that included a photograph of a PVS Conversion confirmation letter between two labor union officials that someone had seen in a Postal Service facility.   On May 31, 2017 I emailed Brent Raney, the  Executive Director of International Operations for the Postal Service, to obtain additional information about these rumors.  Mr. Raney did not respond, but on June 6, 2017, a Transportation Specialist, Edwin Cook, contacted me and confirmed that HCR 48018 was up for conversion to PVS.

14.     Shortly after I initially learned of the potential for HCR 48018 to be converted to PVS, on May 24, 2017, I filed a claim for contract interpretation with the Contracting Officer, Jewell Powell.  A true and correct copy of my May 24, 2017 claim is attached as Exhibit 2.

15.     Although I have still received no official written notice of the conversion or of the termination of HCR 48018 from the Postal Service, it appears to me that the Postal Service has been taking measures to prepare for the conversion, which potentially interfere with Taylor's performance of its work under HCR 48018 and under other contracts.  For example, PVS drivers have stated to Taylor's drivers that they will soon be out of a job, causing them a great deal of anxiety and stress and trying to increase the likelihood that Taylor's drivers will resign and look for alternative employment.  Some of the PVS drivers have encouraged Taylor's employees to leave Taylor and to come to work for PVS.

16.     Based on my experience performing HCR 48018, I believe that there are many reasons why HCR 48018 is not a good candidate for being converted to PVS.  In particular, HCR 48018 presents certain scheduling difficulties that make the contract a doubtful candidate for conversion. There are two Q7 shifts that unavoidably run 9.5 hours each, which would require nearly 1,000 hours of overtime pay for USPS. There is no way to keep these shifts under eight hours.   Additionally, there are numerous concurrent short-range trips in both the morning and afternoon dispatches that just cannot be combined with other shifts. This creates four Q7 or K67 shifts that run only two to four hours in length, which we typically cover with part-time and casual drivers. Postal Service labor contracts may require payment for hours in excess of the currently scheduled trip time for short trips like these.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

5

Dated this _3RD_ day of July, 2017.

_George A. Taylor_
George Taylor

# HIGHWAY TRANSPORTATION CONTRACT - COST WORKSHEET

| SOLICITATION NO. | DATE OF SOLICITATION | CONTRACT NO. 48018 | BEGIN CONTRACT TERM 07/01/2015 | END CONTRACT TERM 06/30/2019 |
|---|---|---|---|---|

| FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE MICHIGAN METROPLEX P&DC, MI | CITY & STATE ROCHESTER, MI |
|---|---|---|

**OFFEROR:** A completed cost worksheet must be submitted with your offer. This worksheet will assist you in determining the cost you expect to incur in performing this service. Please retain a copy of this form for future reference. The instructions for completing this form are listed on the reverse.

OFFEROR'S NAME AND ADDRESS (Include Apt./Suite No./ZIP+4)
TAYLOR POSTAL CONTRACTING INC
4440 PENINSULA DR
JACKSON MI 49201-7803

## BASIS FOR DETERMINING COST

Cost Segment: **A**

COST AS OF **06/30/2017**

| Item | No. of Units Per Year | Unit Cost | Annual Cost |
|---|---|---|---|
| 1a. Vehicle Cost | | | |
| (1) Motor Vehicles | | | |
| (2) Trailers | | | |
| 1b. Operational Cost (Repairs, repair labor, tires, etc.) | | | |
| 2. Taxes | | | |
| 3. Vehicle Registration | | | |
| 4. Miscellaneous | | | |
| 5. General Overhead | | | |
| 6. Fuel (Miles per gallon) | | | |
| 7. Oil (Quarts) | | | |
| 8. Insurance | | | |
| 9. Road Taxes | | | |
| 10. Tolls | | | |
| 11. Total Fixed and Operational Cost (Lines 1-10) | | | |
| 12. Straight Time | | | |
| 13. Overtime | | | |
| 14. Payroll Taxes (Itemized) | | | |
| a. Social Security | | | |
| b. Workman's Compensation | | | |
| c. Federal Unemployment Comp. | | | |
| d. State Unemployment Comp. | | | |
| 15. Fringe Benefits a. Health & Welfare | | | |
| b. Vacation | | | |
| c. Holiday | | | |
| d. Pension | | | |
| 16. Total Operation Labor Cost (Lines 12-15) | | | |
| 17. Supplier's Wages (Personal Driving or Supervision) | | | |
| 18. Total Cost (Lines 11, 16 & 17) | | | |
| 19. Return on Investment | | | |
| 20. TOTAL OFFER (Lines 18 & 19) | | | **1,513,263.40** |

NUMBER OF DRIVERS ON ROUTE: FULL-TIME / PART-TIME

Remarks:

REDACTED

EXHIBIT 1

Offeror's Signature / Date

PS Form 7468A September 2001

# T. P. C., I N C.

**TAYLOR POSTAL CONTRACTING, INC.**

**4440 PENINSULA DRIVE     JACKSON, MI 49201-7803**

☎: 517-764-1978     📠: 517-764-1851

**tpcinc@comcast.net**

**May 24, 2017**

**By Email and Certified Mail Item No. 7015 0640 0006 5289 6955 – Return Receipt Requested**

Ms. Jewell Powell, Manager
Local Distribution Transportation
U.S. Postal Service
1200 Mercantile Lane
Largo, MD 20774-5389

**Re: Claim for contract interpretation under HCR Contract No. 48018**

Dear Ms. Powell:

This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms.  We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment).  We ask for a contracting officer's final decision on this claim as soon as possible.

**Background**

This contract was originally awarded on July 1, 1987, and was renewed for additional four year terms, for the period of July 1, 1991 through June 30, 2015.

On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts.  On August 18, 2016, the arbitrator issued a decision sustaining the grievance.  While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months.  The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

**EXHIBIT**

**2**

In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c). That statute requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

> "The Postal Service, in determining whether to obtain transportation of mail by contract under subsection (a)(3) of this section or by Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of the transportation service under each mode." [39 U.S.C. § 5005(c).]

To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest. The arbitrator's decision did not mention this statute or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct [a § 5005(c) analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest. We also understand that the Postal Service has not raised the issue of 39 U.S.C. § 5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

**Claim for contract interpretation**

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this service to PVS without comporting with the requirements of 39 U.S.C. § 5005(c). In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest? We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not intend to perform a cost comparison and determine which mode of transportation best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty. Under 5005(c), in determining which mode of transportation to use, the Postal Service must

give due consideration to cost (commonly known as a cost comparison) and determine which mode of transportation best serves the public interest.  We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this convert to PVS to carry out the arbitration decision.  We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of good faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal Service to take an action that violates the law.   Converting our contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale.   Doing so would violate the duty of good faith and fair dealing.  We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that would not violate § 5005(c).  Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages.  Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter.  A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.

Sincerely,

George A. Taylor,
President

# EXHIBIT 7

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| MAIL TRANSPORTATION, INC., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.   ) | Case No. _____ |
| ) | |
| UNITED STATES, ) | Judge_____ |
| ) | |
| Defendant. ) | |

## DECLARATION OF NOLA HOLTON

I, Nola Holton, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Secretary-Treasurer of Holton Truck Lines, Inc., which is a Nevada corporation with its principle place of business located at 86 US Highway 93 in Alamo, NV 89001.

2. My husband, Anthony Holton, and I have been in the transportation and trucking business since November 1985.

3. 100 percent of our business is USPS Highway Transportation and CDS Routes.  We currently have 11 HCR Contracts with USPS. All contracts and businesses are operated and managed by Holton Truck Lines, Inc. All equipment is owned and insured under Holton Truck Lines, Inc. and all employees are paid by Holton Truck Lines, Inc.

4. Holton Truck Lines, Inc. has 6 tractors, 21 straight trucks, 8 48-foot trailers, and 6 light duty vehicles currently in service.  Holton Truck Lines, Inc. recently purchased 2 additional tractors and 2 light duty vehicles for use on the routes.

5. Holton Truck Lines, Inc. has 21 employees.

6. We operate two trucking companies – TNH Enterprises and High Miler, Inc. – under the umbrella of Holton Truck Lines, Inc.

7. TNH Enterprises ("TNH") is a Nevada corporation with its principle place of business located at 86 US Highway 93 in Alamo, NV 89001.  Holton Truck Lines, Inc. acquired TNH in July 1987.

8. TNH has three HCR contracts that are being converted to PVS: 890L0, 89042, and 89044. These contracts contain a termination clause that requires the USPS to provide at least 60 days-notice prior to terminating the contract. A true and correct copy of relevant excerpts of these contracts are attached hereto as **Exhibit 1**.

9. The route for HCR contract 890L0 is Las Vegas P&DC to Valle Verde, NV.  This route consists of three parts, which provides service to the following facilities: Valle Verde Post Office, 7 Hills Post Office, and Amazon, Bed Bath and Beyond.

10. It takes 5 full time drivers and 1 part-time driver to perform this contract because of the way these routes are scheduled, and also to avoid violation of Department of Transportation Hours of Service.  There are frequent time changes on the Amazon part of this route to accommodate the large volume of packages in and out of that facility. As a result, it makes it almost impossible to put a substitute driver on this route without doing several days of training for which we are not reimbursed.   An additional stop at North Las Vegas Post Office has been added and being paid on an extra trip ticket.  A request to do a route survey on this part of the route to realign the stops and times has been ignored.

11. HCR contract 890L0 requires 3 tractors (plus a back up vehicle) and 4 trailers to accommodate the schedule.  A tractor trailer used to service the Valle Verde Post Office is left at the dock after each shift for the convenience of USPS.

12. The current contract term for HCR contract 890L0 is from August 1, 2014 through June 30, 2018; however, it was initiated October 1, 1997 when the Valle Verde Post Office opened as part of the route for HCR contract 89042.  On August 1, 2006, HCR contract 890L0 was split from HCR contract 89042 when the 7-Hills Post Office was added to the route. The Amazon part of this contract was run on extra trip tickets for quite a while before a service change was implemented and added to the contract.  This contact has been renewed 6 times, with some extensions at the convenience of USPS.

13. The value of HCR contract 890L0 is $344,228.25 annually and is for 7,074 hours.

14. HCR contract 89044 operates the route from Las Vegas P&DC to Boulder City, NV.  This route services the Boulder City Post Office with three round trips in the morning and one round trip in the afternoon.   This also includes stops at St. Judes and one additional collection box.   It takes 1 full time driver and 1 part time driver.  Equipment used on this route includes 2 straight trucks with 24-foot boxes and lift-gates.

15. The current term of HCR contract 89044 is from August 1, 2014 to June 30, 2018; however, TNH has been operating the route since July 1, 1987.  It has been renewed 6 times with some extensions at the convenience of USPS.

16. The value of HCR contract 89044 is $137,032.35 annually.  This contract includes 3,016 hours.  2,171 hours are employee paid, and an additional 844 hours are supplier provided (that is, provided by the HCR contractor) at a reduced rate.

17. HCR contract 89042 operates the route from Las Vegas P&DC to the Henderson, NV Post Office, with additional service to the Valle Verde Post Office on Holidays.  This route requires 1 tractor-trailer (plus 1 back up tractor and trailer).  This tractor-trailer is left at the

dock after each shift for the convenience of USPS.  It takes 2 full time drivers and 1 part time driver to provide these services.

18. The current contract term is from August 1, 2014 to June 30, 2016; however, the route has been operated by TNH since July 1992 and has been renewed 6 times.

19. The value of HCR contract 89042 is $160,287.97 annually and the hours are 3,233.

20. An issue exists with this route in that the line of travel for this route was changed in October of 2008 when the I-215 opened.   The change in mileage added almost 5,000 miles annually, but the service change did not include any additional mileage.  I have addressed this issue with two USPS contracting officers who refused to address the issue because the original paperwork could not be located.   The mileage was finally changed in 2015, after another route survey was done.  The original paperwork was emailed to me in August of 2016, however my request for back compensation was ignored.  We have traveled, approximately 35,000 additional miles and used approximately 5,000 additional gallons of fuel for which we have not received compensation.

21. High Miler, Inc. ("High Miler") is a Nevada corporation with its principle place of business located at 86 US Highway 93 in Alamo, NV 89001.  Holton Truck Lines, Inc. acquired High Miler in July 1999. It has one HCR contract that is being converted to PVS: 89036.  This contract contains a termination clause that requires the USPS to provide at least 60 days-notice prior to terminating the contract. A true and correct copy of relevant excerpts of this contract is attached hereto as **Exhibit 2**.

22. High Miler's HCR contract 89036 operates the route for Las Vegas P&DC to North Las Vegas post office with service to Nellis Air Force Base. This route requires 1 straight truck (plus 1 back up truck).  It requires 2 full time drivers and 1 part time driver.    When

4

delivering to the North Las Vegas Post Office the driver must have the combination to unlock the yard gate and a key to unlock the vestibule door and secure the mail cages inside. Also, while delivering mail to Nellis Air Force Base, the driver must pass through a security gate, which at times causes significant delays.

23. The current contract term for HCR contract 89036 is from August 1, 2014 through June 30, 2018; however, High Miler has been operating the contract since July 1, 1999. It has been renewed 6 times, with some extensions for the convenience of USPS.

24. The value of HCR contract 89036 is $175,148.63 annually.  The contract calls for 4,113 hours.  1,766 are employee paid hours; however, 2,347 additional hours are supplier provided at a reduced rate.

25. None of the afore mentioned routes have ever been performed by PVS even though an unsuccessful attempt to convert Route 89036 was made in 1999.

26. It will be difficult for USPS to perform these routes because the HCR contracts to be converted operate 6 days a week (Monday through Saturday), all holidays accept Thanksgiving, Christmas and New Years and occasionally operate on Sunday (at the request of USPS).  Our contract schedules are amended each year, which add additional hours for the peak season that usually starts the last weekend in November and extends through December 24th.  All drivers are required to load and unload their own vehicles at the facilities they service without assistance from postal employees.  This is challenging in light of the fact that USPS has cut loading times down to as little as 10 minutes to load a 48 foot trailer. Contractors can perform these contracts more efficiently and at a lower cost to the Postal Service because our companies are not bound by the restraints of the postal workers' union. Frequent changes in the needs of USPS customers require changes in schedules and number

of trips.   This will likely require USPS to modify the specifications of each route to accommodate the union guidelines.

27. The number of extra trips performed for each of these contracts each month are significant.

28. We provide good service to USPS and have accommodated numerous schedule changes and extra service requests and believe that, but for the conversion, we would continue to service the aforementioned routes.

29. Neither I, nor any other TNH Enterprises or High Miler, Inc. representative was given notice of the arbitration proceeding with the APWU that resulted in USPS converting the aforementioned HCR contracts to PVS.   Neither I, nor any other TNH Enterprise nor High Miler representative was allowed to participate or present evidence in the arbitration.

30. TNH Enterprises and High Miler, Inc. was first notified of the conversion of the aforementioned HCR contracts by email on June 9 and June 12, 2017.   This email was received from Paul Horner, a USPS Purchasing Analyst from Memphis, TN.

31. There were rumors about the conversion several weeks before we received the email notifications.   Our drivers were approached by postal employees on the dock of the Las Vegas P&DC telling them that they would be losing their jobs because USPS was taking over contract routes and they needed to apply with the post office so they could continue working.   As a result, 2 of our drivers were recently recruited by USPS because of the HCR to PVS conversion and 3 others have given notice and are taking other jobs.   We do not have enough back up drivers for our routes and the HCR to PVS conversion has made it difficult for us to hire drivers knowing it would only be for a short time.

32. I have heard that USPS wants to convert the aforementioned HCR contract routes to PVS by September 1, 2017.  Typically, we know whether or not we are renewing a particular contract one year before it expires and can plan.  Such has not been the case here.

33. If USPS proceeds with the conversion of the aforementioned HCR contracts, we will lose about 70% of our revenue and will be forced to lay off over half of our total employees.  This is because the routes USPS seeks to convert are our largest HCR contracts.  As noted above, we have already lost 2 drivers to USPS due to the conversion and 3 others have given notice.  We expect to lose 8 more through layoffs if the conversions proceed.  Some of our drivers have been with us for over 10 years. We also have equipment – tractors and trailers that were purchased specifically for the converted routes – that cannot be used on any of our smaller routes.  We will have to sell 8 trailers and 7 tractors.

34. After 30 years of onsite parking at the Las Vegas P & DC, we were told we had to remove all contract vehicles from postal premises and secure parking off site.   This occurred August 2016, which coincidentally is the same time the arbitration ruling came down.  As a result, we had to lease property close to the post office to park our vehicles.  This has added additional employee hours and miles to our contracts.  Our request for compensation has been ignored.  If the USPS proceeds with the conversion, we will have to continue paying for parking after the need has passed. We also have registration and insurance costs that are renewable just before the conversion date and are non-refundable.

35. On or about July 6, 2017, I sent a claim letter via certified mail to USPS requesting clarification of the conversion of service to PVS and compliance with the requirements of 39

U.S.C. § 5005(c). A true and correct copy of this correspondence is attached hereto as **Exhibit 3**.


I declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief.

Nola Holton


Executed in Las Vegas on July 11, 2017.

**UNITED STATES POSTAL SERVICE** ®

# TRANSPORTATION SERVICES RENEWAL CONTRACT
## FOR REGULAR SERVICE

### 1. RENEWAL PURSUANT TO

| a. CONTRACT NO. | b. EXPIRATION DATE OF EXPIRING CONTRACT | c. BEGIN CONTRACT TERM | d. END CONTRACT TERM |
|---|---|---|---|
| 890L0 | 07/31/2014 | 08/01/2014 | 06/30/2018 |

| e. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | CITY & STATE |
|---|---|---|
| | LAS VEGAS P&DC, NV | VALLE VERDE STATION, NV |

### 2. RATE OF COMPENSATION

| a. CONTRACT RATE (Specify If Other Than Annual) | b. ANNUAL MILEAGE | c. RATE PER MILE |
|---|---|---|
| $371,242.50 PER ANNUM | 74,513.9 | $4.98219 |

### 3. SUPPLIER

| a. NAME (Print or Type) | b. ADDRESS (Street, City, State, ZIP+4) |
|---|---|
| TNH ENTERPRISES INC | PO BOX 358 ALAMO NV 89001-0358 |

| c. TELEPHONE NO. | d. DOT NO. | e. SOCIAL SECURITY NO. OR EMPLOYER IDENTIFICATION NO. |
|---|---|---|
| 775-725-3723 | 330477 | 88-0338099 |

| f. LEGAL RESIDENT OF | | g. ENGAGED IN BUSINESS IN | |
|---|---|---|---|
| (Complete If Supplier is an Individual) | | (Complete If Supplier is a Partnership or Corporation) | |
| COUNTY | STATE | COUNTY | STATE |
| | | LINCOLN | NV |

### 4. CONTRACT

This form, your proposal, the Statement of Work and all attachments are incorporated into the renewal contract.

The above referenced contract, for the period specified, is hereby renewed with the rate(s) and service(s) prevailing at the end of the current contract.

| 5. SUPPLIER | 6. U.S. POSTAL SERVICE |
|---|---|
| *Nela Halton* 7-19-14 | |
| (Signature of Supplier)              (Date) | (Signature of Contracting Officer)              (Date) |
| *Nona Holton Secretary* | CONTRACTING OFFICER |
| (Name and Title of Supplier) | (Title of Contracting Officer) |

**COMMENTS** (For U.S. Postal Service Use Only)

"This contract is issued under the Terms and Conditions, Issue 12 (Transportation Routes Only) dated January 15, 2013; Fuel Management Program, effective June 2013 along with the Statement of Work Addendum - 2013."

PS Form 7447
September 2001



**UNITED STATES**
**POSTAL SERVICE** ®

**TRANSPORTATION SERVICES RENEWAL CONTRACT**
**FOR REGULAR SERVICE**

## 1. RENEWAL PURSUANT TO

| a. CONTRACT NO. | b. EXPIRATION DATE OF EXPIRING CONTRACT | c. BEGIN CONTRACT TERM | d. END CONTRACT TERM |
|---|---|---|---|
| 89042 | 07/31/2014 | 08/01/2014 | 06/30/2018 |

| e. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | CITY & STATE |
|---|---|---|
| | LAS VEGAS P&DC, NV | HENDERSON, NV |

## 2. RATE OF COMPENSATION

| a. CONTRACT RATE (Specify If Other Than Annual) | b. ANNUAL MILEAGE | c. RATE PER MILE |
|---|---|---|
| $181,220.91 PER ANNUM | 45,548.6 | $3.97863 |

## 3. SUPPLIER

| a. NAME (Print or Type) | b. ADDRESS (Street, City, State, ZIP+4) |
|---|---|
| TNH ENTERPRISES INC | PO BOX 358 ALAMO NV 89001-0358 |

| c. TELEPHONE NO. | d. DOT NO. | e. SOCIAL SECURITY NO. OR EMPLOYER IDENTIFICATION NO. |
|---|---|---|
| 775-725-3723 | 330477 | 88-0338099 |

| f. LEGAL RESIDENT OF | g. ENGAGED IN BUSINESS IN |
|---|---|
| (Complete if Supplier is an Individual) | (Complete if Supplier is a Partnership or Corporation) |

| COUNTY | STATE | COUNTY | STATE |
|---|---|---|---|
| | | LINCOLN | NV |

## 4. CONTRACT

This form, your proposal, the Statement of Work and all attachments are incorporated into the renewal contract.

The above referenced contract, for the period specified, is hereby renewed with the rate(s) and service(s) prevailing at the end of the current contract.

| 5. SUPPLIER | 6. U.S. POSTAL SERVICE |
|---|---|
| *John Holton* 7-17-14 | |
| (Signature of Supplier) (Date) | (Signature of Contracting Officer) (Date) |
| John Holton Secretary | CONTRACTING OFFICER |
| (Name and Title of Supplier) | (Title of Contracting Officer) |

**COMMENTS** (For U.S. Postal Service Use Only)

"This contract is issued under the Terms and Conditions, Issue 12 (Transportation Routes Only) dated January 15, 2013; Fuel Management Program, effective June 2013 along with the Statement of Work Addendum - 2013."

PS Form 7447
September 2001

| UNITED STATES POSTAL SERVICE® | TRANSPORTATION SERVICES RENEWAL CONTRACT FOR REGULAR SERVICE |
|---|---|

## 1. RENEWAL PURSUANT TO

| a. CONTRACT NO. | b. EXPIRATION DATE OF EXPIRING CONTRACT | c. BEGIN CONTRACT TERM | d. END CONTRACT TERM |
|---|---|---|---|
| 89044 | 07/31/2014 | 08/01/2014 | 06/30/2018 |

| e. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | CITY & STATE |
|---|---|---|
| | LAS VEGAS P&DC, NV | BOULDER CITY, NV |

## 2. RATE OF COMPENSATION

| a. CONTRACT RATE (Specify If Other Than Annual) | b. ANNUAL MILEAGE | c. RATE PER MILE |
|---|---|---|
| $143,145.53 PER ANNUM | 52,656.7 | $2.71847 |

## 3. SUPPLIER

| a. NAME (Print or Type) | b. ADDRESS (Street, City, State, ZIP+4) |
|---|---|
| TNH ENTERPRISES INC | PO BOX 358 ALAMO NV 89001-0358 |

| c. TELEPHONE NO. | d. DOT NO. | e. SOCIAL SECURITY NO. OR EMPLOYER IDENTIFICATION NO. |
|---|---|---|
| 775-725-3723 | 330477 | 88-0338099 |

| f. LEGAL RESIDENT OF (Complete If Supplier Is an Individual) | | g. ENGAGED IN BUSINESS IN (Complete If Supplier Is a Partnership or Corporation) | |
|---|---|---|---|
| COUNTY | STATE | COUNTY | STATE |
| | | LINCOLN | NV |

## 4. CONTRACT

This form, your proposal, the Statement of Work and all attachments are incorporated into the renewal contract.

The above referenced contract, for the period specified, is hereby renewed with the rate(s) and service(s) prevailing at the end of the current contract.

| 5. SUPPLIER | 6. U.S. POSTAL SERVICE |
|---|---|
| *Nola Holton* 7-17-14 (Signature of Supplier) (Date) | (Signature of Contracting Officer) (Date) |
| *Nola Holton - Secretary* (Name and Title of Supplier) | CONTRACTING OFFICER (Title of Contracting Officer) |

COMMENTS (For U.S. Postal Service Use Only)

"This contract is issued under the Terms and Conditions, Issue 12 (Transportation Routes Only) dated January 15, 2013; Fuel Management Program, effective June 2013 along with the Statement of Work Addendum - 2013."

PS Form 7447
September 2001

the contracting officer, accompanied by full supporting documentation of costs, no later than 90 days after the performance of such extra trips. When the contracting officer has ordered several extra trips under a single order, the 90-day period begins on the date of performance of the last trip performed under such order. Failure to agree to such compensation above pro rata pay shall be resolved under the Claims and Disputes clause.

c. **Detours**

When the regular line of travel of a contract route is impassable and the supplier performs full service over another and longer line of travel, the supplier's compensation shall be equitably increased for such service, provided, however, that such increase:

(1) Comprises at least $1.00 (one dollar) in any month, and

(2) Does not exceed an amount determined by multiplying the additional miles actually traveled by the rate per mile that applies to the trip on which the detour was made, determined by dividing the regular compensation for the trip by the regular number of miles.

*Note*: No payments will be made with respect to any detour not reported to the contracting officer or the contracting officer's designee within 90 days after the detoured service is performed. Supplier will use reasonable efforts to minimize additional costs or delays resulting from detours.

d. The supplier shall proceed diligently in accordance with service changes and extra trips ordered unilaterally by the contracting officer. Disputes concerning such orders shall be resolved pursuant to the Claims and Disputes clause. The supplier's claim for equitable adjustment must be asserted within 30 days of receiving a written change order. A later claim may be acted upon — but not after final payment under this contract — if the contracting officer decides that the facts justify such action.

e. **Liquidated Damages**:

See Section 2.3.3.

## *2.3.3 Termination of Contracts*

The Postal Service reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the supplier must immediately stop all work and must immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the supplier will be paid a percentage of the work performed prior to the notice of termination. The supplier will not be paid for any work performed or costs incurred which reasonably could have been avoided.

The clauses below captioned "Termination with Notice" and "Termination for the Postal Service's Convenience" are in the alternative, so that only one of them is applicable to this contract, and not the other. The designation of which of the two clauses applies will be established prior to renewal or award. If no such designation has been made, the clause captioned "Termination for the Postal Service's Convenience" will be assumed to be the designated clause.

If, within 60 days after the supplier is notified of a partial Termination with Notice or Termination for the Postal Service's Convenience, the supplier and contracting officer cannot bilaterally reach agreement on a new contract rate, the contracting officer will process the service change to include the Postal Service's last offer and issue a final decision letter.

### 2.3.3a Termination with Notice

The contracting officer or the supplier, on 60 days written notice, may terminate this contract or the right to perform under it, in whole or in part, without cost to either party.

### 2.3.3b  Termination for the Postal Service's Convenience

The Postal Service reserves the right to terminate a regular contract, or any part thereof, for its sole convenience. In the event of such termination, the supplier must immediately stop all work and must immediately cause any and all of its suppliers and subcontractors to cease work. After termination, the supplier may submit to the contracting officer a termination claim in the form and with the certification prescribed by the contracting officer. The claim must be submitted promptly, but in no event more than 180 days after the effective date of termination, unless an extension in writing is granted by the contracting officer. However, if the contracting officer determines that the facts justify such action, any termination claim may be received and acted upon at any time after the 180-day period. Upon failure of the supplier to submit a termination claim within the time allowed, the contracting officer may determine, on the basis of information available, the amount, if any, due the supplier by reason of the termination and will pay that amount. The supplier will not be required to comply with the cost accounting standards and principles for this purpose. The supplier will not be paid for any work performed or costs incurred which reasonably could have been avoided.  The supplier and the contracting officer shall agree upon the whole or any part of the amount to be paid (including an allowance for the fee) to the supplier by reason of the termination. The supplier has the right of review through the contracting officer to the next higher level contracting authority and/or under the *Claims and Disputes* clause of the determination made by the contracting officer pertaining to the financial amount **ONLY**.  If the supplier fails to request an extension of time, the supplier will have no right of review.

The Postal Service may, under the terms and conditions it may prescribe, make partial payments against costs incurred by the supplier in connection with the terminated portion of the contract whenever, in the opinion of the contracting officer, the aggregate of the partial payments is within the amount to which the supplier will be entitled. If the total of these payments exceeds the amount finally determined to be due under this clause, the excess must be repaid to the Postal Service upon demand, together with interest calculated in accordance with the *Interest* clause of this contract, for the period from the date the excess payment is received by the supplier to the date on which the excess is repaid to the Postal Service. However, no interest will be charged with respect to an excess payment attributable to a reduction in the supplier's claim by reason of retention or other disposition of termination inventory, until 10 days after the date of the retention or disposition.

### 2.3.3c  Clause B-72 Termination on Notice - Emergency Contracts (February 2009) (Modified)

This contract may be terminated by the Postal Service upon notice of not less than 24 hours, or by the supplier upon notice of not less than 15 days without cost.

## *2.3.4  Safety Rating (Federal Motor Carrier Safety Administration)*

If the supplier is notified by the Federal Motor Carrier Safety Administration (FMCSA) that there is a proposed safety rating or determination of a rating of "unsatisfactory" of the supplier (as described in 49 CFR § 385.11), the supplier must notify the contracting officer within five business days of receipt of its receipt of notice from the FMCSA.  Should the supplier fail to do so, the contracting officer may terminate any and all of the supplier's contracts for default.  In addition, the contracting officer may terminate any and all of the supplier's contracts for default based upon a proposed safety rating or determination of a rating of "unsatisfactory" of the supplier (as described in 49 CFR § 385.11) by the FMCSA.

**UNITED STATES**
**POSTAL SERVICE ®**

## TRANSPORTATION SERVICES RENEWAL CONTRACT
### FOR REGULAR SERVICE

### 1. RENEWAL PURSUANT TO

| a. CONTRACT NO. | b. EXPIRATION DATE OF EXPIRING CONTRACT | c. BEGIN CONTRACT TERM | d. END CONTRACT TERM |
|---|---|---|---|
| 89036 | 06/30/2014 | 07/01/2014 | 01/31/2015 |

| e. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | CITY & STATE |
|---|---|---|
| | LAS VEGAS P&DC, NV | NELLIS AFB BRANCH, NV |

### 2. RATE OF COMPENSATION

| a. CONTRACT RATE (Specify If Other Than Annual) | b. ANNUAL MILEAGE | c. RATE PER MILE |
|---|---|---|
| $180,735.20 PER ANNUM | 71,954.8 | $2.51179 |

### 3. SUPPLIER

| a. NAME (Print or Type) | b. ADDRESS (Street, City, State, ZIP+4) |
|---|---|
| HIGH MILER INC | PO BOX 358 ALAMO NV 89001-0358 |

| c. TELEPHONE NO. | d. DOT NO. | e. SOCIAL SECURITY NO. OR EMPLOYER IDENTIFICATION NO. |
|---|---|---|
| 775-725-3723 | | 88-0426367 |

| f. LEGAL RESIDENT OF (Complete If Supplier Is an Individual) | | g. ENGAGED IN BUSINESS IN (Complete If Supplier Is a Partnership or Corporation) | |
|---|---|---|---|
| COUNTY | STATE | COUNTY | STATE |
| | | LINCOLN | NV |

### 4. CONTRACT

This form, your proposal, the Statement of Work and all attachments are incorporated into the renewal contract.

The above referenced contract, for the period specified, is hereby renewed with the rate(s) and service(s) prevailing at the end of the current contract.

| 5. SUPPLIER | 6. U.S. POSTAL SERVICE |
|---|---|
| *Nola Holton* 7-10-14 | |
| (Signature of Supplier)          (Date) | (Signature of Contracting Officer)          (Date) |
| *Noha Holton Secretary* | CONTRACTING OFFICER |
| (Name and Title of Supplier) | (Title of Contracting Officer) |

**COMMENTS** (For U.S. Postal Service Use Only)

This contract is issued under the Terms and Conditions, Issue 12 (Transportation Routes Only) dated January 15, 2013; Fuel Management Program, effective June 2013 along with the Addendum to Trans TC Issue 12.

PS Form 7447
September 2001

**EXHIBIT**
**2**

the contracting officer, accompanied by full supporting documentation of costs, no later than 90 days after the performance of such extra trips. When the contracting officer has ordered several extra trips under a single order, the 90-day period begins on the date of performance of the last trip performed under such order. Failure to agree to such compensation above pro rata pay shall be resolved under the Claims and Disputes clause.

c.    **Detours**

When the regular line of travel of a contract route is impassable and the supplier performs full service over another and longer line of travel, the supplier's compensation shall be equitably increased for such service, provided, however, that such increase:

(1)    Comprises at least $1.00 (one dollar) in any month, and

(2)    Does not exceed an amount determined by multiplying the additional miles actually traveled by the rate per mile that applies to the trip on which the detour was made, determined by dividing the regular compensation for the trip by the regular number of miles.

*Note*: No payments will be made with respect to any detour not reported to the contracting officer or the contracting officer's designee within 90 days after the detoured service is performed. Supplier will use reasonable efforts to minimize additional costs or delays resulting from detours.

d.    The supplier shall proceed diligently in accordance with service changes and extra trips ordered unilaterally by the contracting officer. Disputes concerning such orders shall be resolved pursuant to the Claims and Disputes clause. The supplier's claim for equitable adjustment must be asserted within 30 days of receiving a written change order. A later claim may be acted upon — but not after final payment under this contract — if the contracting officer decides that the facts justify such action.

e.    **Liquidated Damages**:

See Section 2.3.3.


## 2.3.3  Termination of Contracts

The Postal Service reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the supplier must immediately stop all work and must immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the supplier will be paid a percentage of the work performed prior to the notice of termination. The supplier will not be paid for any work performed or costs incurred which reasonably could have been avoided.

The clauses below captioned "Termination with Notice" and "Termination for the Postal Service's Convenience" are in the alternative, so that only one of them is applicable to this contract, and not the other. The designation of which of the two clauses applies will be established prior to renewal or award. If no such designation has been made, the clause captioned "Termination for the Postal Service's Convenience" will be assumed to be the designated clause.

If, within 60 days after the supplier is notified of a partial Termination with Notice or Termination for the Postal Service's Convenience, the supplier and contracting officer cannot bilaterally reach agreement on a new contract rate, the contracting officer will process the service change to include the Postal Service's last offer and issue a final decision letter.

### 2.3.3a  Termination with Notice

The contracting officer or the supplier, on 60 days written notice, may terminate this contract or the right to perform under it, in whole or in part, without cost to either party.

### 2.3.3b  Termination for the Postal Service's Convenience

The Postal Service reserves the right to terminate a regular contract, or any part thereof, for its sole convenience. In the event of such termination, the supplier must immediately stop all work and must immediately cause any and all of its suppliers and subcontractors to cease work. After termination, the supplier may submit to the contracting officer a termination claim in the form and with the certification prescribed by the contracting officer. The claim must be submitted promptly, but in no event more than 180 days after the effective date of termination, unless an extension in writing is granted by the contracting officer. However, if the contracting officer determines that the facts justify such action, any termination claim may be received and acted upon at any time after the 180-day period. Upon failure of the supplier to submit a termination claim within the time allowed, the contracting officer may determine, on the basis of information available, the amount, if any, due the supplier by reason of the termination and will pay that amount. The supplier will not be required to comply with the cost accounting standards and principles for this purpose. The supplier will not be paid for any work performed or costs incurred which reasonably could have been avoided.  The supplier and the contracting officer shall agree upon the whole or any part of the amount to be paid (including an allowance for the fee) to the supplier by reason of the termination. The supplier has the right of review through the contracting officer to the next higher level contracting authority and/or under the *Claims and Disputes* clause of the determination made by the contracting officer pertaining to the financial amount **ONLY**.  If the supplier fails to request an extension of time, the supplier will have no right of review.

The Postal Service may, under the terms and conditions it may prescribe, make partial payments against costs incurred by the supplier in connection with the terminated portion of the contract whenever, in the opinion of the contracting officer, the aggregate of the partial payments is within the amount to which the supplier will be entitled. If the total of these payments exceeds the amount finally determined to be due under this clause, the excess must be repaid to the Postal Service upon demand, together with interest calculated in accordance with the *Interest* clause of this contract, for the period from the date the excess payment is received by the supplier to the date on which the excess is repaid to the Postal Service. However, no interest will be charged with respect to an excess payment attributable to a reduction in the supplier's claim by reason of retention or other disposition of termination inventory, until 10 days after the date of the retention or disposition.

### 2.3.3c  Clause B-72 Termination on Notice - Emergency Contracts (February 2009) (Modified)

This contract may be terminated by the Postal Service upon notice of not less than 24 hours, or by the supplier upon notice of not less than 15 days without cost.

## 2.3.4  Safety Rating (Federal Motor Carrier Safety Administration)

If the supplier is notified by the Federal Motor Carrier Safety Administration (FMCSA) that there is a proposed safety rating or determination of a rating of "unsatisfactory" of the supplier (as described in 49 CFR § 385.11), the supplier must notify the contracting officer within five business days of receipt of its receipt of notice from the FMCSA.  Should the supplier fail to do so, the contracting officer may terminate any and all of the supplier's contracts for default. In addition, the contracting officer may terminate any and all of the supplier's contracts for default based upon a proposed safety rating or determination of a rating of "unsatisfactory" of the supplier (as described in 49 CFR § 385.11) by the FMCSA.

TNH ENTERPRISES
P.O. Box 358
Alamo, Nevada 89001

July 5, 2017

Antoine L. Slaughter
Western LDT Team Leader &
Contracting Officer
1200 Mercantile Lane – Suite 109
Largo, MD  20774-5389

  **Re:**    **Claim for contract interpretation under HCR Contract No.   890L0**

Dear Mr. Slaughter:

  This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms. We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment). We ask for a contracting officer's final decision on this claim as soon as possible.

  **Background**

  This contract was originally awarded on ___October 1, 1997____. The current contract term runs from ____August 1, 2014____ through __June 30, 2018___.

  On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts. On August 18, 2016, the arbitrator issued a decision sustaining the grievance. While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months. The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

  In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c). That statute requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

> "The Postal Service, in determining whether to obtain transportation of
> mail by contract under subsection (a)(3) of this section or by
> Government motor vehicle, shall use the mode of transportation which



best serves the public interest, due consideration being given to the
cost of the transportation service under each mode." [39 U.S.C. §
5005(c).]

To comply with this statute, the Postal Service must perform a cost comparison between HCR service
and PVS and make a determination as to which mode of transportation best serves the public interest.
The arbitrator's decision did not mention this statute or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the
arbitration award presumed that the Postal Service "would conduct [a § 5005(c)] analysis when deciding
which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail
Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We
understand that the Postal Service has not conducted a new cost comparison between our contract and
PVS and does not intend to make a determination as to which transportation mode best serves the
public interest. We also understand that the Postal Service has not raised the issue of 39 U.S.C. §
5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

### Claim for contract interpretation

We seek your decision on whether the "Termination with Notice" clause of the contract may be
exercised for the purpose of converting this service to PVS without comporting with the requirements of
39 U.S.C. § 5005(c). In other words, may the contract be terminated for the purpose of converting the
service to PVS without the Postal Service first making a cost comparison and determining which mode of
transportation best serves the public interest? We understand that the Postal Service intends to
terminate this contract to comply with the arbitration award and that it therefore does not intend to
perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. *See Metcalf Constr. Co. v.
United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing
constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty.
Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due
consideration to cost (commonly known as a cost comparison) and determine which mode of
transportation best serves the public interest. We understand that the Postal Service has neither
conducted a cost comparison nor determined which mode of transportation best serves the public
interest, but intends to convert this contract to PVS to carry out the arbitration decision. We believe
terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis
would violate the duty of good faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the
arbitrator may not direct the Postal Service to take an action that violates the law. Converting our
contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may
not be taken, regardless of the rationale. Doing so would violate the duty of good faith and fair dealing.
We also understand that the Postal Service did not raise this issue with the arbitrator or seek an
alternative remedy that would not violate § 5005(c). Failure to raise this issue with the arbitrator and
seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the
duty of good faith and fair dealing.

This claim does not seek monetary damages. Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter. A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.

Sincerely,

Nola Holton

Nola Holton
TNH Enterprises
P.O. Box 358
Alamo, Nevada 89001

# CERTIFIED MAIL® RECEIPT
**Domestic Mail Only**

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

UPPER MARLBORO, MD 20774

| | | |
|---|---|---|
| Certified Mail Fee | $3.35 | 0305 |
| | $2.75 | VEGAS 06 |
| Extra Services & Fees *(check box, add fee as appropriate)* | | |
| ☐ Return Receipt (hardcopy) | $____ | |
| ☐ Return Receipt (electronic) | $0.00 | Postmark |
| ☐ Certified Mail Restricted Delivery | $0.00 | Here |
| ☐ Adult Signature Required | $0.00 | JUL 06 |
| ☐ Adult Signature Restricted Delivery | $____ | |
| Postage | $0.49 | |
| | | 07/06/2017 |
| Total Postage and Fees | $6.59 | |

7016 2070 0000 0492 3209

Sent To *Antoine Slaughter*

Street and Apt. No., or PO Box No. *1200 Mercantile Ln   Suite 109*

City, State, ZIP+4 *LARGO, MD   20774 - 5389*

PS Form 3800, April 2015 PSN 7530-02-000-9047        See Reverse for Instructions

---

## SENDER: COMPLETE THIS SECTION

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Antoine Slaughter*
*Western LDT Lender*
*Contracting Officer*
*1300 Mercantile Ln Suite 109*
*Largo, MD 20774-5389*

9590 9402 2621 6336 4568 31

2. Article Number *(Transfer from service label)*

7016 2070 0000 0492 3209

PS Form 3811, July 2015 PSN 7530-02-000-9053

## COMPLETE THIS SECTION ON DELIVERY

A. Signature
X ☐ Agent
☐ Addressee

B. Received by *(Printed Name)*        C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
- ☐ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☐ Certified Mail®
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- ☐ Insured Mail
- ☐ Insured Mail Restricted Delivery (over $500)
- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Return Receipt for Merchandise
- ☐ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

# TNH ENTERPRISES
# P.O. BOX 358
# ALAMO, NEVADA  89001

July 1, 2017

Antoine L. Slaughter
Western LDT Team Leader &
Contracting Officer
1200 Mercantile Lane – Suite 109
Largo, MD  20774-5389

      **Re:**    **Claim for contract interpretation under HCR Contract No.**   **89042**      

Dear Mr. Slaughter:

      This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms.  We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment). We ask for a contracting officer's final decision on this claim as soon as possible.

      **Background**

      This contract was originally awarded on __July 25, 1992__.  The current contract term runs from __August 1, 2014__ through __June 30, 2018__.

      On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts.  On August 18, 2016, the arbitrator issued a decision sustaining the grievance.  While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months.  The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

      In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c).  That statute requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

> "The Postal Service, in determining whether to obtain transportation of
> mail by contract under subsection (a)(3) of this section or by
> Government motor vehicle, shall use the mode of transportation which
> best serves the public interest, due consideration being given to the
> cost of the transportation service under each mode." [39 U.S.C. §
> 5005(c).]

To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest. The arbitrator's decision did not mention this statute or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct [a § 5005(c)] analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest. We also understand that the Postal Service has not raised the issue of 39 U.S.C. § 5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

### Claim for contract interpretation

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this service to PVS without comporting with the requirements of 39 U.S.C. § 5005(c). In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest? We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not intend to perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty. Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due consideration to cost (commonly known as a cost comparison) and determine which mode of transportation best serves the public interest. We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this contract to PVS to carry out the arbitration decision. We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of good faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal Service to take an action that violates the law. Converting our contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale. Doing so would violate the duty of good faith and fair dealing. We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that would not violate § 5005(c). Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages.  Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter.  A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.

Sincerely,

Nola Holton
TNH Enterprises
P.O. Box 358
Alamo, Nevada  89001

**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

UPPER MARLBORO, MD 20774

OFFICIAL USE

| Certified Mail Fee | $3.35 | |
| | | $2.75 |
| Extra Services & Fees (check box, add fee as appropriate) | | |
| ☐ Return Receipt (hardcopy) | $0.00 | |
| ☐ Return Receipt (electronic) | $0.00 | |
| ☐ Certified Mail Restricted Delivery | $0.00 | |
| ☐ Adult Signature Required | $0.00 | |
| ☐ Adult Signature Restricted Delivery | | |
| Postage | $0.49 | |
| | | |
| Total Postage and Fees | $8.59 | |

07/06/2017

JUL - Postmark Here

Sent To
Antoine L. Slaughter

Street and Apt. No., or PO Box No.
1200 Mercantile Lane Suite 108

City, State, ZIP+4
Largo MD 20774-5389

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7016 2070 0000 0492 3193

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Antoine L. Slaughter
Western Lot Temp Lender
Covenanting Officer
1200 Mercantile Lane
Largo MD 20774-5389

9590 9402 2621 6336 4568 24

2. Article Number (Transfer from service label)
7016 2070 0000 0492 3193

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X

B. Received by (Printed Name)      C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No
Suite 108

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

# TNH ENTERPRISES
# P.O. BOX 358
# ALAMO, NEVADA  89001

July 5,, 2017

Antoine L. Slaughter
Western LDT Team Leader &
Contracting Officer
1200 Mercantile Lane – Suite 109
Largo, MD 20774-5389

Re:     Claim for contract interpretation under HCR Contract No.   89044

Dear Mr. Slaughter:

This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms.  We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment). We ask for a contracting officer's final decision on this claim as soon as possible.

## Background

This contract was originally awarded on ___July 1, 1987_____.  The current contract term runs from ___08/01/2014_____ through ___06/30/2018_____.

On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts.  On August 18, 2016, the arbitrator issued a decision sustaining the grievance.  While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months.  The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c).  That statute requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

"The Postal Service, in determining whether to obtain transportation of
mail by contract under subsection (a)(3) of this section or by

Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of the transportation service under each mode." [39 U.S.C. § 5005(c).]

To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest. The arbitrator's decision did not mention this statute or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct [a § 5005(c)] analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest. We also understand that the Postal Service has not raised the issue of 39 U.S.C. § 5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

### Claim for contract interpretation

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this service to PVS without comporting with the requirements of 39 U.S.C. § 5005(c). In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest? We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not intend to perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty. Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due consideration to cost (commonly known as a cost comparison) and determine which mode of transportation best serves the public interest. We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this contract to PVS to carry out the arbitration decision. We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of good faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal Service to take an action that violates the law. Converting our contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale. Doing so would violate the duty of good faith and fair dealing. We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that would not violate § 5005(c). Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages. Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter. A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.


Sincerely,


Nola Holton
TNH Enterprises
P.O. Box 358
Alamo, Nevada 89001

7016 2070 0000 0492 3179

## U.S. Postal Service™
## CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

| | |
|---|---|
| Certified Mail Fee | $3.35 |
| | $2.75 |
| Extra Services & Fees (check box, add fee as appropriate) | |
| ☐ Return Receipt (hardcopy) | $_____ |
| ☐ Return Receipt (electronic) | $0.00 |
| ☐ Certified Mail Restricted Delivery | $0.00 |
| ☐ Adult Signature Required | $0.00 |
| ☐ Adult Signature Restricted Delivery | $0.00 |
| Postage | $0.49 |
| Total Postage and Fees | $6.59 |

07/06/2017

Sent To  Antoine L. Slaughter
Street and Apt. No., or PO Box No. 1300 Mercantile Lane Suite 101
City, State, ZIP+4® Hargo, MD 20774-5389

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

---

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Antoine L. Slaughter
Western NSTTeam Leader
Contracting Officer
1300 Mercantile Lane - Suite 101
Hargo, MD
20774-5389

9590 9402 2621 6336 4568 17

2. Article Number (Transfer from service label)
7016 2070 0000 0492 3179

PS Form 3811, July 2015 PSN 7530-02-000-9053

---

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X  ☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

---

### Certified Mail s

A receipt (this portion of t
A unique identifier for you
Electronic verification of c
delivery,
A record of delivery (inclu
signature) that is retained
for a specified period.

**Important Reminders:**

You may purchase Certifie
First-Class Mail®, First-Cla
or Priority Mail® service.
Certified Mail service is n
International mail.
Insurance coverage is not
with Certified Mail service
of Certified Mail service d
insurance coverage autom
certain Priority Mail items.
For an additional fee, and
endorsement on the mailp
the following services:
- Return receipt service, v
of delivery (including the
You can request a hardc
electronic version. For a
complete PS Form 3811
Receipt; attach PS Form

# HIGH MILER, INC.
## P.O. Box 358
## Alamo, Nevada 89001

July 5, 2017

Antoine L. Slaughter
Western LDT Team Leader &
Contracting Officer
1200 Mercantile Lane – Suite 109
Largo, MD  20774-5389

> **Re:**    **Claim for contract interpretation under HCR Contract No.    89036**

Dear Mr. Slaughter:

This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms.  We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment). We ask for a contracting officer's final decision on this claim as soon as possible.

### Background

This contract was originally awarded on   July 1, 1999   .  The current contract term runs from    August 1, 2014    through   June 30, 2018   .

On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts.  On August 18, 2016, the arbitrator issued a decision sustaining the grievance.  While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months.  The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c).  That statute requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

"The Postal Service, in determining whether to obtain transportation of
mail by contract under subsection (a)(3) of this section or by
Government motor vehicle, shall use the mode of transportation which
best serves the public interest, due consideration being given to the
cost of the transportation service under each mode." [39 U.S.C. §
5005(c).]

To comply with this statute, the Postal Service must perform a cost comparison between HCR service
and PVS and make a determination as to which mode of transportation best serves the public interest.
The arbitrator's decision did not mention this statute or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the
arbitration award presumed that the Postal Service "would conduct [a § 5005(c)] analysis when deciding
which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail
Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We
understand that the Postal Service has not conducted a new cost comparison between our contract and
PVS and does not intend to make a determination as to which transportation mode best serves the
public interest. We also understand that the Postal Service has not raised the issue of 39 U.S.C. §
5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

### Claim for contract interpretation

We seek your decision on whether the "Termination with Notice" clause of the contract may be
exercised for the purpose of converting this service to PVS without comporting with the requirements of
39 U.S.C. § 5005(c). In other words, may the contract be terminated for the purpose of converting the
service to PVS without the Postal Service first making a cost comparison and determining which mode of
transportation best serves the public interest? We understand that the Postal Service intends to
terminate this contract to comply with the arbitration award and that it therefore does not intend to
perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. *See Metcalf Constr. Co. v.
United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing
constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty.
Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due
consideration to cost (commonly known as a cost comparison) and determine which mode of
transportation best serves the public interest. We understand that the Postal Service has neither
conducted a cost comparison nor determined which mode of transportation best serves the public
interest, but intends to convert this contract to PVS to carry out the arbitration decision. We believe
terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis
would violate the duty of good faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the
arbitrator may not direct the Postal Service to take an action that violates the law. Converting our
contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may
not be taken, regardless of the rationale. Doing so would violate the duty of good faith and fair dealing.
We also understand that the Postal Service did not raise this issue with the arbitrator or seek an
alternative remedy that would not violate § 5005(c). Failure to raise this issue with the arbitrator and
seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the
duty of good faith and fair dealing.

This claim does not seek monetary damages. Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter. A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.

Sincerely,

Nola Holton

Nola Holton
High Miler, Inc.
P.O. Box 358
Alamo, Nevada  89001

**U.S. Postal Service**
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

UPPER MARLBORO MD 20774

OFFICIAL USE

For delivery information, visit our website at *www.usps.com®*.

| | | |
|---|---|---|
| Certified Mail Fee | $3.35 | |
| $ | $2.75 | 0305 |
| Extra Services & Fees *(check box, add fee as appropriate)* | | 06 |
| ☐ Return Receipt (hardcopy) | $0.00 | |
| ☐ Return Receipt (electronic) | $0.00 | Postmark |
| ☐ Certified Mail Restricted Delivery | $0.00 | Here |
| ☐ Adult Signature Required | $0.00 | -5 2017 |
| ☐ Adult Signature Restricted Delivery $ | | |
| Postage | $0.49 | |
| $ | | 07/06/2017 |
| Total Postage and Fees | $6.59 | |

Sent To  Antone Shaughter
Street and Apt. No., or PO Box No.  1200 Mercantile LN Suite 102
City, State, ZIP+4®  Largo MD 20774-5389

PS Form 3800, April 2015 PSN 7530-02-000-0047    See Reverse for Instructions

7016 2070 0000 0492 3186

---

PS Form 3811, July 2015 PSN 7530-02-000-9053

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Antone L. Shaughter
Western UBT Termenena
Contrening Officer
1200 mercantile lane-Suite104
Largo, MD 20774-5389

2. Article Number *(Transfer from service label)*

9590 9402 2621 6336 4568 00

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
☐ Agent
X                                        ☐ Addressee

B. Received by *(Printed Name)*        C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

# EXHIBIT 8

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| MAIL TRANSPORTATION, INC., et al.,    ) | |
|                             ) | |
|        Plaintiffs,         ) | |
|                             ) | |
|        v.                ) | Case No. _____ |
|                             ) | |
| UNITED STATES,         ) | Judge _____ |
|                             ) | |
|        Defendant.        ) | |

## <u>DECLARATION OF FREDERICK S. RICEPUTO</u>

I, Frederick S. Riceputo, declare, under penalty of perjury pursuant to 28 U.S.C. § 1746,

as follows:

1.      I make this Declaration based on my own personal knowledge and in my capacity

as President and owner of F.S.R. Trucking, Inc., d/b/a  Postal Carrier Corp. ("FSR").

2.      I founded the company that would ultimately become FSR in 1977. I have also

been President and owner since that time.

3.      As President of FSR, I oversee business operations. I am over the age of eighteen

and competent to testify about the matters stated herein.

4.      FSR employs approximately 200 drivers and owns or leases approximately 148

semi-truck tractors and 159 semi-truck trailers. It also owns three box trucks.

5.      FSR transports U.S. mail by semi-truck for the United States Postal Services

("USPS"), pursuant to a number of contracts. These contracts constitute approximately 90% of

FSR's operating revenue.

6.      FSR's predecessor was awarded its first mail transportation contract with USPS on or about May 16, 1977.

7.      FSR has four contracts (hereafter referred to collectively as the "Affected Contracts") that have been targeted by USPS for termination and conversion to have the routes covered by the Postal Vehicle Service ("PVS"). The Affected Contracts include:

    a.      Contract No. 33042

    b.      Contract No. 33430

    c.      Contract No. 33443

    d.      Contract No. 331N3

8.      The current total value of the Affected Contracts, on an annual basis, is $2,777,693.58, broken down as follows:

    a.      Contract No. 33042: $255,813.68 annually;

    b.      Contract No. 33430: $317,831.16 annually;

    c.      Contract No. 33443: $598,482.20 annually; and

    d.      Contract No. 331N3: $1,605,566.54 annually.

9.      FSR has held Contract No. 33042 since 1991. It is my understanding that Contract No. 33042 has been renewed approximately six times since 1991.

10.     FSR has held Contract No. 33430 since 2014.

11.     FSR has held Contract No. 33443 since before 2002. However, our internal records for this contract only go back to 2002, when a renewal was entered into between USPS and FSR. It is my understanding that Contract No. 33443 has been renewed three times since the 2002 renewal.

12.     FSR has held Contract No. 331N3 since 2013. This Contract has been renewed, as modified, one time.

13.     In early June 2017, FSR first learned that USPS intended to terminate the Affected Contracts and have the routes covered by the Affected Contracts performed by PVS.

14.     FSR was made aware of USPS's intention to terminate the Affected Contracts when a mail handler working the dock at USPS's West Palm Beach facility showed one of our supervisors a letter that was sent to an American Postal Workers Union member, indicating that "110 contract routes [are] to be converted" including Contract Nos. 33430, 33443, and 331N3. A true and correct copy of that letter is attached hereto as **Exhibit A**.

15.     I subsequently confirmed that Contract No. 33042 was also on the list of contracts to be terminated by USPS through consultation with counsel. FSR was not otherwise informed of USPS's intent to terminate the Affected Contracts. To date, FSR has not been directly contacted by USPS regarding a proposed termination of any of the Affected Contracts.

16.     I was never given notice of the arbitration that led to the award issued on August 18, 2016. I did not learn of the existence of the arbitration until after an award had been issued. FSR never participated or presented evidence in that arbitration proceeding, nor was it ever afforded an opportunity to do so.

17.     On or about July 3, 2017, I sent a letter to FSR's contracting officer, Keith L. Harris, asserting a claim for an interpretation of the contract terms of each of the Affected Contracts pursuant to the Contract Disputes Act and certain Affected Contract provisions. A true and correct copy of that letter is attached hereto as **Exhibit B**.

**Contract No. 33042**

18.     Contract No. 33042 requires FSR to provide mail transportation services between three USPS facilities in the state of Florida: the Miami Processing and Distribution Center in Miami, FL, the Royal Palm Processing and Distribution Center in Opa Locka, FL, and a facility in West Hollywood, FL.

19.     In performing services under Contract No. 33042, FSR drives approximately 83,041 miles annually. FSR typically performs 10 trips per day on this route and performs services Monday through Saturday.

20.     FSR uses one full-time driver and one part-time driver to perform Contract No. 33042. FSR drivers work 5,536 driver hours annually in performing Contract No. 33042.

21.     FSR uses one semi-truck tractor and one semi-truck trailer to perform Contract No. 33042.

22.     To the best of my knowledge, PVS has never performed this route.

23.     Contract No. 33042 was last renewed in 2015 and is currently up for renewal on June 30, 2019.

24.     Contract No. 33042 has already been renewed by USPS approximately six times and we had no reason to believe that it would not be renewed again in 2019.

25.     FSR was awarded Contract No. 33042 in 1991 through a competitive bid process. In the twenty-six years that FSR has held Contract No. 33042, to the best of my knowledge, FSR has never received any complaints or grievances from USPS regarding its performance.

26.     To the contrary, FSR has been an exemplary contractor, including being the recipient of several USPS awards and commendations. These awards and commendations include:

4

a.      On or about August 1, 2016, FSR was awarded USPS's "Eagle Spirit" award, which, according to USPS's website, is awarded "to recognize the outstanding contributions of companies and individuals who transport mail under contract." The letter that accompanied the 2016 Eagle Spirit Award noted that the award was given "in recognition of the exemplary service you have provided to the Postal Service over the years."

b.      On or about August 26, 2014, FSR was awarded USPS's "Eagle Spirit" award, which was given "in recognition of the exemplary service [FSR] provided to the Postal Service over the years."

c.      On February 6, 2008, FSR received a letter from USPS Manager Kathy R. Gload, commending FSR for its performance during the 2007 Christmas Season. That letter stated that FSR "provided the best Christmas Season for Transportation that I have ever had." It also stated "[b]ecause of the collective efforts put forth by yourself and your employees, Christmas 2007 is one of the best Holiday Seasons in terms of the service provided to our internal and external customers alike . . . our success can be directly attributed to such professionalism."

d.      In 2001, FSR was awarded the "Excellence of Service Award" presented "in recognition of excellent service provided in support of Southeast Area DNO – 2001 Florida PMPPC Implementation."

e.      On or about May 6, 1999, FSR was named as a finalist for the Quality Supplier Award. The letter that accompanied this award indicates that, out of "over 2,000 suppliers" eligible for this recognition, FSR was one of the top 17 applicants. The letter described this designation as "a noteworthy achievement, particularly in view of the ever stiffening competition for these awards."

27.     Contract No. 33042 has a Termination Notice clause that requires 60-days advance written notice to terminate without cost to either party.

28.     If USPS terminates Contract No. 33042, FSR will lose approximately $511,000 in revenue through the remaining term of its current contract, as well as the potential for more than $255,000 in revenue annually thereafter.

**Contact No. 33430**

29.     Contract No. 33430 requires FSR to provide mail transportation services between four USPS facilities in the state of Florida located in West Palm Beach, Greenacres, Lake Worth, and Lucerne.

30.     In performing services under Contract No. 33430, FSR drives approximately 45,538 miles annually. FSR typically performs 22 trips per day on this route and performs services seven days per week.

31.     FSR uses seven full-time drivers to perform Contract No. 33430. FSR drivers work 5,476 driver hours annually in performing Contract No. 33430.

32.     FSR uses three semi-truck tractors and three semi-truck trailers to perform Contract No. 33430.

33.     To the best of my knowledge, PVS has never performed this route. When Contract No. 33430 was awarded to FSR, the route was previously handled by another contractor who was not performing up to USPS's standards.

34.     Contract No. 33430 is currently up for renewal on June 30, 2018.

35.     Given our forty year relationship with USPS and the level of service we have provided during that time, we had no reason to believe that Contract No. 33430 would not be renewed again in 2018.

36.     FSR was awarded Contract No. 33430 through a competitive bid process. In the 2.5 years that FSR has held Contract No. 33430, to the best of my knowledge, FSR has never received any complaints or grievances from USPS regarding its performance.

37.     To the contrary, FSR has been an exemplary contractor, including being the recipient of several USPS awards and commendations.

38.     FSR has gone above and beyond the scheduled call of duty in performing Contract No. 33430. For example, FSR has done "extra trip miles," above and beyond what was contemplated by the contract.

39.     Extra trip miles occur when additional mail delivery trips are ordered by USPS, outside of the contracted-for amount. FSR has a manager on-site at many USPS mail facilities, who monitors FSR drivers coming in and out of the facility. Often times, USPS has extra mail that needs to be sent out in-between FSR's scheduled trips. When this happens, USPS requests the extra trip(s) and the FSR manager makes sure that the trip is adequately staffed and carried out.

40.     In 2015, FSR traveled 4,169 extra trip miles in servicing Contact No. 33430. In 2016, FSR traveled 7,350 extra trip miles in servicing Contact No. 33430.

41.     FSR has also performed extra "late slip hours," above and beyond what was contemplated by the contract. Late slip hours are the extra hours FSR drivers must wait at various facilities because arriving mail is delayed for reasons outside of FSR's control. When this happens, the driver is given a slip that shows how long he or she had to wait due to this delay. On a monthly basis, FSR submits these late slips, along with required forms, to USPS and is paid for this extra time spent in performing the contract.

42.     In 2015, FSR performed 400.27 late slip hours in servicing Contact No. 33430. In 2016, FSR performed 949.87 late slip hours in servicing Contact No. 33430.

43.     Contract No. 33430 has a Termination Notice clause that requires 60-days advance written notice to terminate without cost to either party.

44.     If USPS terminates Contract No. 33430, FSR will lose approximately $317,000 in revenue through the remaining term of its current contract, as well as the potential for more than $317,000 in revenue annually thereafter.

<div align="center">**Contract No. 33443**</div>

45.     Contract No. 33443 requires FSR to provide mail transportation services between the following six USPS facilities in the state of Florida:  West Palm Beach, Delray Beach, Delray Beach West, Boynton Beach, Boynton Beach Downtown, and the Jog Road facility.

46.     In performing services under Contract No. 33443, FSR drives approximately 205,303 miles annually. FSR typically performs 36 trips per day on this route and performs services seven days per week.

47.     FSR uses ten full-time drivers and two part-time drivers to perform Contract No. 33443. FSR drivers work 11,495 driver hours annually in performing Contract No. 33443.

48.     FSR uses six semi-truck tractors and six semi-truck trailers to perform Contract No. 33443.

49.     To the best of my knowledge, PVS has never performed this route.

50.     Contract No. 33443 was last renewed in 2014 and is currently up for renewal on June 30, 2018.

51.     Contract No. 33443 has already been renewed by USPS at least four times and we had no reason to believe that it would not be renewed again in 2018.

52.     In the more than fifteen years that FSR has held Contract No. 33443, to the best of my knowledge, FSR has never received any complaints or grievances from USPS regarding its performance.

53.     To the contrary, FSR has been an exemplary contractor, including being the recipient of several USPS awards and commendations.

54.     FSR has gone above and beyond the scheduled call of duty in performing Contract No. 33443. For example, FSR has done extra trip miles, above and beyond what was contemplated by the contract. In 2015, FSR traveled approximately 17,675 extra trip miles in servicing Contact No. 33443. In 2016, FSR traveled approximately 26,256 extra trip miles in servicing Contact No. 33443.

55.     FSR has also contributed extra "late slip hours," above and beyond what was contemplated by the contract. In 2015 FSR performed 330.28 late slip hours in servicing Contact No. 33443. In 2016 FSR performed 960.92 late slip hours in servicing Contact No. 33443.

56.     Contract No. 33443 has a Termination Notice clause that requires 60-days advance written notice to terminate without cost to either party.

57.     If USPS terminates Contract No. 33443, FSR will lose approximately $598,000 in revenue through the remaining term of its current contract, as well as the potential for more than $598,000 in revenue annually thereafter.

**Contract No. 331N3**

58.     Contract No. 331N3 requires FSR to provide mail transportation services between three main USPS Processing and Distribution Centers in the State of Florida, along with twenty-six other facilities in the surrounding area. The Processing and Distribution Centers include the Miami Processing and Distribution Center in Miami, FL, the Royal Palm Processing and Distribution Center in Opa Locka, FL, and the West Palm Beach Processing and Distribution Center in West Palm Beach, FL.

9

59.     In performing services under Contract No. 331N3, FSR drives approximately 313,943.4 miles annually. FSR typically performs 68 trips per day on this route and performs services seven days per week.

60.     The route covered by Contract No. 331N3 is divided into two segments, Segment A and Segment B.  FSR uses twenty full-time drivers and four part-time drivers to perform Contract No. 331N3. Additionally, Segment B requires an additional nine drivers during the peak, holiday season.

61.     FSR drivers work 48,299 driver hours annually in performing Contract No. 331N3.

62.     FSR uses eleven semi-truck tractors and fifteen semi-truck trailers to perform Contract No. 331N3 during non-peak season. During peak season, an additional eight semi-truck tractors and eight semi-truck trailers are used to perform Contract No. 331N3.

63.     Contract No. 331N3  was last renewed in 2015 and is currently up for renewal on June 30, 2019.

64.     Given our forty year relationship with USPS and the level of service we have provided during that time, we had no reason to believe that Contract No. 331N3 would not be renewed in 2019.

65.     In the more than four years that FSR has held Contract No. 331N3, to the best of my knowledge, FSR has never received any complaints or grievances from USPS regarding its performance.

66.     To the contrary, FSR has been an exemplary contractor, including being the recipient of several USPS awards and commendations.

67.     FSR has gone above and beyond the scheduled call of duty in performing Contract No. 331N3. For example, FSR has done extra trip miles, above and beyond what was contemplated by the contract. In 2015, FSR traveled approximately 174,136 extra trip miles in servicing Contact No. 331N3. In 2016, FSR traveled approximately 91,300 extra trip miles in servicing Contact No. 331N3.

68.     FSR has also contributed extra "late slip hours," above and beyond what was contemplated by the contract. In 2015 FSR performed 2,845 late slip hours in servicing Contact No. 331N3. In 2016 FSR performed 2,843 late slip hours in servicing Contact No. 331N3.

69.     Contract No. 331N3 has a Termination Notice clause that requires 60-days advance written notice to terminate without cost to either party.

70.     If USPS terminates Contract No. 331N3, FSR will lose approximately $3.2 Million in revenue through the remaining term of its current contract, as well as the potential for more than $1.6 Million in revenue annually thereafter.

**Additional Consequences of Conversion of the Affected Contracts**

71.     If the Affected Contracts are terminated and converted to PVS, FSR anticipates that it will be forced to lay-off approximately forty to forty-five drivers and potentially other employees, such as accounting, managerial, and/or human resources staff.

72.     These layoffs may result in a significant increase in unemployment claims being made by laid off employees, which would result in FSR incurring additional costs.

73.     FSR will have approximately twenty semi-truck tractors and twenty semi-truck trailers that will be unused or underused if USPS terminates the Affected Contracts.

74.     FSR takes the term of its USPS contracts into account when purchasing or leasing necessary equipment to service its contracts. For example, several leases for FSR's tractors,

trailers, and other equipment are on a four-year term in order to coincide with the potential non-renewal of certain contracts.

75.     If the Affected Contracts are terminated, FSR will be forced to return certain leased equipment early and potentially incur payment penalties under its leasing contracts.

76.     FSR accepted the risk that operational changes or USPS network changes concerning the route might result in termination, but we did not contemplate or accept the risk that termination would result from USPS failing to live up to its union agreements or other USPS wrongful conduct.

77.     Based on my experience, PVS will not be able to perform the Affected Contracts better than FSR or at a lower cost. This is due to a number of factors, including:

a.     FSR is routinely called upon to perform extra trips, outside of the contracted for amount, due to PVS's inability to service its current routes. These trips would otherwise be performed by PVS, but they are unable to keep up with USPS demand.

b.     In my experience, PVS lacks the required number of drivers and equipment to service the routes covered by the Affected Contracts. On the other hand, FSR has been a USPS Contractor for forty years and knows what it takes to effectively and efficiently service and staff the routes covered by the Affected Contracts.

c.     FSR has over twenty-six years of experience providing exemplary service traveling the route covered by Contract No. 33042, while PVS has none.

d.     FSR has over fifteen years of experience providing exemplary service traveling the route covered by Contract No. 33443, while PVS has none.

78.     News of the impending termination of the Affected Contracts has already negatively affected FSR's workforce and our ability to retain drivers. PVS is recruiting FSR's drivers to work for PVS after the Affected Contracts are converted. This causes drivers to believe that their jobs are in jeopardy, which undermines driver trust in the company.

79.     In the past, when PVS has hired away FSR drivers, many of the drivers quit with

little or no prior notice to FSR. This puts us in a bind to get scheduled routes covered.

PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY THAT THE
STATEMENTS IN THIS DECLARATION ARE TRUE AND CORRECT BASED UPON MY
PERSONAL KNOWLEDGE.

Dated this 10th Day of July, 2017.

_____

Frederick S. Riceputo

13



## American Postal Workers Union, AFL-CIO

1300 L Street, NW, Washington, DC 20005

April 28, 2017

Michael O. Foster
Director
Motor Vehicle
Service Division
202-842-4240 (Office)
202-842-8517 (Fax)

Javier Pineres
Assistant Director
Motor Vehicle
Service Division
202-842-4240 (Office)
202-842-8517 (Fax)

National Executive Board

Mark Dimondstein
President

Debby Szeredy
Executive Vice President

Elizabeth "Liz" Powell
Secretary-Treasurer

Vance Zimmerman
Director, Industrial Relations

Clint Burelson
Director, Clerk Division

Steven G. Raymer
Director, Maintenance Division

Michael O. Foster
Director, MVS Division

Stephen R. Brooks
Director, Support Services Division

Sharyn M. Stone
Coordinator, Central Region

Mike Gallagher
Coordinator, Eastern Region

John H. Dirzius
Coordinator, Northeast Region

Kenneth L. Beasley
Coordinator, Southern Region

Omar M. Gonzalez
Coordinator, Western Region

Roy M. Wilson, MVS Director
Palm Beach Area Local
1957 10th Ave N
Lake Worth, FL 33461

RECEIVED

MAY 0 1 2017

Palm Beach Area Local
A.P.W.U.

Re: Das Award Q06C-4Q-C 11182451 110 PVS Routes

Dear Brother Wilson,

As you may be aware, on August 18, 2016, Arbitrator Shyam Das ruled in National Case No. Q06C-4Q-C 1118245 that the Postal Service must convert 110 Highway Contract Routes to Postal Vehicle Service. This was a major win for the Motor Vehicle Craft, and the Union and the Postal Service have recently come to an agreement on the 110 contract routes to be converted.

These routes will include:

| Route | Area | Site Name | Annual Hours | |
|-------|------|-----------|--------------|---|
| 33430 | SA | West Palm Beach P&DC, FL | 4,826 | Lake worth, Lucerne, Green Acres |
| 33443 | SA | West Palm Beach P&DC, FL | 11,495 | Boyton, Jog RD. Del Ray |
| 331AJ | SA | Royal Palm, FL | 85,704 | |
| 331N3 | SA | Royal Palm, FL | 40,349 | |

We will be sending further notification as the timeline for implementation is finalized. Please contact our office at 202-842-4240 with any questions or concerns.

In Solidarity,

*Michael O. Foster*

Michael O. Foster, Director
Motor Vehicle Service Division

*Javier Pineres*

Javier Pineres, Assistant Director
Motor Vehicle Service Division

CC: Gary P. Hamrick, President
Bruce Amey, National Business Agent, Southeastern Region

MOF EKW
opeiu#2/afl-cio



EXHIBIT
A



1710 Upland Road
West Palm Beach, FL  33409

July 3rd, 2017

**By Email and Certified Mail – Return Receipt Requested/7008 2810 0000 1774 4335**

Mr. Keith L. Harris
United States Postal Service
225 N. Humphreys Blvd. Room 1089
Memphis, TN  38166-7071

    **Re:**    **Claim for contract interpretation under HCR Contract No. HCR 33042; HCR 33443; HCR 33430 and HCR 331N3**

Dear Mr. Harris:

    This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms.  We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment).  We ask for a contracting officer's final decision on this claim as soon as possible.

    **Background**

    The contract HCR 33042 was originally awarded on 02/13/1991.  The current contract term runs from 07/01/2015 through 06/30/2019.
    The contract HCR 33443 was originally awarded prior to 07/01/2002.  The current contract term runs from 10/01/2014 through 06/30/2018.
    The contract HCR 33430 was originally awarded on 12/11/2014.  The current contract term runs from 01/01/2015 through 06/30/2018.
    The contract HCR 331N3 was originally awarded on 02/22/2013.  The current contract term runs from 07/01/2015 through 06/30/2019.

    On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts.  On August 18, 2016, the arbitrator issued a decision sustaining the grievance.  While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months.  The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.



EXHIBIT
B

In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c).  That statute requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

> "The Postal Service, in determining whether to obtain transportation of mail by contract under subsection (a)(3) of this section or by Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of the transportation service under each mode."  [39 U.S.C. § 5005(c).]

To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest.  The arbitrator's decision did not mention this statute or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct [a § 5005(c)] analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts."  *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest.  We also understand that the Postal Service has not raised the issue of 39 U.S.C. § 5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

### Claim for contract interpretation

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this service to PVS without comporting with the requirements of 39 U.S.C. § 5005(c).  In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest?  We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not intend to perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing.  *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014).  Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty.  Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due consideration to cost (commonly known as a cost comparison) and determine which mode of transportation best serves the public interest.  We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this contract to PVS to carry out the arbitration decision.  We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of good faith and fair dealing and constitute a breach of contract.

2

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal Service to take an action that violates the law.   Converting our contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale.   Doing so would violate the duty of good faith and fair dealing. We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that would not violate § 5005(c).   Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages.   Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter.   A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.

Sincerely,

Frederick S. Riceputo
President
Postal Carrier Corp


cc:  David Hendel

3

# EXHIBIT 9

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| MAIL TRANSPORTATION, INC., et al.,      ) | |
|           ) | |
|        Plaintiffs,      ) | |
|           ) | |
|        v.      ) | Case No. _____ |
|           ) | |
| UNITED STATES,      ) | Judge _____ |
|           ) | |
|        Defendant.      ) | |

## DECLARATION OF EUGENE NISHIMURA

I, Eugene Nishimura, declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the following is true and correct:

1.     I am the Managing Member of Hokulani Kigyo, LLC, d/b/a Professional Commercial Services ("Professional").  I have held this position since Professional was founded, approximately five and a half years ago.  In this role, I am responsible for overseeing Professional's day-to-day operations, including with respect to financial, operations, employment, and contracting matters.  Professional is located in Honolulu, Hawaii.

2.     In 2012 I registered Professional as a USPS supplier, and I have been receiving transportation solicitations from around the United States ever since.  In 2015, I received notice of an opportunity for Postal Service contracting in Hawaii.  Following a competitive procurement, Professional was awarded HCR 967L1 in November, 2015.  The current term of the contract is from November 1, 2015 through June 30, 2019.   A true and complete copy of excerpts from HCR 967L1 is attached as Exhibit 1.

3.      Professional has two full time drivers and one part time driver who perform work on HCR 967L1.  The contract contemplates 3,549 driver hours.  To perform the work under HCR 967L1 Professional uses two tractor trucks and two 45 foot container trailers.  The route begins at the main postal and distribution center in Hawaii and requires delivering parcels and flat rate box shipments to FedEx to be loaded and transported to the mainland United States.  The contract provides for 5,321 trips, but Professional runs approximately 700 additional trips each year.

4.      Professional provides outstanding service to the Postal Service.  Professional has not missed any trips or loads.  Professional has never received any 5500s (notices of deficiencies).  Postal Service representatives have praised Professional for providing excellent contract services.  Postal Service workers have informed me on multiple occasions that Professional's work for the Postal Service has been extremely helpful, and that the Postal Service would like Professional to continue as a Postal Service contractor in the future.

5.      The annual contract price for HCR 967L1 is $356,865.00.  This amount comprises approximately 35% of Professional's annual revenue, but also includes substantially all of Professional's profits.  Thus, if this HCR 967L1 is converted to PVS substantially all of Professional's profits will be terminated.

6.      I learned that HCR 967L1 may be converted to PVS in a letter from the National Star Route Mail Contractors Association.  To date, I have not been provided with any notice or information concerning the possibility of conversion from the Postal Service.  I had no notice of the arbitration with the APWU that resulted in the USPS deciding to convert certain HCR contracts to PVS, and I had no opportunity to present evidence or to participate in that proceeding.

7.      Although the Postal Service has not had any communications with me regarding the potential conversion of HCR 967L1, it appears to me that the Postal Service has been taking measures to prepare for the conversion, even though those measures interfere with Professional's business.  For example, Postal Service personnel have been communicating with Professional's drivers and informing them that the contract will be terminated and converted to PVS.  This conduct negatively impacts driver morale and has caused Professional's drivers a great deal of anxiety regarding their job security.  I have asked the Postal Service to cease all such communications with Professional's drivers.

8.      On June 30, 2017, I sent a claim for contract interpretation to the contracting officer for HCR 967L1, a true and complete copy of which is attached as Exhibit 2.  To date, I have not received a response to my claim letter.

9.      If HCR 967L1 is terminated and converted to PVS, the loss of the contract will have an immediate, negative impact on Professional.  Professional will immediately lose over a third of its revenue and a substantial portion of its profits.  Professional will have no choice but to lay off the three drivers working on HCR 967L1 and one other employee.  Professional will have no use for two of its 45 foot container trailers, which were acquired specifically for the purpose of performing HCR 967L1.  Professional will potentially incur additional costs and penalties under its leases for the two tractor trucks used in performing the contract, which are leased until May, 2018.

10.     Based on my experience performing HCR 967L1, PVS will not be able to perform the contract as well as Professional.  The Postal Service does not have the transportation equipment required to perform the work, and it is unlikely the Postal Service could obtain the equipment for as low a price as Professional was able to obtain it.  HCR 967L1 cannot be

performed by multiple smaller trucks because the FedEx facility cannot accommodate multiple trucks, and it is my understanding that there is only one available loading dock to take each load. It is also my understanding that PVS drivers previously attempted to perform the work under HCR 967L1, but the work could not be completed satisfactorily and was therefore contracted out.

11.     Based on my experience with the contract, I also believe that PVS would likely encounter significant staffing difficulties on HCR 967L1, based on my understanding of the available work and employee pool in this area.   Any additional drivers hired to perform the work under HCR 967L1 would be entitled to a cost-of-living adjustment for Hawaii, which could substantially increase PVS's labor costs for the same work.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated this __11TH__ day of July, 2017.

Eugene Nishimura

**UNITED STATES POSTAL SERVICE®**

## NOTICE OF ACCEPTANCE · TRANSPORTATION SERVICES CONTRACT FOR REGULAR SERVICE

### 1. ACCEPTANCE OF PROPOSAL PURSUANT TO

| a. SOLICITATION NO. | b. DATE OF SOLICITATION | c. CONTRACT NO. | d. BEGIN CONTRACT TERM | e. END CONTRACT TERM |
|---|---|---|---|---|
| 980–448–15 | 09/15/2015 | 967L1 | 11/01/2015 | 06/30/2019 |

| f. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | CITY & STATE |
|---|---|---|
| | HONOLULU P&DC, HI | EVERGREEN EAGLE – HNL, HI |

### 2. RATE OF COMPENSATION

| a. CONTRACT RATE | b. ANNUAL MILEAGE | c. RATE PER MILE |
|---|---|---|
| $345,865.00 PER ANNUM | 15,431.2 | $22.41336 |

### 3. SUPPLIER

| a. NAME | b. ADDRESS (Street, City, State, ZIP+4) |
|---|---|
| HOKULANI KIGYO, LLC | 650 KAKIO ST UNIT 250 HONOLULU HI 96819–2062 |

### 4. CONTRACT

Your proposal submitted in response to the solicitation specified above for carrying and/or handling the United States Mail in accordance with your proposal is hereby accepted for the term named herein.

The law prohibits you from assigning or transferring this contract without the authorization of the U.S. Postal Service, and provides for cancellation of the contract if you assign or transfer it without first receiving authorization. Further, you will be liable for any damages resulting from such an assignment or transfer without authorization. If you wish to assign or transfer your contract, contact your Contracting Officer for information on subcontracting requirements.

The presence of a postal inspector in your transportation equipment or in the vicinity of your facilities on the route over which your equipment is operated shall not be revealed by you or your employees to any person at any time.

A copy of your contract, which includes this form properly executed by this office on behalf of the U.S. Postal Service, the solicitation and attachments, and your proposal are enclosed. You are cautioned to preserve these documents carefully for future reference.

A copy of this communication has been sent to all concerned as authority for the above–referenced contract.

### 5. COMMENTS

This contract is issued under the Terms and Conditions dated January 15, 2013 along with the Statement of Work Addendum – 2013.

| 6. SIGNATURE OF CONTRACTING OFFICER | 9. DISTRIBUTION |
|---|---|
| *[signature]* | 1 – Contracting Officer |
| **7. TITLE OF CONTRACTING OFFICER** | 2 – Accounting Service Center |
| CONTRACTING OFFICER | 3 – Administrative Official |
| **8. ADDRESS OF CONTRACTING OFFICER** | 4 – Supplier |
| WESTERN TRANSPORTATION CMT | 5 – P&DC/F |
| US POSTAL SERVICE | 6 – Customer Service District |
| 3825 S WARNER ST, SUITE A | 7 – En Route Offices |
| TACOMA WA 98409–9700 | |

**EXHIBIT** 1

| 10a. DATE ORDERED | b. ORDER NO. | c. ROUTE ORDER NO. | d. BUDGET ACCOUNT NO. | e. FINANCE NO. |
|---|---|---|---|---|
| 11-9-15 | 980–04244–16 | 1 | 53601 | 14–2401 |

PS Form 7409
September 2001

**UNITED STATES POSTAL SERVICE®**

**TRANSPORTATION SERVICES PROPOSAL & CONTRACT FOR REGULAR SERVICE**

## 1. PROPOSAL SUBMITTED PURSUANT TO

| a. SOLICITATION NO. | b. DATE OF SOLICITATION | c. CONTRACT NO. | d. BEGIN CONTRACT TERM | e. END CONTRACT TERM |
|---|---|---|---|---|
| 960-448-15 | 09/15/2015 | 967L1 | 11/01/2015 | 06/30/2019 |

| f. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE HONOLULU P&DC, HI | | CITY & STATE EVERGREEN EAGLE - HNL, HI | |

## 2. RATE OF COMPENSATION

WRITTEN DOLLAR AMOUNT (Proposal must be submitted on a single annual rate basis unless the solicitation specifically calls for proposals at a per mile, per piece, per trip, or other unit rate.)

AMOUNT (Figures) $345000.00

Three Hundred Forty Five Thousand Eight Hundred Sixty Five and No/100 Dollars

## 3. OFFEROR

| a. NAME (Print or Type) Hokulani Kigyo, LLC | b. ADDRESS (Street, City, State, ZIP+4) 650 Kakoi Street, Unit 250 Honolulu, Hawaii 96819 |

| c. TELEPHONE NO. (808) 345-3071 | d. DOT NO. 2294487 | e. SOCIAL SECURITY NO. OR EMPLOYER IDENTIFICATION NO. 27-1237502 |

f. LEGAL RESIDENT OF (Complete if offeror is an individual.)

g. ENGAGED IN BUSINESS IN (Complete if offeror is a partnership or corporation.)

| COUNTY | STATE | COUNTY Honolulu | | STATE Hawaii |
|---|---|---|---|---|

| h. ACKNOWLEDGEMENT OF AMENDMENTS | AMENDMENT NO. | DATE | AMENDMENT NO. | DATE |
|---|---|---|---|---|
| THE OFFEROR ACKNOWLEDGES RECEIPT OF AMENDMENTS TO THE SOLICITATION FOR OFFERS AND RELATED DOCUMENTS NUMBERED AND DATED AS FOLLOWS: | | | | |

## 4. CONTRACT

In compliance with the solicitation of the U.S. Postal Service described above, the above named offeror proposes to provide the service called for in said solicitation and, in the case of a negotiated contract, in the description of service attached hereto and made a part hereof, at the rate of compensation set out above.

The offeror submitting the offer or proposal agrees with the U.S. Postal Service that if this offer or proposal is accepted, the offeror will give personal or representative supervision to the performance of the service. The offeror certifies that this proposal is made in the offeror's own interest and not by the offeror as the representative of another person or company and with full knowledge of the required conditions of service.

The solicitation and all attachments are incorporated by reference as a part of this proposal.

If the offeror is a partnership or corporation, the Contracting Officer may request such offeror to furnish evidence of the authority of the party executing the proposal.

When a partnership offers, the signature of one partner is sufficient.

| 5. OFFEROR | 6. U.S. POSTAL SERVICE |
|---|---|
| This proposal is made in good faith and with the intention to enter into a contract to perform service in case the proposal is accepted. | The U.S. Postal Service has caused this contract to be executed. |
| (Signature of Offeror)     10/14/15 (Date) | (Signature of Contracting Officer)     11-9-15 (Date) |
| Eugene Nishimura, Managing Member (Name and Title of Offeror) | CONTRACTING OFFICER (Title of Contracting Officer) |

PS Form 7405
September 2001

**Hokulani Kigyo, LLC**

623 Kakoi Street, Bay 4
Honolulu, Hawaii 96819
O: (808) 691-9576 F: (808) 691-9939 C: (808) 345-3071
E-Mail:
Eugene@professionalcommercialsvcs.com

June 30, 2017

**By Email and Certified Mail – Return Receipt Requested**

Ms. Shirley Lowry, Purchasing and SM Specialist
UNITED STATES POSTAL SERVICE
1200 Mercantile Ln., Suite 109
Largo, MD 20774-5389

Re:    Claim for contract interpretation under HCR Contract No. HCR 967L1

Dear Ms. Lowery:

This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms. We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment). We ask for a contracting officer's final decision on this claim as soon as possible.

Background

This contract was originally awarded on November 1, 2015. The current contract term runs from November 1, 2015 through June 30, 2019.

On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts. On August 18, 2016, the arbitrator issued a decision sustaining the grievance. While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months. The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c). That statute requires the



EXHIBIT

2

Ms. Shirley Lowery
June 30, 2017
Page Two

Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

> "The Postal Service, in determining whether to obtain transportation of mail by contract under subsection (a)(3) of this section or by Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of the transportation service under each mode." [39 U.S.C. § 5005(c).]

To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest. The arbitrator's decision did not mention this statute or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct [a § 5005(c)] analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest. We also understand that the Postal Service has not raised the issue of 39 U.S.C. § 5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

### Claim for contract interpretation

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this service to PVS without comporting with the requirements of 39 U.S.C. § 5005(c). In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest? We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not intend to perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty. Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due consideration to cost (commonly

Ms. Shirley Lowery
June 30, 2017
Page Three

known as a cost comparison) and determine which mode of transportation best serves the public interest. We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this contract to PVS to carry out the arbitration decision. We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of good faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal Service to take an action that violates the law. Converting our contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale. Doing so would violate the duty of good faith and fair dealing. We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that would not violate § 5005(c). Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages. Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter. A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.

Sincerely,

Eugene H. Nishimura
Managing Member

# EXHIBIT 10

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

|  |  |  |
|---|---|---|
| MAIL TRANSPORTATION, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| UNITED STATES, | ) | Judge _____ |
| | ) | |
| Defendant. | ) | |

<u>**DECLARATION OF YUNG LEE**</u>

I, Yung Lee, declare pursuant to 28 U.S.C. § 1746 as follows:

1.     I am the President and owner of Yung Lee, Inc. ("Yung Lee"), a California corporation.  I have been President of Yung Lee for 28 years, since the company was founded.  I have personal knowledge of the facts stated herein, and if called upon to testify I could testify competently to these facts.

2.     Yung Lee has been an HCR contractor for 28 years. Currently, HCR contract 92352 ("HCR 92352") and HCR contract 90093 ("HCR 90093") represent 100% of Yung Lee's business. By agreement with USPS, HCR 90093 will be converted to PVS on Dec. 31, 2017.

3.     Yung Lee operates 5 drivers, 3 tractors and 3 trailers out of a facility located at 1740 W. Redlands Blvd. in Redlands, CA 92373.

4.     Yung Lee was awarded its HCR 92352 on September 1, 1990.  This contract is set to be converted to PVS in the next 4 to 8 months.  I first received notice of this conversion via an email from Paul Horner of USPS on June 12, 2017. A true and correct copy of this correspondence is attached hereto as <u>**Exhibit 1**</u>.

5.      HCR 92352 runs a route from San Bernardino P&DC to 29 Palms. It has stops in Morongo Valley, Yucca Valley, Joshua Tree, 29 Palms, and 29 Palms MCB. This requires 12 daily trips, six days a week, except Sundays and holidays. The route requires 5 drivers to perform the contract and 10,070 hours annually. The value of the contract is $653,786.01 annually.

6.      HCR 92352 has been renewed 7 times since it was awarded.  It has a current contract term of August 1, 2014 to June 30, 2018.  The contract contains a termination clause that requires the USPS to provide at least 60 days-notice prior to terminating the contract. A true and correct copy of relevant excerpts of this contract is attached hereto as **Exhibit 2**.

7.      I accept the risk that operational changes or USPS network changes concerning the route might result in termination, but I did not contemplate or accept the risk that termination would result from USPS failing to live up to its union agreements or other USPS wrongful conduct.

8.      Yung Lee has a history of providing satisfactory service to USPS under this contract and has received compliments and awards for its exceptional service.  But for the conversion to PVS, there is no reason to doubt that the contract would have been renewed in the future.

9.      If USPS terminates HCR 92352, it will be devastating to Yung Lee's business.  It will eliminate the remaining 50% of Yung Lee's revenue (because HCR 90093 will also be converted 12/31/17).  Yung Lee will be forced to lay off its drivers.  It will lose its company's group health insurance coverage, and 3 tractors and 3 trailers will be idle or underutilized.

10.      Additionally, USPS has already been recruiting my drivers. USPS dock workers have talked to my drivers, stating that HCR contracts will be converted to PVS.  2 of my drivers

answered USPS "drivers wanted" posts and were interviewed on June 30, 2017. They were told they will be notified to confirm their hiring in 3 weeks.

11.     Neither I, nor any other Yung Lee representative was given notice of the arbitration proceeding with the APWU that resulted in USPS converting the aforementioned HCR contracts to PVS.   Neither I, nor any other Yung Lee representative was allowed to participate or present evidence in the arbitration.

12.     On or about July 11, 2017, via certified mail, I sent a claim letter to USPS requesting clarification of the conversion of service for HCR 92353 to PVS and compliance with the requirements of 39 U.S.C. § 5005(c).   A true and correct copy of this correspondence is attached hereto as **Exhibit 3**.

13.     I do not believe USPS will be able to perform HCR 92353 as well or better that Yung Lee.   This is because of the company's access to facility locations and specialized equipment (namely a 45-foot trailer with lift gate), and it ability to avoid layovers.   In addition, the company has approved access to the post office locations on these routes.   Many of these locations are locked after hours when post office employees are not present.   Yung Lee drivers have been trusted with a key to these facilities to load and unload mail during off hours. Further, unlike union drivers, Yung Lee's drivers are permitted to unload, load, or do other work that a USPS driver is prohibited from doing because it interferes with other USPS craft/union work. Finally, Yung Lee provides cost-efficient services. All of its vehicle and equipment maintenance is done in house and within 24 hours.   There is no expensive downtime waiting for an outside shop to do costly repairs.    It also maintains a standby tractor and trailer to ensure that when maintenance is needed on equipment, service stays on schedule.

I declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief.

Yung Lee

Executed in _____July_____ on _____11th_____, 2017.

4

**Subject:** FW: HCR 92352 to PVS

**From:** Horner, Paul M - Memphis, TN (paul.m.horner@usps.gov)

**To:** lee2k88@sbcglobal.net;

**Cc:** Jewell.R.Powell@usps.gov;

**Date:** Monday, June 12, 2017 7:01 AM

Mr. Lee,

It has come to our attention that HCR 92352 will be converted to PVS service in the next 4 to eight months. We will keep you informed of the actual date the PVS conversion will take place. At this time we have no additional information to share with you. If you have any questions please contact ldt@usps.gov.

Thanks

Paul Horner

Purchasing Analyst

Phone 901-747-7277

Fax 650-577-5719



UNITED STATES
POSTAL SERVICE

NOTICE OF RENEWAL OF TRANSPORTATION SERVICES
CONTRACT FOR REGULAR SERVICE

## 1. RENEWAL PURSUANT TO

| a. CONTRACT NO. | b. EXPIRATION DATE OF EXPIRING CONTRACT | c. BEGIN CONTRACT TERM | d. END CONTRACT TERM |
|---|---|---|---|
| 92352 | 07/31/2014 | 08/01/2014 | 06/30/2018 |

| e. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | CITY & STATE |
|---|---|---|
| | SAN BERNARDINO P&DC, CA | TWENTYNINE PALMS MCB, CA |

## 2. RATE OF COMPENSATION

| a. CONTRACT RATE | b. ANNUAL MILEAGE | c. RATE PER MILE |
|---|---|---|
| $494,726.13 PER ANNUM | 306,767.5 | $1.61271 |

## 3. SUPPLIER

| a. NAME | b. ADDRESS (Street, City, State, ZIP+4) |
|---|---|
| YUNG LEE INC | 16380 EVERETTS WAY RIVERSIDE CA 92504-5723 |

## 4. CONTRACT

Having executed PS Form 7447, Transportation Services Renewal Contract for Regular Service, the contract referenced above is renewed for the additional term specified at the rate and under the terms and conditions for service prevailing at the end of the contract term, subject to any change that may be made in the operation under your current contract.

The law prohibits you from assigning or transferring this contract without the authorization of the U.S. Postal Service, and provides for the cancellation of the contract if you assign or transfer it without first receiving authorization. Further, you will be liable for any damages resulting from such an assignment or transfer without authorization. If you wish to assign or transfer your contract, contact your Contracting Officer for information on subcontracting requirements.

The presence of a postal inspector in your transportation equipment or in the vicinity of your facilities or the route over which your equipment is operated shall not be revealed by you or your employees to any person at any time.

A copy of your contract, which includes this form properly executed by this office on behalf of the U.S. Postal Service, the renewal solicitation and attachments, and your proposal are enclosed. You are cautioned to preserve these documents carefully for future reference.

| 5. SIGNATURE OF CONTRACTING OFFICER | 8. DISTRIBUTION |
|---|---|
| *(signature)* | 1 - Contracting Officer |
| 6. TITLE OF CONTRACTING OFFICER | 2 - Accounting Service Center |
| CONTRACTING OFFICER | 3 - Administrative Official |
| 7. ADDRESS OF CONTRACTING OFFICER | 4 - Supplier |
| WESTERN TRANSPORTATION CMT | 5 - P&DC/F |
| US POSTAL SERVICE | 6 - Customer Service District |
| 3825 S WARNER ST, SUITE A | 7 - En Route Offices |
| TACOMA WA 98409-9700 | |

| a. DATE ORDERED | b. ORDER NO. | c. DATE ORDER NO. | d. BUDGET ACCOUNT NO. | e. FINANCE NO. |
|---|---|---|---|---|
| JUL 2 2014 | 980-22807-14 | 1 | 53601 | 05-6745 |

S. Form 7448
e publisher 2001

EXHIBIT 2

## ADDENDUM TO TERMS AND CONDITIONS (Transportation Routes)

The supplier agrees to the terms that are described if checked below for HCR 90093. 92352

|   | |
|---|---|
| | **Routing Technology Requirement** |
| | *Insert Routing Technology Requirement here and check box to left if applicable.* |
| | **Dock Supervision Requirement** |
| | *Insert Dock Supervision Requirement here and check box to left if applicable.* |
| | **Cross-Dock Operation Requirement** |
| | *Insert Cross-Dock Operation Requirement here and check box to left if applicable.* |
| | **Advance Negotiated Service Change Template** |
| | *Indicate if ANSC Template is attached and included in the contract.* |
| | **GPS Tracking Requirement** |
| | *The supplier shall, at all times while its vehicle(s) is/are hauling or contain any mail under this contract, maintain a Global Positioning Satellite (GPS) system in the vehicle(s) that reports the location of the vehicle to the Postal Service not less frequently than every 30 minutes. Compliance to the requirement must reach a minimum of 95% success rate (accurate data transmitted to and received by the Postal Service). The supplier is responsible for providing the following information to the Postal Service:*<br><br>    *a.  Supplier Name.*<br>    *b.  Action: Arrival, Departure, En-Route.*<br>    *c.  Event Date/Time:  The date/time when "pinged"*<br>    *d.  Location by Address or Latitude/Longitude:  The location of the vehicle.*<br>    *e.  Route:  Contract Number.*<br>    *f.  Trip:  Specific Trip Number.*<br>    *g.  Origin Segment Facility Location by Address or NASS (A in A to B).*<br>    *h.  Destination Segment Facility Location by Address or NASS (B in A to B).* |
| | **The following termination clause applies to this contract.** |
| X | 2.3.3a   Termination with Notice<br><br>( )  If checked, 60-day notice period has been changed to _____days. |
| | 2.3.3b   Termination for the Postal Service's Convenience |

Terms and Conditions, Issue 12, dated January 15, 2013 will apply.


Fuel Management Plan dated June, 2013 will apply.


YUNG LEE _____       _____     4-8-14
Supplier (printed)                         Supplier (signed)            Date

HOWARD E. BRUNER _____      _____
Contracting Officer (printed)                     Contracting Officer (signed)       Date

July 1, 2017

**By Email and Certified Mail – Return Receipt Requested**

Paul M Horner
Purchasing Analyst
USPS
225 N. Humphreys Blvd, RM 1089
Memphis, TN 38166-7071

Re:    **Claim for contract interpretation under HCR Contract No. 92352**

Dear Contracting Officer:

This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms. We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment). We ask for a contracting officer's final decision on this claim as soon as possible.

**Background**

This contract was originally awarded on Sep 1, 1990. The current contract term runs from July 1, 2014 through June 30, 2018.

On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts. On August 18, 2016, the arbitrator issued a decision sustaining the grievance. While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service (PVS), the arbitrator directed the Postal Service to convert as many as 110 existing HCR contracts to PVS within six months. The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

In December 2016, the National Star Route Mail Contractors Association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c). That statute requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode:"

> "The Postal Service, in determining whether to obtain transportation of mail by contract under subsection (a)(3) of this section or by Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of the transportation service under each mode." [39 U.S.C. § 5005(c).]



To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest. The arbitrator's decision did not mention this statute or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct [a § 5005(c)] analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest. We also understand that the Postal Service has not raised the issue of 39 U.S.C. § 5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

### Claim for contract interpretation

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this service to PVS without comporting with the requirements of 39 U.S.C. § 5005(c). In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest? We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not intend to perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty. Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due consideration to cost (commonly known as a cost comparison) and determine which mode of transportation best serves the public interest. We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this contract to PVS to carry out the arbitration decision. We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of good faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal Service to take an action that violates the law. Converting our contract to PVS without first performing a § 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale. Doing so would violate the duty of good faith and fair dealing. We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that would not violate § 5005(c). Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate § 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages. Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter.  A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate the contract.

Sincerely,

Yung Lee,  President
16380 Everetts Way
Riverside, CA 92504
Phone 951-780-3229
Cell:   951-522-9846

# EXHIBIT 11

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| MAIL TRANSPORTATION, INC., et al.,<br><br>            Plaintiffs,<br><br>       v.<br><br>UNITED STATES,<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)  Case No. _____<br>)<br>)  Judge_____<br>)<br>)<br>) |

## DECLARATION OF GREG CAUSLEY

I, Greg Causley, declare pursuant to 28 U.S.C. § 1746 as follows:

 1.     I am the President of Causley Trucking, Inc. ("Causley"), a Michigan corporation with its principle place of business located at 1621 Terminal Drive in Sagniaw MI 48601.   My father, Harold, founded the company in 1940.  I joined the company in 1972.   I have personal knowledge of the facts stated herein, and if called upon to testify I could testify competently to these facts.

 2.     Causley operates offices out of Saginaw and Detroit, Michigan.  It has facilities located in Saginaw, Detroit, Melvindale, Gaylord, and Kingsford, Michigan.

 3.     To carry on its operations, Causley has 95 tractors, 78 trailers, and 22 straight trucks.

 4.     Causley obtained its first HCR contract in 1951 and currently holds 19 HCR contracts.  These HCR contracts produce $12,089,632.54 of Causley's annual revenue.

 5.     Two of these contracts – HCR 48090 and HCR 48162 – are being converted to PVS. These routes have never been performed by PVS.

6.      The loss of income of these two contracts would equal $1,909,085.04 or 16% of Causley's total mail-related annual revenue.  Additionally, these routes are 50% of Causley's HCR contracts operating out of its 4100 Fort Street terminal in Detroit. Considering only the income out of the 4100 Fort Street terminal, the loss of income of these two contracts would represent 53% of the annual income for that facility alone.

7.      HCR 48090 was initially awarded to George E. Campbell and Sons prior to 1985 and HCR 48162 was initially awarded to George E Campbell and Sons on November 23, 1985.  I purchased the stock of George E. Campbell and Sons on July 1, 1995 and took over all operations of George E. Campbell and Sons at that time.  In 2015, all George E. Campbell and Sons HCR contracts and routes, including HCR 48090 and HCR 48162, were novated to Causley Trucking, Inc.

8.      HCR 48162 requires 12 tractors, 13 trailers and 12 drivers, who drive 755,985.60 miles a year as part of the contract.  The route is out of Ann Arbor with stops in Ann Arbor, Ann Arbor Green Road, the University of Michigan, Ypsilanti, Melville, Detroit P&DC, Detroit NDC, and the Michigan Metroplex in Pontiac. The contract hours are 21,427; however, due to pre- and post-trip time and inspections the drivers are required to complete, the actual annual hours required to operate that contract are 25,400.  The value of the contract is $1,474,671.69 annually.

9.      HCR 48162 was awarded in 1985.  It has been renewed consistently since 1989, including short term renewals and extensions as requested by USPS.  This contract is set to expire in January of 2018.

10.     The contract for HCR 48162 contains a termination clause that requires the USPS to provide at least 60 days-notice prior to terminating the contract. A true and correct copy of relevant excerpts of this contract is attached hereto as **Exhibit 1**.

11.     HCR 48090 requires 4 tandem tractor-trailers and 4 drivers, who drive 259,509 miles a year. This route is from Detroit NDC to Michigan Metroplex P&DC. The contract hours are listed as 7,514 hours; however, the actual hours put in by the drivers is 8,101 hours a year. The value of this contract is $453,734.02 annually.

12.     HCR 48090 has been renewed consistently since 1985, including short term renewals and extensions as requested by USPS. This contract is set to expire on August 31, 2017.

13.     The contract for HCR 48090 contains a termination clause that requires the USPS to provide at least 60 days-notice prior to terminating the contract. A true and correct copy of relevant excerpts of this contract is attached hereto as **Exhibit 2**.

14.     To fulfill the aforementioned contracts, Causley has purchased special equipment, including E-Track, GPS, overhead doors, rear shoring bars, straps, and stake pockets, required by USPS specifications.

15.     Causley has historically provided USPS with cost effective service, which is why these contracts have been renewed and extended so frequently. In fact, Causley runs these contracts at 99.5% efficiency. In recognition of its excellent service, Causley has received Eagle Spirit Awards from USPS. But for the HCR to PVS conversion, there is no reason to believe HCR 48162 and HCR 48090 would not be renewed in the future.

16.     Neither I, nor any other Causley representative was given notice of the arbitration proceeding with the APWU that resulted in USPS converting the aforementioned HCR contracts

to PVS.  Neither I, nor any other Causley representative was allowed to participate or present evidence in the arbitration.

17.    I first heard mention of the possible conversion of certain HCR contracts to PVS about a year ago, in August of 2016, at the national convention for the National Star Route Contractors Association in Nashville, TN.

18.    In or around May 27, 2017, our drivers were taunted by postal work union drivers that USPS would be taking over their contracts. One union driver showed his W-2 to our drivers to attempt to entice our drivers away.

19.    I did not learn which specific HCR contracts would be converted until I received an email from Paul Horner, the purchasing analyst for USPS on June 9, 2017.

20.    On or about June 9, 2017, via certified mail, I sent a claim letter to USPS requesting clarification of the conversion of service for HCR 48090 to PVS and compliance with the requirements of 39 U.S.C. § 5005(c).  On or about June 13, 2017, via certified mail, I sent a claim letter to USPS requesting clarification of the conversion of service for HCR 48162 to PVS and compliance with the requirements of 39 U.S.C. § 5005(c). I received confirmation that USPS received my claim letters, but have not received a substantive response.   A true and correct copy of this correspondence is attached hereto as **Exhibit 3**.

21.    If USPS terminates the aforementioned contracts it will have a devastating impact on Causley's 4100 Fort Street terminal in Detroit.  Without the revenue from the 2 converted contracts at this facility, maintaining the facility will not be possible. Other facilities will be underutilized and Causley may have to downsize to smaller locations.

22.    In addition, Causley will be forced to lay off drivers operating the aforementioned contracts.  These drivers have been long term employees of 14 years or more.  Causley will be

forced to lay off other employees as well, including 2 dispatchers, 1 administrative staff person, and approximately 2 maintenance technicians.  Further, this will undoubtedly increase Causley's unemployment rate for the next 5 years thus increasing costs substantially on all wages paid though out the whole company.

23.     Causley will have underutilized equipment that cannot be transitioned to other uses.  For example, tractors used to transport U.S. mail are underpowered to transport freight as the mail weighs much less than the maximum weight capacity. Thus, the tractors used on the converted routes cannot be utilized for standard freight and this will significantly impact their resale value, which will be much lower than market rate.

24.     The conversion of the aforementioned contracts will also impact Causley's efficiency on other routes.  To enhance route efficiency, Causley often "ties in" its frequent short distance trips with other contracts to fully utilize their drivers and equipment.  Without the aforementioned contracts, there will be gaps in driver schedules that will cause additional expense to Causley.

25.     As a result of downsizing its facilities, staff and equipment, and the loss of revenue from the converted contracts and the increased expenses, Causley will be forced to restructure its remaining staff and facilities, as well as reevaluate its goals, tasks, and responsibilities.

26.     I do not believe that PVS will be able to perform Causley's contracts better than Causley.

a.      Causley had an HCR contract converted to PVS 3 years ago.  Under Causley's management, 7 tractors with 7 trailers and 11 drivers were utilized.  In taking over the contract, USPS could not operate the route as efficiently.  USPS rented 12 new

trucks and hired 20 new drivers, but the drivers were not as efficient or competent because they were unfamiliar with the route and could not make special trips due to union requirements. Postmasters and local transportation specialists on the route complained about the USPS service after the conversion.

b.      Moreover, USPS does not have facilities domiciled in Ann Arbor to efficiently handle the routes under HCR 48162. This will require rerouting over 4,000 trips operating out of Ann Arbor to a PVS facility in Detroit. This will expand USPS processing times, will increase route mileage, and delay service times.

I declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief.

Greg Causley

Executed in _____July_____ on _____12_____, 2017.

# AMENDMENT TO TRANSPORTATION SERVICES CONTRACT

## 1. AMENDMENT PURSUANT TO

| NTRACT NO. | b. AMENDMENT NO. | c. EFFECTIVE DATE | d. BEGIN CONTRACT TERM | e. END CONTRACT TERM |
|---|---|---|---|---|
| 162 | 2 | 01/01/2015 | 07/01/2014 | 01/31/2015 |

| MAIL SERVICE | CITY & STATE | | CITY & STATE |
|---|---|---|---|
| R BETWEEN | DETROIT P&DC, MI | | ANN ARBOR, MI |

## 2. SUPPLIER

| ME AND ADDRESS OF SUPPLIER | b. DOT NO. | c. SSN/EIN |
|---|---|---|
| USLEY TRUCKING INC<br>21 TERMINAL DR<br>GINAW MI 48601-9602 | 71955 | 38-2263810 |

| | d. TELEPHONE NO. |
|---|---|
| | 989-752-8383 |

## 3. DESCRIPTION OF AMENDMENT

ONTRACT TERM MODIFICATION

ffective close of business 01/01/2015 supplier agrees to the new contract term dates at the prevailing rate in force.

ONTRACT RATE:   $1,142,234.22 PER ANNUM

ew Contract Term: 07/01/2014 to 06/30/2018

ept as provided herein, all terms and conditions of the contract described in block 1 remain unchanged and in full force and effect.

he parties have caused this amendment to be executed, effective the date set forth in block 1c.

| PRINCIPAL | U.S. POSTAL SERVICE |
|---|---|
| *Greg Causley*   1/7/15 | |
| (Signature of person authorized to sign)   (Date) | (Signature of Contracting Officer)   (Date) |

| E AND TITLE OF SIGNER | TITLE OF CONTRACTING OFFICER |
|---|---|
| *Greg Causley, President* | CONTRACTING OFFICER |

rm 7406
ber 2001



EXHIBIT
1

CONTRACT NO.   48162              DETROIT P&DC, MI TO ANN ARBOR, MI

EFFECTIVE DATE 01/01/2015

PECIAL RATE INFORMATION

| COST SEG | DESCRIPTION | BEGIN DATE | END DATE | OLD SPECIAL RATE | NEW SPECIAL RATE | FINANCE NUMBER | BUDGET ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|
| A | LATE SLIP - HIRED DRIVER RATE | 10/01/2014 | 06/30/2018 | 34.06066 | 34.06066 | 25-2492 | 53138 |

SIGNATURE BLOCK

| | |
|---|---|
| *(signature)* 1/7/15 | |
| (Signature of Supplier)          (Date) | (Signature of Contracting Officer)          (Date) |

Form 7406
ptember 2001

NOTICE OF RENEWAL OF TRANSPORTATION SERVICES
CONTRACT FOR REGULAR SERVICE

## 1. RENEWAL PURSUANT TO

| a. CONTRACT NO. | b. EXPIRATION DATE OF EXPIRING CONTRACT | c. BEGIN CONTRACT TERM | d. END CONTRACT TERM |
|---|---|---|---|
| 48162 | 06/30/2014 | 07/01/2014 | 01/31/2015 |

| e. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | CITY & STATE |
|---|---|---|
| | DETROIT P&DC, MI | ANN ARBOR, MI |

## 2. RATE OF COMPENSATION

| a. CONTRACT RATE | b. ANNUAL MILEAGE | c. RATE PER MILE |
|---|---|---|
| $1,135,611.00 PER ANNUM | 614,870.4 | $1.84691 |

## 3. SUPPLIER

| a. NAME | b. ADDRESS (Street, City, State, ZIP+4) |
|---|---|
| CAUSLEY TRUCKING INC | 1621 TERMINAL DR<br>SAGINAW MI 48601-9602 |

## 4. CONTRACT

Having executed PS Form 7447,   Transportation Services Renewal Contract for Regular Service,   the contract referenced above is renewed for the additional term specified at the rate and under the terms and conditions for service prevailing at the end of the contract term, subject to any change that may be made in the operation under your current contract.

The law prohibits you from assigning or transferring this contract without the authorization of the U.S. Postal Service, and provides for the cancellation of the contract if you assign or transfer it without first receiving authorization. Further, you will be liable for any damages resulting from such an assignment or transfer without authorization. If you wish to assign or transfer your contract, contact your Contracting Officer for information on subcontracting requirements.

The presence of a postal inspector in your transportation equipment or in the vicinity of your facilities or the route over which your equipment is operated shall not be revealed by you or your employees to any person at any time.

A copy of your contract, which includes this form properly executed by this office on behalf of the U.S. Postal Service, the renewal solicitation and attachments, and your proposal are enclosed. You are cautioned to preserve these documents carefully for future reference.

| 5. SIGNATURE OF CONTRACTING OFFICER | 8. DISTRIBUTION |
|---|---|
| | 1 -- Contracting Officer |
| 6. TITLE OF CONTRACTING OFFICER<br>CONTRACTING OFFICER | 2 -- Accounting Service Center |
| | 3 -- Administrative Official |
| 7. ADDRESS OF CONTRACTING OFFICER | 4 -- Supplier |
| CENTRAL TRANSPORTATION CMT<br>US POSTAL SERVICE<br>1745 STOUT ST  STE 350<br>DENVER CO 80299-0350 | 5 -- P&DC/F |
| | 6 -- Customer Service District |
| | 7 -- En Route Offices |

| 9a. DATE ORDERED | b. ORDER NO. | c. ROUTE ORDER NO. | d. BUDGET ACCOUNT NO. | e. FINANCE NO. |
|---|---|---|---|---|
| JUN 2 0 2014 | 800--10673--14 | 1 | 53601 | 25--2492 |

PS Form 7448
September 2001

**UNITED STATES POSTAL SERVICE**

## TRANSPORTATION SERVICES RENEWAL CONTRACT FOR REGULAR SERVICE

### 1. RENEWAL PURSUANT TO

| CONTRACT NO. 48162 | b. EXPIRATION DATE OF EXPIRING CONTRACT 06/30/2014 | c. BEGIN CONTRACT TERM 07/01/2014 | d. END CONTRACT TERM 01/31/2015 |
|---|---|---|---|
| e. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE DETROIT P&DC, MI | CITY & STATE ANN ARBOR, MI | |

### 2. RATE OF COMPENSATION

| a. CONTRACT RATE (Specify if Other Than Annual) $1,135,611.00 PER ANNUM | b. ANNUAL MILEAGE 614,870.4 | c. RATE PER MILE $1.84691 |
|---|---|---|

### 3. SUPPLIER

| a. NAME (Print or Type) CAUSLEY TRUCKING INC | b. ADDRESS (Street, City, State, ZIP+4) 1621 TERMINAL DR SAGINAW MI 48601-9602 |
|---|---|
| c. TELEPHONE NO. 989-752-8383 | d. DOT NO. 71955 | e. SOCIAL SECURITY NO. OR EMPLOYER IDENTIFICATION NO. ▓▓▓▓▓ |

| f. LEGAL RESIDENT OF (Complete if Supplier is an Individual) | g. ENGAGED IN BUSINESS IN (Complete if Supplier is a Partnership or Corporation) |
|---|---|
| COUNTY | STATE | COUNTY SAGINAW | STATE MI |

### 4. CONTRACT

This form, your proposal, the Statement of Work and all attachments are incorporated into the renewal contract.

The above referenced contract, for the period specified, is hereby renewed with the rate(s) and service(s) prevailing at the end of the current contract.

| 5. SUPPLIER | 6. U.S. POSTAL SERVICE |
|---|---|
| *(Signature of Supplier)* 6-20-2014 *(Date)* | *(Signature of Contracting Officer)* JUN 20 2014 *(Date)* |
| Kenneth M. Causley, Vice Director *(Name and Title of Supplier)* | CONTRACTING OFFICER *(Title of Contracting Officer)* |

COMMENTS (For U.S. Postal Service Use Only)

PS Form 7447
September 2001

**UNITED STATES POSTAL SERVICE** ®   CONTRACT ROUTE SERVICE ORDER

| | |
|---|---|
| 1. CONTRACT R/ | OLD:   $1,072,117.28 PER ANNUM |
| | NEW:   $1,135,611.00 PER ANNUM |

| 2. CONTRACT NO. | 3. BEGIN CONTRACT TERM | 4. END CONTRACT TERM |
|---|---|---|
| 48162 | 07/01/2009 | 06/30/2014 |

| 5. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | CITY & STATE |
|---|---|---|
| | DETROIT P&DC, MI | ANN ARBOR, MI |

| 6. NAME AND ADDRESS OF SUPPLIER | 7. THIS SPACE FOR ASC USE ONLY |
|---|---|
| CAUSLEY TRUCKING INC 1621 TERMINAL DR SAGINAW MI 48601-9602 | |

**8. THE FOLLOWING ORDER IS HEREBY ISSUED**

CONTRACT RENEWAL

Effective close of business 06/30/2014 contract requirements are amended as shown on the attached PS Form 7406, "Amendment to Transportation Services Contract."

Adjust pay by $63,493.72 PER ANNUM, effective SEE ABOVE.

Scheduled annual mileage       614,870.4; new rate per mile       $1.84691

| 9. SIGNATURE OF CONTRACTING OFFICER | 10. DISTRIBUTION |
|---|---|
| | 1 -- Contracting Officer |
| **11. TITLE OF CONTRACTING OFFICER** CONTRACTING OFFICER | 2 -- Accounting Service Center |
| | 3 -- Administrative Official |
| **12. ADDRESS OF CONTRACTING OFFICER** CENTRAL TRANSPORTATION CMT US POSTAL SERVICE 1745 STOUT ST STE 350 DENVER CO 80299-0350 | 4 -- Supplier |
| | 5 -- P&DC/F |
| | 6 -- Customer Service District |
| | 7 -- En Route Offices |

| 13a. DATE ORDERED | b. ORDER NO. | c. ROUTE ORDER NO. | d. BUDGET ACCOUNT NO. | e. FINANCE NO. |
|---|---|---|---|---|
| JUN 2 0 2014 | 800-10672-14 | 999 | 53601 | 25-2492 |

PS Form 7440
September 2001

**UNITED STATES POSTAL SERVICE®**   HIGHWAY TRANSPORTATION CONTRACT — COST WORKSHEET

| ICITATION NO. | DATE OF SOLICITATION | CONTRACT NO.<br>48162 | BEGIN CONTRACT TERM<br>07/01/2014 | END CONTRACT TERM<br>06/30/2018 |
|---|---|---|---|---|
| MAIL SERVICE<br>OR BETWEEN | | CITY & STATE<br>DETROIT P&DC, MI | CITY & STATE<br>ANN ARBOR, MI | |

OFFEROR: A completed cost worksheet must be submitted with your offer. This worksheet will assist you in determining the cost you expect to incur in performing this service. Please retain a copy of this form for future reference. The instructions for completing this form are listed on the reverse.

TOR'S NAME AND ADDRESS (Include Apt./Suite No./ZIP+4)
USLEY TRUCKING INC
21 TERMINAL DR
GINAW MI 48601-9602

**NUMBER OF DRIVERS ON ROUTE**

| FULL-TIME | PART-TIME |
|---|---|
| | |

arks:

Pd 2-28-17
V# 407007377
$ 112,429.40
# 150-10672-17A
(D)

**REDACTED**

Cost Statement     Fuel

HCR Financial     History

| | BASIS FOR DETERMINING COST | | | | |
|---|---|---|---|---|---|
| Cost Segment | A | COST AS OF 02/01/2017 | | | |
| Item | | No. of Units<br>Per Year | X | Unit Cost | = Annual Cost |
| 1a. Vehicle Cost | | | | | |
| (1) Motor Vehicles | | | | | |
| (2) Trailers | | | | | |
| 1b. Operational Cost (Repairs, repair labor, tires, etc.) | | | | | |
| 2. Taxes | | | | | |
| 3. Vehicle Registration | | | | | |
| 4. Miscellaneous | | | | | |
| 5. General Overhead | | | | | |
| 6. Fuel (Miles per gallon) | | | | | |
| 7. Oil (Quarts) | | | | | |
| 8. Insurance | | | | | |
| 9. Road Taxes | | | | | |
| 10. Tolls | | | | | |
| 11. Total Fixed and Operational Cost (Lines 1-10) | | | | | |
| 12. Straight Time | | | | | |
| 13. Overtime | | | | | |
| 14. Payroll Taxes (Itemized) | | | | | |
| a. Social Security | | | | | |
| b. Workman's Compensation | | | | | |
| c. Federal Unemployment Comp. | | | | | |
| d. State Unemployment Comp. | | | | | |
| 15. Fringe Benefits<br>a. Health & Welfare | | | | | |
| b. Vacation | | | | | |
| c. Holiday | | | | | |
| d. Pension | | | | | |
| 16. Total Operation Labor Cost (Lines 12-15) | | | | | |
| 17. Supplier's Wages (Personal Driving or Supervision) | | | | | |
| 18. Total Cost (Lines 11, 16 & 17) | | | | | |
| 19. Return on Investment | | | | | |
| 20. TOTAL OFFER (Lines 18 & 19) | | | | | 1,465,597.57 |
| Offeror's Signature | | | | Date | |

Form 7468A
tember 2001

# ADDENDUM TO TERMS AND CONDITIONS (Transportation Routes)

HCR: ___48162___

The supplier agrees to the GPS Tracking Requirement terms that are described **if checked**:

| | |
|---|---|
| ☐ | **GPS Tracking Requirement**<br><br>*The supplier shall, at all times while its vehicle(s) is/are hauling or contain any mail under this contract, maintain a Global Positioning Satellite (GPS) system in the vehicle(s) that reports the location of the vehicle to the Postal Service not less frequently than every 30 minutes. <u>Compliance to the requirement must reach a minimum of 95% success rate (accurate data transmitted to and received by the Postal Service).</u> The supplier is responsible for providing the following information to the Postal Service:*<br><br>   *a.  Supplier Name.*<br>   *b.  Action: Arrival, Departure, En-Route.*<br>   *c.  Event Date/Time: The date/time when "pinged".*<br>   *d.  Location by Latitude/Longitude: The location of the vehicle.*<br>   *e.  Route: Route/Contract Number.*<br>   *f.  Trip: Specific Trip Number.*<br>   *g.  Origin Segment Facility Location by Address or NASS ("A" in A to B).*<br>   *h.  Destination Segment Facility Location by Address or NASS ("B" in A to B).* |

The following checked termination clause applies to this contract:

| | |
|---|---|
| ☒ | 2.3.3a  Termination with Notice |
| ☐ | 2.3.2b  Termination for the Postal Service's Convenience |

√ Terms and Conditions, Issue 12, dated January 15, 2013, will apply.

√ Fuel Management Plan dated June 2013, will apply.

_Kevin M. Causey_        _[signature]_        _6-20-2014_
Supplier (printed)        Supplier (signed)        Date

Bert Manchego        _[signature]_        JUN 2 0 2014
Contracting Officer (printed)        Contracting Officer (Signed)        Date

# HIGHWAY CONTRACT ROUTE (HCR)
## *TRANSPORTATION ROUTES ONLY*

# TERMS AND CONDITIONS, ISSUE 8

*Effective:  February 27, 2009*

determined by dividing the regular compensation for the trip by the regular number of miles.

*Note:* No payments will be made with respect to any detour not reported to the contracting officer or the contracting officer's designee within 90 days after the detoured service is performed. Supplier will use reasonable efforts to minimize additional costs or delays resulting from detours.

d.   **Liquidated Damages**:

See Section 2.3.3.

## 2.3.3   Termination of Contracts

The Postal Service reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the supplier must immediately stop all work and must immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the supplier will be paid a percentage of the work performed prior to the notice of termination. The supplier will not be paid for any work performed or costs incurred which reasonably could have been avoided.

The clauses below captioned "Termination with Notice" and "Termination for the Postal Service's Convenience" are in the alternative, so that only one of them is applicable to this contract, and not the other. The designation of which of the two clauses applies will be established prior to renewal or award. If no such designation has been made, the clause captioned "Termination for the Postal Service's Convenience" will be assumed to be the designated clause.

### 2.3.3a   Termination with Notice

The contracting officer or the supplier, on 60 days written notice, may terminate this contract or the right to perform under it, in whole or in part, without cost to either party.

Section *e* of Clause B-67 does not apply to transportation routes.

### 2.3.3b   Termination for the Postal Service's Convenience

The Postal Service reserves the right to terminate a regular contract, or any part thereof, for its sole convenience. In the event of such termination, the supplier must immediately stop all work and must immediately cause any and all of its suppliers and subcontractors to cease work. After termination, the supplier may submit to the contracting officer a termination claim in the form and with the certification prescribed by the contracting officer. The claim must be submitted promptly, but in no event more than 180 days after the effective date of termination, unless an extension in writing is granted by the contracting officer. However, if the contracting officer determines that the facts justify such action, any termination claim may be received and acted upon at any time after the 180-day period. Upon failure of the supplier to submit a termination claim within the time allowed, the contracting officer may determine, on the basis of information available, the amount, if any, due the supplier by reason of the termination and will pay that amount. The supplier will not be required to comply with the cost accounting standards and principles for this purpose. The supplier will not be paid for any work performed or costs incurred which reasonably could have been avoided. The supplier and the contracting officer shall agree upon the whole or any part of the amount to be paid (including an allowance for the fee) to the supplier by reason of the termination. The supplier has the right of review through the contracting officer to the next higher

level contracting authority and/or under the *Claims and Disputes* clause of the determination made by the contracting officer pertaining to the financial amount **ONLY.** If the supplier fails to request an extension of time, the supplier will have no right of review.

The Postal Service may, under the terms and conditions it may prescribe, make partial payments against costs incurred by the supplier in connection with the terminated portion of the contract whenever, in the opinion of the contracting officer, the aggregate of the partial payments is within the amount to which the supplier will be entitled. If the total of these payments exceeds the amount finally determined to be due under this clause, the excess must be repaid to the Postal Service upon demand, together with interest calculated in accordance with the *Interest* clause of this contract, for the period from the date the excess payment is received by the supplier to the date on which the excess is repaid to the Postal Service. However, no interest will be charged with respect to an excess payment attributable to a reduction in the supplier's claim by reason of retention or other disposition of termination inventory, until 10 days after the date of the retention or disposition.

Section *e* of Clause B-67 does not apply to transportation routes.

**2.3.3c   Clause B-72 Termination on Notice - Emergency Contracts (February 2009) (Modified)**

This contract may be terminated by the Postal Service upon notice of not less than 24 hours, or by the supplier upon notice of not less than 15 days without cost.

## 2.3.4   Safety Rating (Federal Motor Carrier Safety Administration)

If the supplier is notified by the Federal Motor Carrier Safety Administration (FMCSA) that there is a proposed safety rating or determination of a rating of "unsatisfactory" of the supplier (as described in 49 CFR § 385.11), the supplier must notify the contracting officer within five business days of receipt of its receipt of notice from the FMCSA. Should the supplier fail to do so, the contracting officer may terminate any and all of the supplier's contracts for default.  In addition, the contracting officer may terminate any and all of the supplier's contracts for default based upon a proposed safety rating or determination of a rating of "unsatisfactory" of the supplier (as described in 49 CFR § 385.11) by the FMCSA.

## 2.3.5   Clause B-9 Claims and Disputes (March 2006)

a.   This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601-613) ("the Act" or "CDA").
b.   Except as provided in the Act, all disputes arising under or relating to this contract must be resolved under this clause.
c.   "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. However, a written demand or written assertion by the supplier seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph d.2 below. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount is not acted upon in a reasonable time.
d.

| UNITED STATES POSTAL SERVICE® | CONTRACT ROUTE SERVICE ORDER | 1 CONTRACT RATE |
|---|---|---|
| | | OLD: NO |
| | | NEW: CHANGE |

| 2. CONTRACT NO. | 3 BEGIN CONTRACT TERM | 4 END CONTRACT TERM | |
|---|---|---|---|
| 48090 | 07/01/2013 | 06/30/2017 | |

| 5 FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | | CITY & STATE |
|---|---|---|---|
| | DETROIT NDC, MI | | MICHIGAN METROPLEX P&DC, MI |

| 6 NAME AND ADDRESS OF SUPPLIER | 7 THIS SPACE FOR ASC USE ONLY |
|---|---|
| CAUSLEY TRUCKING INC<br>1621 TERMINAL DR<br>SAGINAW MI 48601-9602 | |

**8 THE FOLLOWING ORDER IS HEREBY ISSUED**

CONTRACT TERM MODIFICATION

Effective close of business 06/01/2017, the term of this contract is amended in accordance with the attached PS Form 7406, "Amendment to Transportation Services Contract."

New Contract Term: 07/01/2013 - 08/31/2017

| 9 SIGNATURE OF CONTRACTING OFFICER | Edwin C. Cook<br>2017.06.21 12:23:05 -05'00' | 10 DISTRIBUTION |
|---|---|---|
| 11 TITLE OF CONTRACTING OFFICER<br>CONTRACTING OFFICER | | 1 · Contracting Officer<br>2 · Accounting Service Center<br>3 · Administrative Official |
| 12 ADDRESS OF CONTRACTING OFFICER<br>PNT OFFICE - PNT@USPS.GOV<br>225 N. HUMPHREYS BLVD, RM 1089<br>MEMPHIS TN 38166-7071 | | 4 · Supplier<br>5 · P&DC/F<br>6 · Customer Service District<br>7 · En Route Offices |

| 13a. DATE ORDERED | b. ORDER NO.<br>300-13049-17 | c. ROUTE ORDER NO<br>30 | d. BUDGET ACCOUNT NO. | e. FINANCE NO. |
|---|---|---|---|---|

PS Form 7440
September 2001



EXHIBIT
2

| UNITED STATES POSTAL SERVICE ▾ | CONTRACT ROUTE SERVICE ORDER | | 1 CONTRACT R... OLD   NO NEW:   CHANGE |
|---|---|---|---|
| 2 CONTRACT NO 48090 | 3 BEGIN CONTRACT TERM 07/01/2013 | 4 END CONTRACT TERM 01/31/2015 | |
| 5 FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE DETROIT NDC, MI | | CITY & STATE MICHIGAN METROPLEX P&DC, MI |
| 6 NAME AND ADDRESS OF SUPPLIER CAUSLEY TRUCKING INC 1621 TERMINAL DR SAGINAW MI 48601-9602 | | | 7 THIS SPACE FOR ASC USE ONLY |

8 THE FOLLOWING ORDER IS HEREBY ISSUED

CONTRACT TERM MODIFICATION

Effective close of business 01/01/2015, the term of this contract is amended in accordance with the attached PS Form 7406, "Amendment to Transportation Services Contract."

New Contract Term: 07/01/2013 - 01/31/2016

| 9 SIGNATURE OF CONTRACTING OFFICER *(signature)* CoS            7(e)(1) | 10 DISTRIBUTION 1 — Contracting Officer |
|---|---|
| 11 TITLE OF CONTRACTING OFFICER CONTRACTING OFFICER | 2 — Accounting Service Center 3 — Administrative Official |
| 12 ADDRESS OF CONTRACTING OFFICER CENTRAL TRANSPORTATION CMT US POSTAL SERVICE 1745 STOUT ST  STE 350 DENVER CO 80299-0350 | 4 — Supplier 5 — P&DC/F 6 — Customer Service District 7 — En Route Offices |

| 13a DATE ORDERED 1-28-15 | b ORDER NO 800-11198-15 | c ROUTE ORDER NO 9 | d BUDGET ACCOUNT NO 53127 | e FINANCE NO 25-2491 |
|---|---|---|---|---|

PS Form 7440
September 2001

| POSTAL SERVICE® | CONTRACT ROUTE SERVICE ORDER | 1. CONTRACT RATE OLD: NO NEW: CHANGE FEB - 3 2014 |
|---|---|---|

| 2. CONTRACT NO. 48090 | 3. BEGIN CONTRACT TERM 07/01/2013 | 4. END CONTRACT TERM 01/31/2014 |

| 5. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE DETROIT NDC, MI | CITY & STATE MICHIGAN METROPLEX P&DC, MI |

| 6. NAME AND ADDRESS OF SUPPLIER CAUSLEY TRUCKING INC 1621 TERMINAL DR SAGINAW MI 48601-9602 | 7. THIS SPACE FOR ASC USE ONLY |

8. THE FOLLOWING ORDER IS HEREBY ISSUED

CONTRACT TERM MODIFICATION

Effective close of business 01/01/2014, the term of this contract is amended in accordance with the attached PS Form 7406, "Amendment to Transportation Services Contract."

New Contract Term: 07/01/2013 - 01/31/2015

9. SIGNATURE OF CONTRACTING OFFICER

11. TITLE OF CONTRACTING OFFICER
CONTRACTING OFFICER

12. ADDRESS OF CONTRACTING OFFICER
CENTRAL TRANSPORTATION CMT
US POSTAL SERVICE
1745 STOUT ST STE 350
DENVER CO 80299-0350

10. DISTRIBUTION
1 -- Contracting Officer
2 -- Accounting Service Center
3 -- Administrative Official
4 -- Supplier
5 -- P&DC/F
6 -- Customer Service District
7 -- En Route Offices

| 13a. DATE ORDERED JAN 2 8 2014 | b. ORDER NO. 800-07305-14 | c. ROUTE ORDER NO. 7 | d. BUDGET ACCOUNT NO. 53127 | e. FINANCE NO. 25-2491 |

PS Form 7419
September 2001

| | CONTRACT ROUTE SERVICE ORDER | 1. CONTRACT RATE | |
|---|---|---|---|
| ES ICE® | | OLD: $385,381.45 PER ANNUM | |
| 2. CONTRACT NO. 48090 | 3. BEGIN CONTRACT TERM 07/01/2008 | 4. END CONTRACT TERM 06/30/2013 | NEW: $386,482.10 PER ANNUM |

| 5. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE DETROIT NDC, MI | CITY & STATE MICHIGAN METROPLEX P&DC, MI |
|---|---|---|

| 6. NAME AND ADDRESS OF SUPPLIER | 7. THIS SPACE FOR ASC USE ONLY |
|---|---|
| GEORGE CAMPBELL & SONS 4100 W FORT ST DETROIT MI 48209-3224 | |

**8. THE FOLLOWING ORDER IS HEREBY ISSUED**

CONTRACT RENEWAL

Effective close of business 06/30/2013 contract requirements are amended as shown on the attached PS Form 7406, "Amendment to Transportation Services Contract."

Adjust pay by $1,100.65 PER ANNUM, effective SEE ABOVE.

Scheduled annual mileage     198,856.7; new rate per mile     $1.94352

| 9. SIGNATURE OF CONTRACTING OFFICER | 10. DISTRIBUTION |
|---|---|
| | 1 - Contracting Officer |
| 11. TITLE OF CONTRACTING OFFICER CONTRACTING OFFICER | 2 - Accounting Service Center |
| | 3 - Administrative Official |
| 12. ADDRESS OF CONTRACTING OFFICER CENTRAL TRANSPORTATION CMT US POSTAL SERVICE 1745 STOUT ST  STE 350 DENVER CO 80299-0350 | 4 - Supplier |
| | 5 - P&DC/F |
| | 6 - Customer Service District |
| | 7 - En Route Offices |

| 13a. DATE ORDERED JUN 19 2013 | b. ORDER NO. 800-12884-13 | c. ROUTE ORDER NO. 999 | d. BUDGET ACCOUNT NO. 53127 | e. FINANCE NO. 25-2491 |
|---|---|---|---|---|

PS Form 7440
September 2001

## PS FORM 7440 - CONTINUATION SHEET - 1

CONTRACT NO. 48090          DETROIT NDC, MI TO MICHIGAN METROPLEX P&DC, MI

EFFECTIVE DATE   COB 06/30/2013          ORDER NO. 800-12884-13

SPECIAL RATE INFORMATION

| COST SEG | DESCRIPTION | BEGIN DATE | END DATE | OLD SPECIAL RATE | NEW SPECIAL RATE | FINANCE NUMBER | BUDGET ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|
| A | LATE SLIP - HIRED DRIVER RATE | 07/01/2012 | 06/30/2013 | 33.98983 | N/A | 25-2491 | 53138 |

**UNITED STATES POSTAL SERVICE ®**   AMENDMENT TO TRANSPORTATION SERVICES CONTRACT

## 1. AMENDMENT PURSUANT TO

| a. CONTRACT NO. | b. AMENDMENT NO. | c. EFFECTIVE DATE | d. BEGIN CONTRACT TERM | e. END CONTRACT TERM |
|---|---|---|---|---|
| 48090 | 99 | COB 06/30/2013 | 07/01/2008 | 06/30/2013 |

| f. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | | CITY & STATE |
|---|---|---|---|
| | DETROIT NDC, MI | | MICHIGAN METROPLEX P&DC, MI |

## 2. SUPPLIER

| a. NAME AND ADDRESS OF SUPPLIER | b. SCI NO. | c. SSN/EIN |
|---|---|---|
| GEORGE CAMPBELL & SONS<br>4100 W FORT ST<br>DETROIT MI 48209-3224 | 209027 | 38-2000841 |
| | d. TELEPHONE NO.<br>313-849-3211 | |

## 3. DESCRIPTION OF AMENDMENT

FINALIZE EXPIRING CONTRACT

As a result of renewal negotiations between supplier and the Postal Service, contract is amended as stated.

NEW CONTRACT RATE:    $386,482.10 PER ANNUM

Adjust pay by $1,100.65 PER ANNUM, effective SEE ABOVE.

Scheduled annual mileage 198,856.7, NEW rate per mile $1.94352

Except as provided herein, all terms and conditions of the contract described in block 1 remain unchanged and in full force and effect.

4. The parties have caused this amendment to be executed, effective the date set forth in block 1c.

| PRINCIPAL | U.S. POSTAL SERVICE |
|---|---|
| *Dawn M Waldecke* 6/17/13<br>(Signature of person authorized to sign)   (Date) | JUN 19 2013<br>(Signature of Contracting Officer)   (Date) |
| NAME AND TITLE OF SIGNER<br>Dawn M Waldecke<br>Controller | TITLE OF CONTRACTING OFFICER<br>CONTRACTING OFFICER |

PS Form 7405
September 2001

CONTRACT NO.   48090                    DETROIT NDC, MI TO MICHIGAN METROPLEX P&DC, MI

EFFECTIVE DATE COB 06/30/2013

SPECIAL RATE INFORMATION

| COST SEG | DESCRIPTION | BEGIN DATE | END DATE | OLD SPECIAL RATE | NEW SPECIAL RATE | FINANCE NUMBER | BUDGET ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|
| A | LATE SUP - HIRED DRIVER RATE | 07/01/2012 | 06/30/2013 | 33.86933 | N/A | 26-2491 | 53138 |

SIGNATURE BLOCK

_(Signature of Supplier)_     Controller     _(Date)_ 6/17/13

_(Signature of Contracting Officer)_     _(Date)_ JUN 1 9 2013

PS Form 7406
September 2004

**UNITED STATES POSTAL SERVICE**®

## NOTICE OF RENEWAL OF TRANSPORTATION SERVICES CONTRACT FOR REGULAR SERVICE

### 1. RENEWAL PURSUANT TO

| a. CONTRACT NO. | b. EXPIRATION DATE OF EXPIRING CONTRACT | c. BEGIN CONTRACT TERM | d. END CONTRACT TERM |
|---|---|---|---|
| 48090 | 06/30/2013 | 07/01/2013 | 01/31/2014 |

| e. FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | CITY & STATE |
|---|---|---|
| | DETROIT NDC, MI | MICHIGAN METROPLEX P&DC, MI |

### 2. RATE OF COMPENSATION

| a. CONTRACT RATE | b. ANNUAL MILEAGE | c. RATE PER MILE |
|---|---|---|
| $386,482.10 PER ANNUM | 198,856.7 | $1.94352 |

### 3. SUPPLIER

| a. NAME | b. ADDRESS (Street, City, State, ZIP+4) |
|---|---|
| GEORGE CAMPBELL & SONS | 4100 W FORT ST<br>DETROIT MI 48209-3224 |

### 4. CONTRACT

Having executed PS Form 7447,   *Transportation Services Renewal Contract for Regular Service*,   the contract referenced above is renewed for the additional term specified at the rate and under the terms and conditions for service prevailing at the end of the contract term, subject to any change that may be made in the operation under your current contract.

The law prohibits you from assigning or transferring this contract without the authorization of the U.S. Postal Service, and provides for the cancellation of the contract if you assign or transfer it without first receiving authorization. Further, you will be liable for any damages resulting from such an assignment or transfer without authorization. If you wish to assign or transfer your contract, contact your Contracting Officer for information on subcontracting requirements.

The presence of a postal inspector in your transportation equipment or in the vicinity of your facilities or the route over which your equipment is operated shall not be revealed by you or your employees to any person at any time.

A copy of your contract, which includes this form properly executed by this office on behalf of the U.S. Postal Service, the renewal solicitation and attachments, and your proposal are enclosed. You are cautioned to preserve these documents carefully for future reference.

A copy of this communication has been sent to all concerned as authority for the above-referenced contract.

| | |
|---|---|
| 5. SIGNATURE OF CONTRACTING OFFICER | 8. DISTRIBUTION |
| 6. TITLE OF CONTRACTING OFFICER<br>CONTRACTING OFFICER | 1 - Contracting Officer<br>2 - Accounting Service Center<br>3 - Administrative Official |
| 7. ADDRESS OF CONTRACTING OFFICER<br>CENTRAL TRANSPORTATION CMT<br>US POSTAL SERVICE<br>1745 STOUT ST  STE 350<br>DENVER CO 80299-0350 | 4 - Supplier<br>5 - P&DC/F<br>6 - Customer Service District<br>7 - En Route Offices |

| 9a. DATE ORDERED | b. ORDER NO | c. ROUTE ORDER NO. | d. BUDGET ACCOUNT NO. | e. FINANCE NO. |
|---|---|---|---|---|
| JUN 19 2013 | 800-12885-13 | 1 | 53127 | 25-2491 |

**UNITED STATES POSTAL SERVICE**

## TRANSPORTATION SERVICES RENEWAL CONTRACT
### FOR REGULAR SERVICE

### 1. RENEWAL PURSUANT TO

| a CONTRACT NO | b EXPIRATION DATE OF EXPIRING CONTRACT | c BEGIN CONTRACT TERM | d END CONTRACT TERM |
|---|---|---|---|
| 48090 | 06/30/2013 | 07/01/2013 | 01/31/2014 |

| e FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE | | CITY & STATE |
|---|---|---|---|
| | DETROIT NDC, MI | | MICHIGAN METROPLEX P&DC, MI |

### 2. RATE OF COMPENSATION

| a CONTRACT RATE (Specify if Other Than Annual) | b ANNUAL MILEAGE | c RATE PER MILE |
|---|---|---|
| $386,482.10 PER ANNUM | 198,856 7 | $1.94352 |

### 3. SUPPLIER

| a NAME (Print or Type) | b ADDRESS (Street, City, State, ZIP+4) |
|---|---|
| GEORGE CAMPBELL & SONS | 4100 W FORT ST<br>DETROIT MI 48209-3224 |

| c TELEPHONE NO | d DOT NO | e SOCIAL SECURITY NO OR EMPLOYER IDENTIFICATION NO |
|---|---|---|
| 313-849-3211 | 209027 | 38-2000841 |

| f LEGAL RESIDENT OF | | g ENGAGED IN BUSINESS IN |
|---|---|---|
| (Complete if Supplier is an Individual) | | (Complete if Supplier is a Partnership or Corporation) |

| COUNTY | STATE | COUNTY | STATE |
|---|---|---|---|
| | | WAYNE | MI |

### 4. CONTRACT

This form, your proposal, the Statement of Work and all attachments are incorporated into the renewal contract.

The above referenced contract, for the period specified, is hereby renewed with the rate(s) and service(s) prevailing at the end of the current contract.

| 5 SUPPLIER | 6 U.S POSTAL SERVICE |
|---|---|
| *(signature)* Dawn Waldecke 6/17/13<br>(Signature of Supplier) (Date)<br>Dawn M Waldecke<br>(Name and Title of Supplier) Controller | *(signature)*  JUN 19 2013<br>(Signature of Contracting Officer) (Date)<br>CONTRACTING OFFICER<br>(Title of Contracting Officer) |

COMMENTS (For U.S Postal Service Use Only)

PS Form 7217
September 2001

# ADDENDUM TO TERMS AND CONDITIONS (Transportation Routes)

HCR: 48090

The supplier agrees to the GPS Tracking Requirement terms that are described **If checked**:

| | |
|---|---|
| ☐ | **GPS Tracking Requirement**<br><br>*The supplier shall, at all times while its vehicle(s) is/are hauling or contain any mail under this contract, maintain a Global Positioning Satellite (GPS) system in the vehicle(s) that reports the location of the vehicle to the Postal Service not less frequently than every 30 minutes. <u>Compliance to the requirement must reach a minimum of 95% success rate (accurate data transmitted to and received by the Postal Service).</u> The supplier is responsible for providing the following information to the Postal Service:*<br><br>a. *Supplier Name.*<br>b. *Action: Arrival, Departure, En-Route.*<br>c. *Event Date/Time: The date/time when "pinged".*<br>d. *Location by Latitude/Longitude: The location of the vehicle.*<br>e. *Route: Route/Contract Number.*<br>f. *Trip: Specific Trip Number.*<br>g. *Origin Segment Facility Location by Address or NASS ("A" in A to B).*<br>h. *Destination Segment Facility Location by Address or NASS ("B" in A to B).* |

The following checked termination clause applies to this contract:

| | |
|---|---|
| ☒ | 2.3.3a   Termination with Notice |
| ☐ | 2.3.3b   Termination for the Postal Service's Convenience |

√ Terms and Conditions, Issue 12, dated January 15, 2013, will apply.

√ Fuel Management Plan dated April 2011, will apply.

Dawn m Walloche          Dawn Walloche                6/10/13
Supplier (printed)  Controller    Supplier (signed)              Date

Bert Manchego
Contracting Officer (printed)

Contracting Officer (Signed)          JUN 19 2013
                                                          Date

UNITED STATES
POSTAL SERVICE ®   HIGHWAY TRANSPORTATION CONTRACT — COST WORKSHEET

| SOLICITATION NO. | DATE OF SOLICITATION | CONTRACT NO. 48090 | BEGIN CONTRACT TERM 07/01/2013 | END CONTRACT TERM 06/30/2017 |
|---|---|---|---|---|

| FOR MAIL SERVICE IN OR BETWEEN | CITY & STATE DETROIT NDC, MI | | CITY & STATE MICHIGAN METROPLEX P&DC, MI |
|---|---|---|---|

OFFEROR: A completed cost worksheet must be submitted with your offer. This worksheet will assist you in determining the cost you expect to incur in performing this service. Please retain a copy of this form for future reference. The instructions for completing this form are listed on the reverse.

| OFFEROR'S NAME AND ADDRESS (include Apt./Suite No./ZIP+4) CAUSLEY TRUCKING INC 1621 TERMINAL DR SAGINAW MI 48601-9602 | | BASIS FOR DETERMINING COST | | |
|---|---|---|---|---|
| | Cost Segment | A | COST AS OF 02/01/2017 | |
| | Item | No. of Units Per Year ✗ | Unit Cost = | Annual Cost |
| | 1a. Vehicle Cost | | | |
| | (1) Motor Vehicles | | | |
| NUMBER OF DRIVERS ON ROUTE | (2) Trailers | | | |
| FULL-TIME | PART-TIME | | | |
| | 1b. Operational Cost (Repairs, repair labor, tires, etc.) | | | |
| Remarks: | 2. Taxes | | | |
| | 3. Vehicle Registration | | | |
| | 4. Miscellaneous | | | |
| | 5. General Overhead | | | |
| | 6. Fuel (Miles per gallon) | | | |
| | 7. Oil (Quarts) | | | |
| | 8. Insurance | | | |
| | 9. Road Taxes | | | |
| | 10. Tolls | | | |
| | 11. Total Fixed and Operational Cost (Lines 1-10) | | | |
| | 12. Straight Time | | | |
| | 13. Overtime | | | |
| | 14. Payroll Taxes (itemized) | | | |
| | a. Social Security | | | |
| | b. Workman's Compensation | | | |
| | c. Federal Unemployment Comp. | | | |
| | d. State Unemployment Comp. | | | |
| REDACTED | 15. Fringe Benefits | | | |
| | a. Health & Welfare | | | |
| | b. Vacation | | | |
| | c. Holiday | | | |
| | d. Pension | | | |
| | 16. Total Operation Labor Cost (Lines 12-15) | | | |
| | 17. Supplier's Wages (Personal Driving or Supervision) | | | |
| | 18. Total Cost (Lines 11, 16 & 17) | | | |
| Cost Statement     Fuel | 19. Return on Investment | | | |
| HCR Financial     History | 20. TOTAL OFFER (Lines 18 & 19) | | | 453,734.02 |
| | Offeror's Signature | | | Date |

PS Form 7468A
September 2001



June 13, 2017

**By Email and Certified Mail- Return Receipt Requested**

United States Postal Service

Mr. Keith L. Harris, Manager Transportation Contracts

Processing Network Transportation Office

225 N. Humphrey's Blvd, Suite 4126

Memphis, TN  38166

**Re: Claim for contract interpretation under HCR Contract No. 48162**

Dear Mr. Harris:

This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms. We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment). We ask for a contracting officer's final decision on this claim as soon as possible.

**Background**

This contract was originally awarded to George Campbell and Sons, Detroit MI, I believe in the early 1960's.  On July 1, 1995, I purchased the stock of George E. Campbell and Sons from Dale Campbell.  On 10/1/13, this contract, as was all other George E. Campbell contracts, novated to Causley Trucking, Inc.  The current contract term runs from July 1, 2014 thru June 30, 2018.

On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts.  On August 18, 2016, the arbitrator issued a decision sustaining the grievance. While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service(PVS), the arbitrator directed the postal service to convert as many as 110 existing HCR contracts to PVS within six months.  The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

In December 2016, the National Star Route Mail Contractors association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c). That statue requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode."

"The Postal Service, in determining whether to obtain transportation of mail by contract under subsection (a)(3) of this section or by Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of transportation service under each mode." (39 U.S.C. 5005(c).)

To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest.  The arbitrator's decision did not mention this statue or this requirement.

COPY

Scanned to Greg on

EXHIBIT

3

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct (a 5005(c)) analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26. We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest. We also understand that the Postal Service has not raised the issue of 39 U.S.C. 5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

**Claim for contract interpretation**

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this series to PVS without comporting with the requirements of 39 U.S.C. 5005(c). In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest? We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not intend to perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing. See *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty. Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due consideration to cost (commonly known as a cost comparison) and determine which mode of transportation best serves the public interest. We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this contract to PVS to carry out the arbitration decision. We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of god faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal service to take an action that violates the law. Converting our contract to PVS without first performing a 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale. Doing so would violate the duty of good faith and fair dealing. We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that does not violate 5005(c). Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages. Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter. A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate contract.

Respectfully,

Greg Gausley
President



June 9, 2017

**By Email and Certified Mail- Return Receipt Requested**

United States Postal Service

Mr. Keith L. Harris, Manager Transportation Contracts

Processing Network Transportation Office

225 N. Humphrey's Blvd, Suite 4126

Memphis, TN  38166



### Re: Claim for contract interpretation under HCR Contract No. 48090

Dear Mr. Harris:

This is a claim, pursuant to the Contract Disputes Act and the "Claims and Disputes" clause of the above-referenced contract, for an interpretation of contract terms.  We seek a contracting officer's final decision on whether this contract may be properly terminated under the "Termination with Notice" clause for the purpose of converting the service to Postal Vehicle Service (postal drivers and equipment). We ask for a contracting officer's final decision on this claim as soon as possible.

### Background

This contract was originally awarded to Pink Moody. Detroit MI, I believe in the early 1960's.  On or about July 1, 1985, George E. Campbell and Sons purchased Pink Moody and took over the operation of this contract.  On July 1, 1995, I purchased the stock of George E. Campbell and Sons from Dale Campbell.  On 10/1/13, this contract, as was all other George E. Campbell contracts, novated to Causley Trucking, Inc.  The current contract term runs from July 1, 2013 thru June 30, 2017.  Causley Trucking is currently in the process of renewal negotiations with your office for the contract term of July 1, 2017 thru June 30, 2019.

On April 19, 2011, the American Postal Workers Union (APWU) filed a grievance contending that the Postal Service had not complied with the National Agreement by failing to provide it with notice and an opportunity for discussions before awarding certain HCR contracts.  On August 18, 2016, the arbitrator issued a decision sustaining the grievance. While the arbitrator recognized that there was "little likelihood" that any of the HCR work would have gone to Postal Vehicle Service(PVS), the arbitrator directed the postal service to convert as many as 110 existing HCR contracts to PVS within six months.  The arbitrator also retained jurisdiction to resolve any matters relating to implementing the remedy.

In December 2016, the National Star Route Mail Contractors association brought an action in U.S. District Court seeking to stop the Postal Service from carrying out the arbitration award, contending it would violate 39 U.S.C. 5005(c). That statue requires the Postal Service to use the mode of transportation that "best serves the public interest, due consideration being given to the cost of transportation service under each mode."

"The Postal Service, in determining whether to obtain transportation of mail by contract under subsection (a)(3) of this section or by Government motor vehicle, shall use the mode of transportation which best serves the public interest, due consideration being given to the cost of transportation service under each mode." (39 U.S.C. 5005(c).)

To comply with this statute, the Postal Service must perform a cost comparison between HCR service and PVS and make a determination as to which mode of transportation best serves the public interest.  The arbitrator's decision did not mention this statue or this requirement.

While the District Court dismissed the action on jurisdictional grounds, the Court stated that the arbitration award presumed that the Postal Service "would conduct (a 5005(c)) analysis when deciding which contracts to terminate pursuant to its rights under the HCR contracts." *National Star Route Mail Contractor's Association Inc. v. USPS*, Civ. No. 16-2350, December 19, 2016 (D.D.C.), slip op. at 26.  We understand that the Postal Service has not conducted a new cost comparison between our contract and PVS and does not intend to make a determination as to which transportation mode best serves the public interest.  We also understand that the Postal Service has not raised the issue of 39 U.S.C.  5005(c) compliance with the arbitrator or sought alternative relief from the arbitrator.

### Claim for contract interpretation

We seek your decision on whether the "Termination with Notice" clause of the contract may be exercised for the purpose of converting this series to PVS without comporting with the requirements of 39 U.S.C. 5005(c).  In other words, may the contract be terminated for the purpose of converting the service to PVS without the Postal Service first making a cost comparison and determining which mode of transportation best serves the public interest?  We understand that the Postal Service intends to terminate this contract to comply with the arbitration award and that it therefore does not intend to perform a cost comparison and determine which mode of interest best serves the public interest.

Every contract contains an implied duty of good faith and fair dealing.  See *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014).  Failure to fulfill the duty of good faith and fair dealing constitutes a breach of contract in the same manner as failure to fulfill an express contractual duty.  Under 5005(c), in determining which mode of transportation to use, the Postal Service must give due consideration to cost (commonly known as a cost comparison) and determine which mode of transportation best serves the public interest.  We understand that the Postal Service has neither conducted a cost comparison nor determined which mode of transportation best serves the public interest, but intends to convert this contract to PVS to carry out the arbitration decision.  We believe terminating this contract for the purpose of converting it to PVS without performing a 5005(c) analysis would violate the duty of god faith and fair dealing and constitute a breach of contract.

While we understand the Postal Service's desire to comply with the arbitration award, the arbitrator may not direct the Postal service to take an action that violates the law.  Converting our contract to PVS without first performing a 5005(c) analysis violates that law, and thus that action may not be taken, regardless of the rationale.  Doing so would violate the duty of good faith and fair dealing.  We also understand that the Postal Service did not raise this issue with the arbitrator or seek an alternative remedy that does not violate 5005(c).  Failure to raise this issue with the arbitrator and seek an alternative remedy that does not violate 5005(c) is a separate and additional breach of the duty of good faith and fair dealing.

This claim does not seek monetary damages.  Rather, we seek an interpretation of the contract as to whether it may be terminated for the purpose of converting the service to PVS without first performing a 5005(c) analysis or seeking an alternative remedy.

Thank you for your attention to this matter.  A contracting officer's final decision is sought as soon as possible and no later than 60 days or before any action is taken to terminate contract.

Respectfully,

Greg Causley
President

# EXHIBIT 12

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| MAIL TRANSPORTATION, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| UNITED STATES, | ) | Judge _____ |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF WALTER B. ADAMS

I, Walter B. Adams, declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as

follows:

1.      I make this Declaration based on my own personal knowledge and in my capacity

as President and owner of W.B. Adams Trucking, Inc. ("WBA").

2.      I founded WBA thirty-six years ago, in 1981. I have been President and owner

since that time.

3.      As President of WBA, I oversee WBA's daily business operations. I am over the

age of eighteen and competent to testify about the matters stated herein.

4.      WBA employs approximately 58 drivers and owns or leases approximately 3

semi-truck tractors, 2 semi-truck trailers, 5 service trucks, and 55 box trucks.

5.      WBA transports U.S. mail for the United States Postal Services ("USPS"),

pursuant to a number of contracts. These contracts constitute 100% of WBA's operating revenue.

6.      WBA was awarded its first mail transportation contract with USPS approximately

thirty-six years ago.

7.      One of WBA's contracts with USPS (Contract No. 194L4) has been targeted by USPS for termination and conversion to have the route covered by the Postal Vehicle Service ("PVS").

8.      The current total value of Contract No. 194L4, on an annual basis, is $871,564.16.

9.      Contract No. 194L4 accounts for approximately 24% of WBA's annual revenue.

10.     Contract No. 194L4 was awarded to WBA, through a competitive process, on or about December 2, 2008. It is my understanding that Contract No. 194L4 has been extended or renewed twice since that time.

11.     On or about June 30, 2017, WBA first learned that USPS intended to terminate Contract No. 194L4 and have the route covered by Contract No. 194L4 performed by PVS.

12.     WBA was made aware of USPS's intention to terminate Contract No. 194L4 when a WBA employee discovered an e-mail from USPS, dated June 12, 2017, in which Contract No. 194L4 was identified as a contract that was to be converted "from Supplier provided Highway Contract Services to Postal provided Postal Vehicle Services in the next 3-9 months." A true and correct copy of that letter is attached hereto as **Exhibit A**.

13.     WBA did not discover the June 12 e-mail until June 30, 2017 because the e-mail arrived during the time WBA was switching internet service providers. As a result, WBA's notice of the e-mail was delayed.

14.     WBA was never given notice of the arbitration that led to the award issued on August 18, 2016. WBA did not learn of the existence of the arbitration until after an award had been issued and after Contract No. 194L4 had been designated for conversion to PVS. WBA never participated or presented evidence in that arbitration proceeding, nor was it ever afforded an opportunity to do so.

**Contract No. 194L4**

15.    Contract No. 194L4 requires WBA to provide mail transportation services between several USPS facilities on the east coast of the county. The route covered by Contract No. 194L4 starts at the USPS Processing and Distribution Center in Newcastle, DE; ends at the USPS post office in Nottingham, PA; and has approximately eleven stops in-between at various USPS post offices.

16.    In performing services under Contract No. 194L4, WBA drives approximately 411,000 miles annually. WBA typically performs approximately 1,612 trips per year on this route and performs services seven days per week.

17.    WBA uses seven full-time drivers and four part-time drivers to perform Contract No. 194L4. WBA drivers work 15,184 driver hours annually in performing Contract No. 194L4.

18.    WBA uses seven box trucks to perform Contract No. 194L4.

19.    To the best of my knowledge, PVS has never performed this route.

20.    Contract No. 194L4 was last renewed in 2015 and is currently up for renewal on June 30, 2019.

21.    Contract No. 194L4 has already been renewed by USPS in the past and we had no reason to believe that it would not be renewed again in 2019.

22.    In the approximately seven years that WBA has held Contract No. 194L4, to the best of my knowledge, WBA has never received any complaints or grievances from USPS regarding its performance.

23.    Additionally, to the best of my knowledge and review of company records, WBA has never even received a "5500" notice of deficiency related to Contract No. 194L4.

24.     To the contrary, WBA has been an exemplary contractor, including being the recipient of USPS's "Eagle Spirit" award in 2012, which, according to USPS's website, is awarded "to recognize the outstanding contributions of companies and individuals who transport mail under contract." The letter that accompanied the 2012 Eagle Spirit Award noted that the award was given "in recognition of the exemplary service you have provided to the Postal Service over the years."

25.     Contract No. 194L4 has a Termination Notice clause that requires 60-days advance written notice to terminate without cost to either party.

26.     If USPS terminates Contract No. 194L4, WBA will lose approximately $1.74 Million in revenue through the remaining term of its current contract, as well as the potential for more than $871,000 in revenue annually thereafter.

27.     If Contract No. 194L4 is terminated and converted to PVS, WBA anticipates that it will be forced to lay-off between eight and eleven drivers (including drivers who have been driving the route under Contract No. 194L4 since the contract was awarded) as well as one to two mechanics.

28.     WBA will have approximately seven box trucks that will be unused or underused if USPS terminates Contract No. 194L4.

29.     WBA takes the term of its USPS contracts into account when purchasing or leasing necessary equipment to service its contracts. For example, WBA tries to schedule loan payments on trucks and other equipment to coincide with the term(s) of the contract(s) for which those trucks or equipment will be used. WBA is also able to more adequately prepare for necessary staffing changes.

30.     WBA has also purchased special equipment required for its performance of Contract No. 194L4. Among other things, WBA is required to have at least two box trucks equipped with power lift gates that are necessary to load and unload mail at certain post offices along the route covered by Contract No. 194L4. As a result, four of WBA's seven box trucks are equipped with power lift gates.

31.     USPS has also required contractors to equip their trucks with specific GPS units by July 31, 2017. WBA currently has GPS units on order for the seven box trucks used to service Contract No. 194L4. If USPS terminates Contract No. 194L4 shortly after July 31, 2017, WBA will have been forced to incur this expense for nothing.

32.     WBA accepted the risk that operational changes or USPS network changes concerning the route might result in termination, but we did not contemplate or accept the risk that termination would result from USPS failing to live up to its union agreements or other USPS wrongful conduct.

33.     Based on my experience, PVS will not be able to perform Contract No. 194L4 better than WBA or at a lower cost. This is due to a number of factors, including:

    a.    In my experience, PVS will be required to use more drivers and trucks than WBA in order to adequately perform the route covered by Contract No. 194L4. Among other things, WBA drivers sometimes have to work 10-11 hour days. It is my understanding that the union agreement covering PVS drivers will not allow such work days without incurring significant increased labor costs, if at all.

    b.    WBA has over seven years of experience providing exemplary service traveling the route covered by Contract No. 194L4, while PVS has none. Approximately five of the drivers who service Contract No. 194L4 have been on this route for the entirety of the existence of Contract No. 194L4. This route has unique characteristics that make it difficult to drive for novice drivers, including the presence of many hills, which are difficult to navigate during the harsh Pennsylvania winter months.

    c.    WBA is required to help load and unload mail at the post offices along the route covered by Contract No. 194L4. WBA has key access (either through a physical

5

presence of many hills, which are difficult to navigate during the harsh Pennsylvania winter months.

c.   WBA is required to help load and unload mail at the post offices along the route covered by Contract No. 194L4. WBA has key access (either through a physical key or a combination lock) to approximately nine post offices along this route. It is my understanding PVS drivers are prohibited from doing these tasks under their union agreement with USPS.

34.   News of the impending termination of Contract No. 194L4 has already negatively affected WBA's workforce and our ability to retain drivers. As a general matter, employee confidence and morale is down among managers and drivers because they are in fear of losing their jobs.

35.   PVS is already recruiting WBA's drivers to work for PVS. We have recently had one driver leave WBA to go work for PVS. This driver notified WBA that he was quitting WBA to go work for PVS around the end of June 2017. I understood that he would begin working for PVS in July 2017.

36.   If PVS hires away a number of our drivers, we will be left in the difficult position of trying to hire drivers to service our existing contracts while having the prospect of Contract No. 194L4 being terminated hanging over our head. It is difficult to hire drivers when they may need to be let go just a few months, or less, later.

PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY THAT THE STATEMENTS IN THIS DECLARATION ARE TRUE AND CORRECT BASED UPON MY PERSONAL KNOWLEDGE.

Dated this _11th_ Day of July, 2017.

Walter B. Adams

----------Original Message----------

From: "Benlizar, Gibsy J - Largo, MD"
Date: Jun 12, 2017 11:00:47 AM
Subject: PVS Conversion
To: "WBADAMS1@VERIZON.NET" <WBADAMS1@VERIZON.NET>
Cc: "Benlizar, Gibsy J - Largo, MD" <Gibsy.J.Benlizar2@usps.gov>

*Dear Supplier,*

*We would like to notify you that the USPS will be converting the below listed contracts from Supplier provided Highway Contract Services to Postal provided Postal Vehicle Services in the next 3-9 months.  You are being contacted because one or more of your contracts are indicated in the below list.*

*Please be aware that this timeline is an approximation, you will be alerted to the specifics of the change in the coming months.   USPS is providing you with this notification to ensure you are made of aware of these planned changes as earliest possible.*

*Suppliers Contracts*

*194L4*



*If you have questions please feel free to reach out by email to Jetur Conway at* *Jetur.L.Conway@usps.gov.*

*Best,*

**Gibsy Benlizar**

*Purchasing and SM Specialist*

*Local Distribution Transportation*

*United States Postal Service*

*1200 Mercantile Lane*

*Largo, MD. 20774*

*Office:* *301-386-8909*

*Cell:* *240-758-8179*

*eFax:* *202-268-0903*

*eMail:* *Gibsy.J.Benlizar2@usps.gov*

--
Walter B. Adams
President, W.B Adams Trucking Inc.
1005 Old White Horse Pike
Waterford Works, NJ 08089
Phone: (856) 767-1357
Cell: (609) 707-9651
Fax: (856) 767-2664
eFax: (609) 257-0678

# EXHIBIT 13

THOMAS J. MARSHALL
GENERAL COUNSEL
AND EXECUTIVE VICE PRESIDENT


UNITED STATES
POSTAL SERVICE

June 20, 2017

Mr. David P. Hendel
Husch Blackwell LLP
750 17th Street, NW, Suite 900
Washington, DC  20006-4675

Re:  List of 110 Highway Contract Routes

Dear Mr. Hendel:

This letter is in response to your inquiry about implementation of the August 18, 2016 Das arbitration award.  The Postal Service and the American Postal Workers Union, AFL-CIO have reached agreement on a list of 110 highway contract routes (HCRs) to be converted to postal vehicle service by September 1, 2017, pursuant to Arbitrator Das' award.  A list of the 110 routes that will be converted is enclosed.

Once the Postal Service has sufficient staffing in place for a particular route, formal notice of cancellation will be provided to the contractor operating the HCR.  The Postal Service and the APWU agreed that all 110 routes should be converted by September 1; however, in the event the Postal Service is unable to meet that deadline for certain routes, the APWU will be notified.

Please let me know if you have any questions or if you would like to discuss matter further.

Sincerely,

Thomas J. Marshall

Enclosure

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-1100
PHONE: 202-268-5555
FAX: 202-268-6981
THOMAS.J.MARSHALL@USPS.GOV
www.usps.com

# EXHIBIT 14

CHARLES F. KAPPLER
DEPUTY GENERAL COUNSEL



June 23, 2017


David P. Hendel
Husch Blackwell LLP
750 17th Street, NW, Suite 900
Washington, DC 20006-4675

Re:     List of 110 Highway Contract Routes


Dear Mr. Hendel,

As requested, attached please find an updated version of the list of 110 highway contractor routes (HCRs) that will be converted to postal vehicle service by September 1, 2017.  As you will note, we deleted the "Confidential, Not for Distribution" footer in this version.

Please let me know if you have any questions or if you would like to discuss matter further.

Charles F. Kappler

Attachment

cc:  Mr. Marshall

475 L'ENFANT PLAZA, SW, RM 6002
WASHINGTON, DC 20260-1149
PHONE: (202) 268-2932
FAX: (202) 268-6981
Charles.F.Kappler@usps.gov

HCR Contracts

| | Route | Area | Site Name | Annual Hours |
|---|---|---|---|---|
| 104 | 02111 | NE | Boston P&DC | 5,956 |
| 1 | 04032 | NE | Southern ME P&DC, ME | 2,364 |
| 52 | 08531 | EA | Trenton P&DC, NJ | 4,045 |
| 53 | 08550 | EA | Trenton P&DC, NJ | 7,213 |
| 4 | 19431 | EA | Southeastern P&DC, PA | 3,468 |
| 5 | 19433 | EA | Southeastern P&DC, PA | 5,216 |
| 6 | 19436 | EA | Southeastern P&DC, PA | 9,648 |
| 7 | 19439 | EA | Southeastern P&DC, PA | 3,628 |
| 9 | 19455 | EA | Southeastern P&DC, PA | 3,277 |
| 10 | 19459 | EA | Philadelphia P&DC | 7,021 |
| 11 | 19492 | EA | Southeastern P&DC, PA | 15,352 |
| 54 | 20830 | CM | Suburban MD P&DC, MD | 9,603 |
| 55 | 23030 | CM | Richmond P&DC, VA | 9,010 |
| 12 | 28036 | CM | Charlotte P&DC, NC | 2,564 |
| 13 | 28057 | CM | Charlotte P&DC, NC | 3,714 |
| 57 | 32757 | SA | Orlando P&DC, FL | 10,498 |
| 58 | 33030 | SA | Miami P&DC, FL | 9,083 |
| 59 | 33034 | SA | Miami P&DC, FL | 3,962 |
| 60 | 33038 | SA | Miami P&DC, FL | 4,246 |
| 61 | 33042 | SA | Miami P&DC, FL | 4,318 |
| 62 | 33043 | SA | Miami P&DC, FL | 4,343 |
| 63 | 33048 | SA | Miami P&DC, FL | 4,870 |
| 64 | 33051 | SA | Miami P&DC, FL | 4,547 |
| 65 | 33430 | SA | West Palm Beach P&DC, FL | 4,826 |
| 66 | 33443 | SA | West Palm Beach P&DC, FL | 11,495 |
| 106 | 43491 | EA | Toledo P&DC | 39,053 |
| 67 | 44028 | EA | Cleveland P&DC, OH | 16,147 |
| 68 | 44246 | EA | Akron P&DC, OH | 9,506 |
| 69 | 44636 | EA | Canton P&DC, OH | 8,108 |
| 100 | 48010 | GL | Michigan Metroplex P&DC, MI | 9,962 |
| 102 | 48018 | GL | Michigan Metroplex P&DC, MI | 27,636 |
| 99 | 48067 | GL | Michigan Metroplex P&DC, MI | 3,119 |
| 85 | 48090 | GL | Michigan Metroplex P&DC, MI | 7,514 |
| 101 | 48130 | GL | Detroit P&DC, MI | 42,491 |
| 56 | 48162 | GL | Detroit P&DC, MI | 21,360 |
| 70 | 66393 | WA | Kansas City NDC, KS | 13,459 |
| 14 | 76090 | SA | Dallas NDC, TX | 8,281 |
| 15 | 89036 | WA | Las Vegas P&DC, NV | 4,124 |
| 16 | 89042 | WA | Las Vegas P&DC, NV | 3,279 |
| 17 | 89044 | WA | Las Vegas P&DC, NV | 3,081 |
| 71 | 90092 | PA | Los Angeles NDC | 21,829 |
| 72 | 90093 | PA | Los Angeles NDC | 12,713 |
| 18 | 90198 | PA | Los Angeles NDC CA | 18,294 |
| 73 | 90731 | PA | Los Angeles P&DC, CA | 8,840 |
| 74 | 90734 | PA | Los Angeles P&DC, CA | 4,615 |
| 19 | 91716 | PA | Industry, CA P&DC | 4,807 |

HCR Contracts

| | Route | Area | Site Name | Annual Hours |
|---|---|---|---|---|
| 20 | 91730 | PA | Industry, CA P&DC | 12,106 |
| 21 | 91732 | PA | Industry, CA P&DC | 60,010 |
| 22 | 91733 | PA | Industry, CA P&DC | 6,809 |
| 23 | 91734 | PA | Industry, CA P&DC | 6,876 |
| 24 | 91762 | PA | Industry, CA P&DC | 8,188 |
| 25 | 92012 | PA | Margret Sellers, CA | 4,596 |
| 26 | 92311 | PA | San Bernardino P&DC, CA | 8,459 |
| 75 | 92335 | PA | San Bernardino P&DC, CA | 11,858 |
| 76 | 92350 | PA | San Bernardino P&DC, CA | 22,060 |
| 27 | 92352 | PA | San Bernardino P&DC, CA | 9,914 |
| 77 | 92616 | PA | Santa Ana P&DC, CA | 9,741 |
| 28 | 94895 | PA | San Jose,CA P&DC | 7,043 |
| 78 | 95032 | PA | San Jose,CA P&DC | 7,774 |
| 79 | 95034 | PA | San Jose,CA P&DC | 11,197 |
| 29 | 95612 | PA | Sacramento P&DC, CA | 13,671 |
| 30 | 97032 | WA | Portland P&DC, OR | 11,383 |
| 49 | 98337 | WA | Tacoma P&DC, WA | 3,145 |
| 51 | 010B0 | NE | GMF Dock, CT | 5,377 |
| 105 | 018L4 | NE | Boston P&DC | 14,535 |
| 110 | 018M5 | NE | Middlesex-Essex P&DC | 3,050 |
| 31 | 061BQ | NE | Newington (Data Mail Inc), CT | 2,301 |
| 2 | 06432 | NE | Southern CT P&DC, CT | 3,006 |
| 3 | 06444 | NE | Southern CT P&DC, CT | 4,171 |
| 80 | 070U7 | NE | NJ NDC | 14,023 |
| 81 | 070U9 | NE | NJ NDC | 8,975 |
| 82 | 070V1 | NE | NJ NDC | 19,261 |
| 32 | 102AQ | NE | New Jersey Int'l NDC, NJ | 1,584 |
| 109 | 112U0 | NE | Brooklyn P&DC | 29,342 |
| 83 | 144VJ | EA | Northwest Rochester P&DC, NY | 9,070 |
| 84 | 144YJ | EA | Northwest Rochester P&DC, NY | 7,701 |
| 33 | 194L1 | EA | Philadelphia P&DC | 2,218 |
| 34 | 194L4 | EA | Delaware P&DC | 17,975 |
| 35 | 194L6 | EA | Southeastern P&DC, PA | 3,514 |
| 8 | 197M6 | EA | Delaware P&DC | 12,431 |
| 86 | 275N4 | CM | Raleigh P&DC, NC | 7,918 |
| 87 | 275P9 | CM | Raleigh P&DC, NC | 8,845 |
| 88 | 277L0 | CM | Raleigh P&DC, NC | 12,723 |
| 89 | 330L0 | SA | Miami P&DC, FL | 7,387 |
| 90 | 330L3 | SA | Miami P&DC, FL | 11,652 |
| 91 | 330L4 | SA | Miami P&DC, FL | 23,189 |
| 92 | 330L7 | SA | Miami P&DC, FL | 9,928 |
| 107 | 331AJ | SA | Royal Palm, FL | 85,704 |
| 108 | 331N3 | SA | Royal Palm, FL | 40,349 |
| 93 | 332L1 | SA | Miami P&DC, FL | 8,365 |
| 95 | 440N3 | EA | Cleveland P&DC, OH | 10,227 |
| 96 | 440N4 | EA | Cleveland P&DC, OH | 7,281 |

|  | Route | Area | Site Name | Annual Hours |
|---|---|---|---|---|
| 97 | 442L7 | EA | Akron P&DC, OH | 18,843 |
| 98 | 442M0 | EA | Akron P&DC, OH | 7,101 |
| 36 | 550DA | WA | St. Paul P&DC, MN | 24,252 |
| 37 | 553DA | WA | Minneapolis P&DC, MN | 20,473 |
| 94 | 606JK | GL | Chicago ISC, IL | 3,068 |
| 38 | 680N9 | WA | Omaha P&DC, NE | 4,542 |
| 39 | 760M2 | SA | Fort Worth P&DC, TX | 2,767 |
| 40 | 890AD | WA | Las Vegas P&DC, NV | 24,858 |
| 41 | 890L0 | WA | Las Vegas P&DC, NV | 7,407 |
| 42 | 890L7 | WA | Las Vegas P&DC, NV | 4,090 |
| 43 | 926L1 | PA | Santa Ana P&DC, CA | 2,841 |
| 44 | 926L6 | PA | Santa Ana P&DC, CA | 2,549 |
| 103 | 928L4 | PA | Anaheim P&DF, CA | 10,760 |
| 45 | 950L0 | PA | San Jose,CA P&DC | 1,278 |
| 46 | 956L1 | PA | Sacramento P&DC, CA | 2,691 |
| 47 | 967L1 | PA | Honolulu P&DC, HI | 3,549 |
| 48 | 970M2 | WA | Portland P&DC, OR | 17,316 |
| 50 | 983L1 | WA | Tacoma P&DC, WA | 3,141 |
| 111 | **Total** | | | **1,210,943** |